BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP
DAVID R. STICKNEY   (Bar No. 188574)
(davids@blbglaw.com)
MATTHEW P. SIBEN   (Bar No. 223279)
matthews@blbglaw.com
12481 High Bluff Drive, Suite 300
San Diego, CA  92130
Tel:     (858) 793-0070
Fax:     (858) 793-0323
        -and-
CHAD JOHNSON
(chad@blbglaw.com)
1285 Avenue of the Americas
New York, NY  10019
Tel:     (212) 554-1400
Fax:     (212) 554-1444

*Attorneys for Lead Plaintiff Arkansas*
*Teacher Retirement System and*
*Lead Counsel for the Class*

## UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ATLAS and GAIL ATLAS, Individually and On Behalf of All Others Similarly Situated,<br><br>        Plaintiffs,<br><br>    vs.<br><br>ACCREDITED HOME LENDERS HOLDING CO.; JAMES KONRATH; JOSEPH J. LYDON; STUART D. MARVIN; JOHN S. BUCHANAN; DAVID E. HERTZEL; and JEFFREY W. CRAWFORD;<br><br>        Defendants. | Case No. 3:07-cv-00488-H-RBB<br><br>**CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

# **TABLE OF CONTENTS**

Page

I.    OVERVIEW ..........................................................................................................1

II.   FIRST AND SECOND CLAIMS FOR RELIEF -- For
      Violations Of Sections 10(b) And 20(a) Of The Exchange
      Act And Rule 10b-5 Against Defendants Accredited, The
      REIT, Konrath, Lydon, Buchanan, Marvin And Crawford ................................2

      A.    INTRODUCTION ..................................................................................2

      B.    JURISDICTION AND VENUE ...........................................................5

      C.    THE PARTIES......................................................................................6

      D.    Defendants' Fraudulent Scheme ........................................................10

            1.    Background ...............................................................................10

            2.    The Sub-Prime Mortgage Industry Boom
                  And Background On The Industry..............................................12

            3.    Accredited Secretly Abandons Its Stated
                  Underwriting Standards To Grow The
                  Volume Of Its Business .............................................................13

                  a.    Accredited Acquires Aames ...........................................23

                  b.    The Individual Defendants Closely Monitored
                        Accredited's Loan Originations......................................25

            4.    Defendants' Violations of Accounting Rules
                  and Regulations..........................................................................27

                  a.    Defendants' Manipulation Of Earnings By
                        Inadequately Reserving For Defaults On Mortgage
                        Loans Held By The Company For Investment .............28

                  b.    Defendants' Manipulation Of Earnings By
                        Inadequately Reserving For Real Estate Owned .........32

                  c.    Defendants' Manipulation Of Earnings By
                        Inadequately Reserving For Repurchase Losses On
                        Mortgage Loans Sold To Third Party Investors .........35

                  d.    Net Effect of Defendants' Manipulation Of
                        Reserves ........................................................................40

                  e.    Defendants' Manipulation Of Earnings And Its
                        Balance Sheet By Not Properly Accounting For The
                        Aames Acquisition........................................................41

5.    The REIT's And Accredited's Collapse And Near Bankruptcy Resulting From Defendants' Concealment Of The Company's True Financial Condition And Its Undisclosed Contingent Liabilities ......................43

E.    Defendants' False And Misleading Statements ........................49

    1.    Defendants' Statements Before The Class Period ......................49

    2.    Defendants' Statements During The Class Period, Before Investors Begin To Learn The Truth ......................50

    3.    The Marketplace Begins To Learn The Truth Concerning Accredited But Defendants Continue To Make False And Misleading Statements ......................74

F.    Post-Class Period Events ......................92

G.    Loss Causation ......................98

H.    Presumption Of Reliance ......................100

I.    No Safe Harbor Protection ......................101

III.    THIRD CLAIM FOR RELIEF – For Violations Of Section 14(a) Of The Exchange Act And Rule 14a-9 Promulgated Thereunder Against Defendants Accredited, Konrath, Lydon, Gunderson, Pratt, Erickson, Espy, Berglund And Marvin ......................106

IV.    FOURTH AND FIFTH CLAIMS FOR RELIEF – For Violations Of Sections 11 And 15 Of The Securities Act Against Defendants Accredited, Konrath, Lydon, Gunderson, Pratt, Erickson, Espy, And Berglund ......................109

A.    Jurisdiction And Venue......................110

B.    The Parties ......................111

C.    Background ......................114

D.    The Registration Statement......................120

V.    SIXTH AND SEVENTH CLAIMS FOR RELIEF – For Violations Of Sections 12(a)(2) And 15 Of The Securities Act Against Defendants Accredited, Konrath, Lydon, Gunderson, Pratt, Erickson, Espy, Berglund And Marvin......................126

VI.    CLASS ACTION ALLEGATIONS – APPLICABLE TO ALL CLAIMS......................127

VII.    PRAYER FOR RELIEF – APPLICABLE TO ALL
        CLAIMS ....................................................................................................129

VIII.   JURY DEMAND – APPLICABLE TO ALL CLAIMS...................................130

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Court-appointed Lead Plaintiff, the Arkansas Teacher Retirement System ("ATRS" or "Lead Plaintiff"), brings this federal securities law class action on behalf of itself and all other persons and entities (other than defendants and their affiliates, as specified below) who purchased or acquired the securities of Accredited Home Lenders Holding Co. ("Accredited" or the "Company" or "LEND"), including its subsidiary Accredited Preferred Securities Trust I and its publicly traded subsidiary Accredited Mortgage Loan REIT Trust (the "REIT"), between November 1, 2005 and March 12, 2007 (the "Class Period"), and who were damaged by the conduct asserted herein.

I.  <u>OVERVIEW</u>

The Consolidated Amended Complaint for Violations of the Federal Securities Laws (the "Complaint") alleges seven separate claims for relief:

- Claims One and Two allege claims against defendants Accredited, the REIT (as defined herein), James A. Konrath, Joseph J. Lydon, John S. Buchanan, Stuart D. Marvin and Jeff W. Crawford for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a) and 78t-1, and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

- Claim Three alleges that defendants Accredited, Konrath, Lydon, Jody A. Gunderson, Richard T. Pratt, Gary M. Erickson, Bowers W. Espy, James H. Berglund and Marvin violated Section 14(a) of the Exchange Act and SEC Rule 14a-9. Claim Three asserts that the Joint Proxy/Prospectus contained untrue statements of material fact or omitted material facts required to be stated therein or necessary to make the statements therein not misleading.

- Claim Three incorporates by reference the allegations set forth in Claims One and Two. Claims One, Two and Three are set out in ¶¶1-343, 414-421 of the Complaint.

- Claims Four, Five, Six and Seven allege claims against defendants Accredited, Konrath, Lydon, Gunderson, Pratt, Erickson, Espy and Berglund for violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2) and 77o. These claims are set forth in ¶¶344-421 of the Complaint. Claims Four, Five, Six and Seven arise under the Securities Act and are predicated on a Registration Statement that contained untrue statements of material fact or omitted material facts required to be stated therein or necessary to make the statements therein not misleading. Because Claims Four, Five, Six and Seven are not based upon fraud, these Claims are separate from and do not incorporate the allegations of Claims One, Two or Three.

II.    **FIRST AND SECOND CLAIMS FOR RELIEF  -- For Violations Of Sections 10(b) And 20(a) Of The Exchange Act And Rule 10b-5 Against Defendants Accredited, The REIT, Konrath, Lydon, Buchanan, Marvin And Crawford**

A.    INTRODUCTION

1.    Accredited is a sub-prime lender.  Prior to and during the Class Period, Accredited provided mortgages to persons who otherwise would not qualify for such loans in the conventional market because of poor creditworthiness, the absence of income documentation, high loan-to-value ratios, or other risk factors.

2.    In the years prior to the Class Period, Accredited reported increasing loan originations.  The Company's reported net income similarly grew, increasing from just $28.8 million in 2002 to $155.4 million in 2005.  As a result, the Company's stock price also increased, trading as high as $58 in May 2006 compared to $7 in 2003.

3.    Accredited was supposed to be better than its peers at reducing the risks of sub-prime lending:  more conservative; dedicated to disciplined and sustainable growth; committed to strict underwriting policies developed from decades of experience; infused with an overarching goal to produce high quality loans.  Defendants repeatedly emphasized these themes in their public statements.

4.    For instance, Accredited's Form 10-K for 2005, filed with the SEC on March 16, 2006, purports to explain the Company's underwriting process and the Company's focus on disciplined growth and originating loans of high credit quality:

> We originate loans primarily based upon the borrower's willingness and ability to repay the loan and the adequacy of the collateral.  Our experienced management team has developed incentive programs, technology tools and business processes that focus our employees on originating non-prime mortgage loans with the financial and other characteristics that generate profits for us. We believe that this business approach has contributed to our disciplined growth in both origination volume and profits.

> *    *    *

> We believe that our commitment to originating high-quality loans strengthens our relationships with warehouse line providers, whole loan purchasers, rating agencies and others with whom we do business.

> *    *    *

We believe these strengths enable us to originate better-performing, non-prime loans, and grow a more profitable, more conservatively managed company than many of our competitors.

5.     Similarly, in a letter to shareholders included in the Company's annual report, defendants Lydon and Konrath wrote:

The quality of the portfolio is another focus at Accredited that will continue to differentiate us.

*     *     *

This unique approach enables us to constantly track the factors that impact portfolio quality, maintain an "early warning system" to spot problems in the portfolio, and implement the changes necessary to fix those problems in order to maintain superior portfolio quality.

6.     In truth, however, defendants engaged in a fraudulent scheme to artificially inflate the Company's loan volume and reported earnings by purposefully disregarding the Company's underwriting policies and procedures.  While this scheme had the short-term effect of enabling defendants to inflate the Company's reported financial results, it also put the Company at great, undisclosed risk.  In originating these risky loans, the Company violated the representations and warranties that the Company had made when the Company sold and/or securitized the loans.  When borrowers defaulted, the purchasers of the Company's loans discovered the Company had violated its representations and warranties.  The Company, not the purchasers, was forced to shoulder the burden of the losses.

7.     The defendants artificially inflated the Company's reported income by manipulating the Company's reserves for bad loans in violation of Generally Accepted Accounting Principles ("GAAP").  These manipulations of reserves inflated the Company's pre-tax income by no less than $631.66 million during the Class Period.  Additionally, the Company overstated income by $142.4 million in the fourth quarter of 2006 by improperly accounting for its acquisition of Aames Investment Corporation ("Aames").  Thus, during the Class Period, defendants fraudulently caused the Company to overstate income by $774.06 million.

8.     According to a former Accredited Corporate Underwriter – whose testimonial is corroborated by that of numerous other former employees – the Company's underwriting policies were not followed as defendants publicly claimed: "The problem with the whole system

was the overrides. The overrides were rampant, especially during the last few days of each month when they wanted to ramp up production. During those last few days of the month it was balls to the wall to get loans approved. ***If the borrower breathed, he got the loan***."[1]

9. The Company's management constantly overrode the decisions of its appraisers – inflating appraisals to allow borrowers to qualify for loans under the Company's stated underwriting policies for loan-to-value ratios. According to the Company's former Chief Appraiser: "As of June 2006, between 12% and 15% of our business was being done through management overrides."

10. According to the Company's own filings with the SEC, each month the Company performed an extensive re-underwriting of a random sampling of the loans originated by the Company with the results reported to, among others, defendants Konrath, Lydon, and Crawford. The Company's own software also specifically tracked – and made available to defendants at all times – high risk loans that were approved over the decision of an underwriter to reject the application because the loan did not comply with Company underwriting policy. Former employees confirm that the Individual Defendants received these and other monthly reports detailing numerous facets of the Company's loan portfolio, as set forth in more detail herein.

11. Defendants also knew about the rampant overrides of appraisals. Accredited had a custom-built appraisal review and tracking system that tracked management overrides of appraisers' decisions. Defendant Crawford received a report each month specifically detailing the amount of appraisal overrides in the prior month. This was done because inflation of appraisals became a huge problem for the Company. When loans defaulted, the Company was forced to buy back loans with inflated appraisals. It was a "major issue," according to the former Chief Appraiser at the Company.

12. By the end of the Class Period, the market started to learn the truth of the Company's financial health through reports of skyrocketing default rates and repurchase requirements and a severely diminished valuation of the Company's loan portfolio. Investors no

---

[1] Throughout, emphasis has been added, unless otherwise indicated.

longer believed management's exhortations that the Company was dedicated to credit quality and conservative, disciplined growth. As one analyst put it, "in order for investors to remain comfortable owning a subprime mortgage company, management credibility is paramount." "[W]e believe [Accredited's] management has lost credibility."

13. After the Class Period, on August 2, 2007, the Company belatedly filed with the SEC its Form 10-K for 2006. In the Form 10-K, which the Company filed 4.5 months late, the Company admitted that certain of the defendants' Class Period statements had been false, including the Company's reported income in 2006. In the Form 10-K, the Company substantially increased reserves for bad loans as of December 31, 2006, which defendants had understated during the Class Period in order to manipulate the Company's reported earnings. Moreover, the Company disclosed for the first time that the amount of delinquencies in its mortgage loan portfolio held for investment had increased to $316.3 million from only $136.8 million in the prior quarter and $71.3 million in the prior year. Furthermore, the Company admits in the Form 10-K that it had improperly accounted for the acquisition of Aames, resulting in a $142.4 million overstatement of the Company's previously reported income. As set forth further herein, these disclosures after the Class Period demonstrate that certain of defendants' statements during the Class Period were false and misleading.

14. Defendants' scheme artificially inflated the price of the Company's stock. As a result of multiple disclosures concerning the true financial condition of the Company, the artificial inflation in the price for the Company's securities was removed. The Company's stock closed at only $3.97 per share on the day after the Class Period, after having traded at over $50 for much of the Class Period.

B.   JURISDICTION AND VENUE

15. This Claim arises under Sections 10(b), 20(a) and 14(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a) and 78n(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5") and SEC Rule 14a-9, 17 C.F.R. § 240.141-9 ("Rule 14a-9").

16. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

17. Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa. At all relevant times, Accredited maintained its headquarters and principal place of business in this District. Many of the acts and transactions that constitute the violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

18. In connection with the acts alleged in the Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of national securities exchanges.

C. THE PARTIES

**Plaintiffs**

19. Court-appointed Lead Plaintiff, the Arkansas Teacher Retirement System ("ATRS" or "Lead Plaintiff"), was established in 1937 to provide retirement benefits to the employees of the state's education community. For the fiscal year ending June 30, 2006, ATRS's total assets equaled $11.27 billion with 85,916 active members and 24,050 retirees receiving benefits through the system. During the Class Period, ATRS purchased Accredited common stock. As a result of these purchases and the violations of the securities laws alleged herein, ATRS suffered substantial damages. On June 25, 2007, the Court appointed ATRS as Lead Plaintiff in this litigation.

20. Plaintiff William F. Kornfeld ("Kornfeld") acquired 561 shares of Accredited common stock in exchange for 6,000 shares of Aames common stock pursuant to Accredited's acquisition of Aames and, as a result, and because of the violations of the securities laws alleged herein, Kornfeld suffered substantial damages.

**Defendants**

21.     Accredited Home Lenders Holding Co. ("Accredited" or the "Company" or "LEND") is a mortgage banking company operating throughout the United States and in Canada. The Company originates, finances, securitizes, services and sells sub-prime (a/k/a non-prime) mortgage loans secured by residential real estate. Accredited focuses on borrowers who may not qualify for loans from traditional banking entities because of higher loan-to-value ratios, the nature or absence of income documentation, limited credit histories, high levels of consumer debt, or past credit difficulties.

22.     Accredited Mortgage Loan REIT Trust (the "REIT") is an indirect subsidiary of Accredited and Accredited Home Lenders, Inc. ("AHL"). AHL is a wholly owned subsidiary of Accredited. The REIT was formed on May 4, 2004 as a Maryland real estate investment trust. The REIT engages in the business of acquiring, holding, financing, and securitizing non-prime mortgage loans secured by residential real estate. Generally, the REIT acquires mortgage assets and assumes related funding obligations from AHL, which are accounted for at AHL's carrying value, as contributions of capital from AHL. These mortgage assets consist primarily of residential mortgage loans, or interests in these mortgage loans, that have been originated or acquired by AHL. All of the outstanding common shares of the REIT are held by AHL. AHL is excluded from the Class. The REIT also issued preferred stock to the general public that is traded on the New York Stock Exchange. Purchasers of the REIT preferred stock are members of the proposed Class.

23.     James A. Konrath ("Konrath") is a founder of the Company and was at all relevant times Chairman of the Board and Chief Executive Officer of Accredited and part of its Executive Management. In this capacity, Konrath signed certain of the Company's false and misleading filings with the SEC (including the 2005 Form 10-K), participated in drafting and/or approved the Company's false and misleading press releases, met with analysts and media to discuss the Company, and participated in the Company's conference calls with analysts and investors. Prior to founding Accredited, Mr. Konrath was the President and Chief Executive Officer of Security Pacific Financial Services, Inc., where he managed over 1,900 people in more

than 300 consumer finance offices, from 1986 to 1989. From 1983 to 1986, Mr. Konrath was the President and Chief Executive Officer of Security Pacific Housing Services, where he founded a new subsidiary focused on manufactured housing loans. Mr. Konrath earned a Bachelor of Arts degree in Accounting with a minor in Economics from the University of Wisconsin—Whitewater in 1969. Defendant Konrath also served as CEO and Chairman of the REIT during the Class Period and signed SEC filings on behalf of the REIT.

24. Joseph J. Lydon ("Lydon") was at all relevant times President and Chief Operating Officer of Accredited and served on the Company's Board of Directors and part of the Company's Executive Management. In this capacity, Lydon signed certain of the Company's false and misleading filings with the SEC (including the 2005 Form 10-K), participated in drafting and/or approved the Company's false and misleading press releases and participated in the Company's conference calls with analysts and investors. Mr. Lydon is a veteran of more than two decades in the mortgage banking industry, having joined Accredited in 1997 from Ford Consumer Finance, a division of The Associates First Capital Corporation, where he served as Executive Vice President for the western division from 1993 to 1997. From 1977 to 1993, Mr. Lydon worked at Security Pacific Financial Services, Inc., rising to the level of Senior Vice President in charge of six operating divisions. Mr. Lydon earned a Bachelor of Science degree in Management from Pepperdine University in 1991. Defendant Lydon also served as President and Chief Operating Officer of the REIT during the Class Period.

25. Stuart D. Marvin ("Marvin") was at all relevant times Executive Vice President of Accredited and labeled by the Company as part of its Executive Management. In this capacity, Marvin spoke at investor conferences, approved certain of the Company's false and misleading filings with the SEC, participated in drafting and/or approved the Company's false and misleading press releases and participated in the Company's conference calls with analysts and investors. Mr. Marvin joined Accredited in April 2005 and oversees Finance, Capital Markets and Corporate Communications. Mr. Marvin has over 23 years of experience in the financial services and non-prime mortgage industry. Prior to joining Accredited, he was President, Corporate Operations and Chief Financial Officer for Aegis Mortgage Corporation and a partner

at PriceWaterhouseCoopers, LLP focusing on mortgage banking and financial institutions. Mr. Marvin is a Certified Public Accountant and earned a Bachelor of Science degree with honors in Accounting from Jacksonville (FL) University (1982). Mr. Marvin also served as Executive Vice President and Secretary of the REIT during the Class Period and signed SEC filings on behalf of the REIT.

26. John S. Buchanan ("Buchanan") was at all relevant times Chief Financial Officer of Accredited. As Accredited's CFO, Buchanan signed certain of the Company's false and misleading filings with the SEC (including the 2005 Form 10-K), participated in drafting and/or approved the Company's false and misleading press releases and participated in the Company's conference calls with analysts and investors. Prior to joining Accredited, Mr. Buchanan was Controller of GreenPoint Credit, a non-prime consumer finance entity, from 1998 to 2001, where he was responsible for accounting, planning, financial analysis, cash management, and facilities. From 1992 to 1998, Mr. Buchanan was Senior Vice President and Chief Financial Officer of GreenPoint Credit's predecessor, BankAmerica Housing Services. From 1981 to 1990, Mr. Buchanan worked for Security Pacific Financial Services, Inc., where he became Vice President of Financial Planning and Analysis. Mr. Buchanan earned a Bachelor of Science degree in Business in 1978 from San Diego State University. Defendant Buchanan also served as CFO of the REIT during the Class Period and signed SEC filings on behalf of the REIT.

27. Jeff W. Crawford ("Crawford") was at all relevant times Director of Operations at Accredited. During the Company's annual investor conference on September 27, 2006, Crawford described his job as follows:

> As Director of Operations, I oversee directly our underwriting and loan fulfillment functions through each of our originations channels. And at the same time I'm responsible for our servicing platform and our portfolio performance. So that puts me in a position to have clear visibility into all of the moving parts and effects what's necessary on the front lines in the credit risk assessment component in response to what we're observing in the performance of the portfolio.

As the Company's Director of Operations, Crawford participated in drafting and/or approved the Company's false and misleading press releases and SEC filings and participated in certain of the Company's meetings with analysts and investors.

28.     Defendants Konrath, Lydon, Marvin, Buchanan and Crawford are collectively referred to herein as the "Individual Defendants."

29.     In addition to their normal salary, the Individual Defendants stood to receive bonus and stock compensation as follows contingent upon the Company obtaining certain net income levels:

| Net Income After Tax | | Potential Award (Pct. of base salary) | |
|---|---|---|---|
| Dollars (in millions) | Percentage of 2006 Operating Plan | Cash | Stock Award |
| $105.2 | 60% | 25% | 0% |
| $131.6 | 75% | 67% | 0% |
| $175.4 | 100% | 125% | 140% |
| $192.9 | 110% | 125% | 170% |
| $210.5 | 120% | 125% | 200% |
| $228.0 | 130% | 125% | 225% |
| $245.6 | 140% | 125% | 245% |
| $263.1 | 150% | 125% | 260% |
| $280.6 | 160% | 125% | 275% |

D.     Defendants' Fraudulent Scheme

1.     Background

30.     Defendant Konrath founded Accredited in 1990 in San Diego. In 2003, the Company became public.

31.     Like many sub-prime lenders, Accredited operated via two principle units, retail and wholesale. The wholesale unit operated through 15 division offices throughout the United States and in Canada and originated loans through a network of mortgage brokers. The retail division included numerous offices throughout the United States and originated loans directly to borrowers.

32.     Loan "origination" is the process by which a lender obtains new loans. This includes: qualifying borrowers; appraising collateral; processing documents; loan underwriting; funding of the loan and recording the debt onto title.

33.     "Underwriting" is the credit analysis preceding the granting of a loan, based on credit information furnished by the borrower, such as employment history, salary, and financial

statements; publicly available information, such as the borrower's credit history, which is detailed in a credit report; and the lender's evaluation of the borrower's credit needs and ability to pay.

34. To fund loans that the Company originated, the Company maintained credit facilities with warehouse lenders. Generally speaking, warehouse lenders are commercial banks or other corporate entities that lend money to a mortgage bank, such as Accredited, so that the mortgage bank can cover the mortgage loans it extends to home buyers. Thus, the Company could borrow from these credit facilities to fund loans originated by the Company, and the loans originated by Accredited would serve as collateral for the debt incurred under the credit facility. When loans serving as collateral lose value, the Company's warehouse lenders make a margin call that requires the Company to pay cash back to the warehouse lender.

35. After originating a loan, Accredited would generally do one of two things with the loan. The loan would either be securitized or it would be sold. Once loans were sold or securitized, the proceeds would be used to pay off the debt incurred under the credit facilities.

36. Securitization is a form of structured finance in which pools of loans are packaged and sold to an independent entity, which raises money to finance the purchase by issuing notes or some other security backed by the pool of loans. The Company describes its securitizations in its Form 10-K as follows:

> In a securitization, we may sell or transfer a pool of loans to a trust and retain a residual interest for the right to receive future cash flow. The trust raises the cash purchase price of the loan pool by selling asset-backed securities, or notes, representing senior interests in the loans. The purchasers of these interests receive the principal collected on the loans plus a fixed or adjustable interest rate as stated in the particular note. The residual interest we retain entitles us to receive the interest income generated on the principal amount of the loans in the trust minus the interest paid to the purchasers of the loan interests, servicing, trust and other fees and losses on the loans, provided that certain overcollateralization requirements are met. Depending upon the structure of the asset-backed securities and the performance of the underlying mortgage loans, excess cash flow may not begin to be distributed to us for 12 months or more. As a result of the overcollateralization and certain other credit enhancement features, the trust is able to issue investment-grade, asset-backed securities.

37. Accredited provided purchasers of its mortgage loans with representations and warranties regarding the underwriting standards the Company followed in originating the loans. If a purchaser of the mortgage loans determined that Accredited violated its representations and

warranties OR a borrower defaulted during the early months of the loan, the purchaser could require Accredited to repurchase the mortgage loan.

38. Throughout the Class Period, Accredited and the Individual Defendants publicly pronounced the Company's commitment to credit quality as part of their corporate culture, called "The Accredited Way." According to defendants, this commitment to credit quality set Accredited apart from other sub-prime lenders.

39. For example, Accredited's website proclaims the Company's commitment to disciplined, profitable growth without sacrificing credit quality in order to inflate the volume of the Company's loan portfolio:

**The Accredited Way**

Corporate culture and integrity are integral to the tight-knit Accredited fabric, where empowerment, leadership, commitment to quality, excellence, and teamwork are more than workplace buzzwords. ***Unlike competitors, Accredited compensates employees on margin, quality, and profit, not volume.***

Key strengths that distinguish us from other non-prime lenders include:

Experienced Management: More than 50 managers and executives have 20+ years of industry experience each. Accredited's three senior executives have a combined total of 80 years of experience in the mortgage industry.

Diversified Approach: Accredited strives to diversify its originations, financing sources, and loan dispositions.

***Profit Culture: Internally, Accredited emphasizes rewarding quality and results, not volume and activity.*** Incentives are based on being able to meet customers' needs profitably and are offered at all levels of the organization. ***The profit culture includes credit disciplines and portfolio quality, as well as strong cost disciplines.***

40. The Company's stated credit discipline and portfolio quality were metrics closely monitored by equity analysts covering the Company prior to and during the Class Period. Such analysts issued influential reports to investors recommending that they buy the Company's securities.

2. The Sub-Prime Mortgage Industry Boom And Background On The Industry

41. In the years before the beginning of the Class Period, Accredited and its main competitors within the sub-prime industry grew at an explosive pace. According to the Federal

Deposit Insurance Corporation, the volume of sub-prime mortgage loans originated in the United States rose more than six-fold to $213 billion in 2002 from just $35 billion in 1994. Industry growth continued unabated in the years leading up to 2006. Sub-prime loans made up 12.75% of the $10.2 trillion mortgage market in 2006, up from 8.5% in 2001.

42.      In the years prior to the Class Period, Accredited grew even faster than the sub-prime industry. The total volume of loans that Accredited originated increased to $12.422 billion in 2004 from just $1.517 billion in 2000, a compound annual growth rate of almost 70%.

| Year | Origination Volume (in $ billions) |
|------|------------------------------------|
| 2000 | $1.517 |
| 2001 | $2.324 |
| 2002 | $4.303 |
| 2003 | $7.958 |
| 2004 | $12.422 |

3.      Accredited Secretly Abandons Its Stated Underwriting Standards To Grow The Volume Of Its Business

43.      With this boom in the sub-prime market as a backdrop, defendants grew Accredited's business into one of the largest sub-prime lenders in the country. Defendants also asserted that the Company could conservatively grow earnings 15% a year over the long run.

44.      At all relevant times, Accredited made money by selling or securitizing the loans it originated. These investors who bought Accredited's loans were enticed by the premium interest rates that could be charged to borrowers in the sub-prime market. Prior to the second half of 2006, investors who bought or participated in securitizations of Accredited's loans only reviewed a very small percentage of the loans being sold or securitized (approximately 2%-3% according to Confidential Witness CW3, *see infra* ¶¶56-57). Default rates were at historic lows as home prices increased. Moreover, Accredited was required to buy back faulty loans from investors if the loans did not comply with the Company's underwriting standards. Within this context, investors buying loans from Accredited did not review 97% to 98% of the loans they bought from Accredited.

45.      In 2005, contrary to their representations to the marketplace, defendants caused the Company's employees to disregard Accredited's stated underwriting guidelines in an effort

to increase the volume of loans that Accredited originated. As detailed below, the exceptions to the Company's policies were so numerous that they became the rule.

46. For a time, the fraudulent scheme was a success. Investors buying loans from Accredited did not closely scrutinize the loans. Loan volume increased, and delinquency and default rates did not immediately skyrocket. Delinquency and default rates lagged behind changes in underwriting policies by approximately six months or more. Defendant Lydon told investors on the Company's February 14, 2007 conference call: "Generally, there's roughly a six-month lag before we see repurchases resulting from the sale of loans." Moreover, borrowers were able to refinance loans rather than defaulting. Thus, as the Company originated more loans and sold (or securitized) those loans to investors, Accredited's earnings increased dramatically. Defendants projected future earnings increases of 15% a year on the basis of the Company's artificially inflated loan volume.

47. However, by the third quarter of 2005, defendants began to falsely inflate Accredited's reported earnings and originate loans that did not conform to the Company's own underwriting guidelines.

48. Confidential Witness 1 ("CW1") was a Corporate Underwriter at Accredited between June 2004 and March 2005. CW1 worked within Accredited's wholesale channel in the St. Petersburg office and reported to Rich Renaud, who reported to Credit Manager Luis Zendejas. As a Corporate Underwriter, CW1's job was to review loan files and accept or deny applications based on the borrower's creditworthiness and Accredited's underwriting guidelines. According to CW1, his underwriting decisions were frequently overridden by managers on the sales side of the business. CW1 noted such loans were tracked internally at the Company, and it was well-known they performed poorly. Moreover, according to CW1, by no later than the early part of 2005, the Company approved risky loans that did not comply with its own underwriting guidelines in an effort to reach monthly production targets. As discussed below, witnesses detail pervasive, widespread exceptions to the Company's underwriting policies and substantial pressures to approve such loans at the end of reporting periods in an effort to meet financial projections.

49.     The Company closely monitored loans that underwriters first denied but which were approved by more senior management, as is detailed further in Section II.D.3.b.  According to CW1 and CW11 (described below), the Company maintained a database (accessible by only Accredited personnel ***and not by purchasers of the Company's loans***) that contained the underwriter's (and others') notes concerning each loan and which documented the reasons underwriters denied specific loans.  According to CW1, a number of loans on which his denial was overridden included explicit notes delineating glaring problems with the loan application such as: (1) the borrower was acting as a "straw borrower" for someone else; (2) employment could not be verified; (3) income claimed on a stated-income loan was way above that which could be possible for the stated job title; and (4) multiple exceptions to Accredited's underwriting guidelines regarding debt-to-income, minimum credit score, loan-to-value, and/or previous employment history.

50.     Confidential Witness 2 ("CW2") worked in Accredited's San Diego office from 1998 until December 2006.  Initially, CW2 held the position of loan underwriter until 2003, when CW2 became a National Sales Manager.  From September 2006 until December 2006, CW2 worked within Loss Mitigation.  National Sales, which was based in San Diego, underwrote loans originated by mortgage brokers across the country.

51.     CW2 was strongly encouraged to "push loans through" and the pressure to approve loans, regardless of quality, was especially bad during the period from mid-2005 until CW2 left at the end of 2006.  According to CW2, "The pressure became so bad, I felt like they were undermining my integrity."

52.     CW2 transferred from the position as National Sales Manger to Loss Mitigation to avoid the pressures to approve bad loans.  In Loss Mitigation, CW2 reported to Tom Cooperstein, a Vice President within Wholesale Production.  Cooperstein, in turn, reported to Jim Voisard, Director of Wholesale Production since September 2004.

53.     CW2 researched and created reports on Accredited's defaulted loans, which included loans ranging from first payment default (FPD) to foreclosure situations.  According to

CW2, Accredited's upper-level management received monthly "profit and loss reports" that showed, among other things, the estimated loss to the entire Company from defaulted loans.

54. According to CW2, Accredited's upper-level management – including defendants – knew about the extensive use of overrides to get loans approved. According to CW2, "They absolutely knew about the degree of overrides. I used to get e-mails from Joe Lydon about what type of crap was going on and the losses we were taking."

55. Like other confidential witnesses, as detailed herein, CW2 expressed that the Company's growing problem with bad loans was attributable to management overrides of the underwriting and appraisal process.

56. Confidential Witness 3 ("CW3") was a Corporate Underwriter at Accredited between August 2003 and February 2006 in Tampa, Florida, who reported to Credit Manager Richard Renaud, who in turn reported to Luis Zendejas. As a Corporate Underwriter, CW3's job was to review loan files to spot any inconsistencies in data or violations of Accredited's lending policies. Like other Confidential Witnesses who acted as underwriters, CW3 witnessed a tremendous decrease in the quality of Accredited's underwriting and, like other confidential witnesses, CW3's decisions to reject loan applications were constantly overridden by Operations Managers and Senior Operations Managers.

57. According to CW3: "The problem with the whole system was the overrides. The overrides were rampant, especially during the last few days of each month when they wanted to ramp up production. During those last few days of the month it was balls to the wall to get loans approved. If the borrower breathed, he got the loan."

58. Confidential Witness 4 ("CW4") was a Regional Manager in the retail lending division of Accredited who worked at the Company from January 2005 through December 2005. CW4 worked in Accredited's largest and most profitable region, Orange County, and supervised six retail branches and over fifty employees. CW4 reported to Divisional Manager of retail lending, Chuck Biggs. Biggs reported to Joseph Rutter, Director of Retail Operations.

59. According to CW4, Accredited was very aggressive in lending to persons with very bad credit. Contrary to defendants' statements to the marketplace, Accredited was just as

reckless as others in the sub-prime space when it came to underwriting risky loans. According to CW4, "We were pretty aggressive in our lending, but it was on par with what the other sub-prime lenders were doing. You could get a loan one day out of bankruptcy. You could get a loan at 100% loan-to-value. We even had a program where you could get a loan at more than 100% loan-to-value."

60.     Notably, according to CW4, the Company's underwriting guidelines were frequently overridden by senior management. Overrides on individual loans were frequently approved by persons as high as the Director of Retail Operations, Joseph Rutter. According to CW4, Rutter and others in senior management approved loans that did not comply with Accredited's underwriting guidelines because in 2005 institutional investors only reviewed a small fraction of the loans that they purchased from Accredited. Because only a small fraction of the loans being purchased were reviewed, Accredited's senior management – according to CW4 – "hoped that the investors wouldn't check the loan file. They sort of slipped it in there. They figured that even if the loan did get caught by the investors, Accredited could always securitize it instead of selling it as a whole loan."

61.     At the end of each month and at the end of financial reporting periods, the Company made increasing exceptions to its underwriting standards to inflate the volume of loans originated in an attempt to meet financial projections. According to CW4, Accredited's lending became especially aggressive towards the end of each month, as the branches were trying to hit their monthly loan volume targets. For example, Accredited's retail branches would even fund loans at the end of a month where the borrower had not yet supplied all of the required documentation. In CW4's own words: "The underwriting was pretty damn aggressive towards the end of the month. That is when they would pull the trigger and start funding lots of things." CW4's account is corroborated by that of CW1 and CW5 (identified below).

62.     Confidential Witness 5 ("CW5") was a Corporate Underwriter at Accredited in San Diego between May 2002 and November 2006. CW5's job was to review, and either approve or deny, applications for sub-prime mortgage loans. When CW5 began working at Accredited, the Company's underwriting procedures were followed and the Company did solid

loans. However, according to CW5, by 2005 the Company's underwriters who reviewed and approved or denied loans were being overridden, frequently resulting in the Company making many loans that did not comply with its own underwriting guidelines. According to CW5, *the number of overrides grew to be so large that, in 2005, the Company was forced to institute a system to track such overrides, which included a box on the loan file that needed to be checked off by an underwriter if the loan was approved "as a business decision" by a higher-level manager over the recommendation of the underwriter to reject the application.*

63. Management at the Company overrode underwriters' decisions to reject bad loans in order to meet its financial forecasts, which were the basis for Wall Street's earnings expectations. According to CW5, whenever the Company was behind in making its projected numbers, upper-level managers would pressure the underwriters to approve loans that did not qualify under the Company's underwriting guidelines. According to CW5: "If we were down and needed to crank up our numbers, upper management would pressure us to approve loans that otherwise would not have been approved. Senior managers would come and beat on my head. We were pressured to approve loans where there was no mitigating value except to get the loan on the books. Some of the loans were not even profitable – the pricing was a giveaway."

64. The problem of originating bad credit-quality loans grew during the Class Period. According to CW5, in the early part of 2006 the Company was increasingly originating "questionable" loans, and underwriters who worked on these loans were being "favored because they produced more loans." Contrary to defendants' public statements, employees had "a great deal of financial incentive to get deals done" and this was especially true after (approximately) August 2006, at which time Accredited changed its compensation scheme so that Account Executives were compensated regardless of loan quality, which increased the origination of non-compliant, bad credit-quality loans.

65. Confidential Witness 6 ("CW6") was an Underwriter and Corporate Underwriter at Accredited in California between March 2001 and December 2006. CW6 began as underwriter and held that position for three years before working for one year in Accredited's IT department. CW6 became a Corporate Underwriter in August 2005, working in San Diego and

reporting to Richard Brooks. CW6 was laid off in December 2006 because, according to CW6, CW6 had been vocal about Accredited's credit quality problems and the extent to which the sales staff was overriding credit decisions made by underwriters.

66. According to CW6, the Company's underwriting and loan quality after August 2005 was much worse than it was earlier before CW6 had worked in the IT department. According to CW6: "Around August 2005 is when I became really aware of how bad it was. When I returned to underwriting, I thought that the loan files were going to look the same as they did before – but they had gotten much worse."

67. According to CW6, corporate underwriters repeatedly tried to challenge loans that were almost certainly bad credits. Yet, each time they challenged a loan, their objections were shot down by credit managers or sales managers, including Susan Englert, Steve Mosteller, and Richard (Rick) Harway. CW6 elaborated: "Over and over again we tried to challenge these loans and were told 'You have to go forward with it.' If you made a big stink about it, they would raise their eyebrows and say, 'Do you want a job?'"

68. According to CW6, salespersons constantly overrode the decisions being made by underwriters. According to CW6, "Giving the salespeople signing authority made appraisal review and corporate underwriting into a laughingstock."

69. Confidential Witness 7 ("CW7") was a Corporate Underwriter at Accredited between June 19, 2000 and March 23, 2007 in the Company's San Diego offices and later in the Company's Austin, Texas office after April 2006. CW7 reviewed document preparation and reviewed loans prior to document preparation and provided guidance on whether loans should be approved or denied. After being transferred to Austin, CW7 managed the funding division of the company's Alt-A lending program, supervising eight employees.[2]

70. According to CW7, the sales side of the California Division was run by Richard Harway, Gregory Salomon and Steve Mosteller who placed enormous pressure on her and other

---

[2] Alternate "A" quality mortgages are loans to borrowers considered low-risk but who cannot satisfy all of the conditions for receiving a prime loan; oftentimes alternate "A" loans are made when a borrower cannot provide all of the documentation required for a prime loan.

underwriters to approve loan files, especially at the end of a month when the Account Executives needed to make their quotas. CW7 explains: "At the end of the month, we were handed loan files and told to just sign them with no audit."

71.     According to CW7, the Company approved many loans of a dubious nature. For instance, according to CW7, inflated income on "stated-income" loans was a most common problem and it was not unusual to see housekeepers who claimed to make $8,000 per month or landscapers who claimed to make $10,000 or $12,000 per month. Inflated property appraisals were another common problem, as were suspicious CPA letters used to verify self-employment, according to CW7.

72.     According to Confidential Witness 8 ("CW8"), Accredited's lending practices were no better during the end of 2006 or early 2007 (despite defendants' statements that the Company was tightening its standards). CW8 was a former Senior Corporate Underwriter and Corporate Auditor at Accredited who worked in Austin, Texas, and reported to Corporate Underwriting Managers Liz Emerson and Will Shipp. CW8 joined the company in December 2006 and was fired in March 2007. CW8 was fired because he was "turning down too many loans." According to CW8, Account Executives (a/k/a/ "AEs") who originated loans made no effort to ensure that they were making quality loans. According to CW8: "The AEs were just trying to make money. As an AE, you could lose your job for not having enough deals. Accredited just wanted to show income; they wanted to show loans coming in. If a loan was turned down in subprime, they tried to make it work in Alt-A. If it was turned down in Alt-A, they tried to make it work in subprime."

73.     Another means by which the defendants were able to grow the volume of total loans originated was by relaxing collateral requirements for loans. This was done by falsifying and/or manipulating property appraisals so they would purport to comply with the Company's underwriting policies.

74.     Confidential Witness 9 ("CW9") was the Chief Appraiser at Accredited for five years between 2002 and June 2007, during which he worked at the Company's headquarters in San Diego and reported to Luis Zendejas, the head of corporate underwriting. CW9 was

involved in the, as he put it, "CSI" type of investigations to show to defendant Crawford how the collateral side of business was affected by the wrong appraisal value decisions made by sales managers that also helped cause loan performance to fail. CW9 also worked with the Capital Markets department in the repurchases of loans bought by Wall Street investors. CW9 also performed many reviews on loans Accredited was forced to repurchase because the Company had violated the representations and warranties it had made to the purchasers of the loans by accepting inflated appraisal values when it originated the loan.

75. According to CW9, Accredited allowed both corporate underwriters and sales managers to override the decisions of licensed property appraisers. In many cases, an appraisal reviewer working for Accredited would reject a loan application after concluding that the appraisal submitted with the application was inflated. According to CW9, the Account Executive who submitted the loan application would become annoyed by the rejection and appeal the decision to a sales manager who then would overturn the appraisal reviewer's decision without any valid justification. According to CW9, overrides of appraisers' decisions were rampant: "As of June 2006, between 12% and 15% of our business was being done through management overrides."

76. According to CW9, during the Class Period Accredited had a custom-built appraisal review and tracking system that was developed by an outside vendor called ACI that tracked all documentation with regard to appraisals – including management overrides of appraisers' decisions.

77. Management override of appraisers' decisions became a huge problem for the Company when loans defaulted. According to CW9, when loans defaulted, the investors who had purchased the loans performed an investigation and often found that the loan had been originated based on an inflated appraisal, which gave the investors a legitimate reason to force Accredited to buy back the defective loan. According to CW9, forced buybacks resulting from inflated appraisals "started in 2005 and became a major issue halfway through 2006."

78. Notably, CW9 sent a report each month to defendant Jeffrey Crawford, Director of Operations at Accredited, entitled: "Appraisal Review Production Report." The Appraisal

Review Production Report included, among other things, summaries of all appraisal reviews including who performed the review, the outcome, ***and whether management had overridden the decision of the appraiser***. According to CW9, the Company's system tracked specifically any manager override activity on a national basis and the monthly Appraisal Review Production Report CW9 distributed to all managers showed how many overrides were performed within each division, and who performed them. The Appraisal Review Production Report, according to CW9, makes it impossible for Accredited's upper-level management to claim they were unaware of issues with regard to the Company's appraisal review process.

79. Confidential Witness 10 ("CW10") corroborates the account of CW9. CW10 was an Appraisal Reviewer for Accredited who worked at one of the Company's regional offices in Florida from July 2005 through June 2006. CW10's job was to review property appraisals submitted with each loan application, and reject those not within a 5% tolerance level of what CW10 believed to be a fair valuation based upon, among other things, information from Accredited's database. According to CW10, he was constantly under pressure to approve appraisals CW10 did not believe to be fair, a practice that bothered CW10 so much CW10 left the Company because of it: "There was a lot of pressure on us to give them the value that they needed to do that loan, and that is why I left Accredited."

80. Similarly, prior to and throughout the Class Period, as detailed in Section II.E., defendants falsely and misleadingly stated that the Company's underwriting policies penalized employees who approved bad loans. According to defendants, the Company prevented poor credit-quality loans from being originated by ensuring that "any loss on the loan is charged back to the origination team." In truth, the Company's policies did not fully "charge back" such losses from the origination of bad loans.

81. According to CW1, managers on the sales side of Accredited's business had strong financial incentives to achieve high loan volumes. Operations Managers could receive a monthly bonus of $10,000 or more based on origination volume. According to CW1, Operations Managers' bonuses were reduced only slightly when Accredited was forced to buy back loans from investors because of underwriting defects or early-payment defaults. According to CW1,

the financial reward that sales managers could earn for originating loans (of any quality) was far greater than the penalties they faced for originating bad loans.

a. Accredited Acquires Aames

82. In May 2005, Accredited announced it would acquire a smaller sub-prime lender, Aames. The deal was valued at $340 million, of which $109 million was paid in cash and the rest in Accredited stock exchanged for Aames's stock at a ratio of 0.07 to 1. The transaction later closed on October 1, 2006. Because of defendants' false and misleading representations, the investing public firmly believed that Accredited's underwriting standards were superior to Aames's underwriting standards. For example, the Joint Proxy Statement and Prospectus issued by Accredited and Aames in connection with the acquisition stated that "Aames's [historic] higher delinquency rate is due to the lower credit quality of its typical borrower as compared to Accredited's." Investors were further led to believe that Accredited's acquisition of Aames would succeed, in part, because Aames's mortgage underwriters would be taught Accredited's disciplined and conservative underwriting procedures. In truth, according to former employees of Aames who then went to work at Accredited, Accredited originated loans to persons with poor credit-quality who were not qualified under the Company's lending policies.

83. Confidential Witness 11 ("CW11") worked at Aames for five years prior to joining Accredited in October 2006 as part of the acquisition. CW11 was the Western Retail Operations Manager at Accredited from October 2006 until March 2007. CW11 was the top credit manager for the Western Division of Accredited's retail lending operations. CW11 reported to H. James Fullen, Director of Retail Production at Accredited, who reported to defendant Crawford. According to CW11, Accredited's lending standards were much more lenient than those at Aames. Aames was willing to make just one exception to its normal underwriting guidelines for each loan. Accredited, by contrast, made multiple exceptions to its lending guidelines on any given loan. According to CW11, "Accredited got very loosey goosey on credit. It was common to see four, five or six exceptions on a loan. At Aames, you got one exception and that was it. At Accredited, they actually pushed making the exceptions."

84.     According to CW11, at Accredited there were about two dozen types of exceptions that could be made on a loan.  These included policy exceptions relating to: verification of employment, debt-to-income ratio, the interest rate on the loan, the margin on the loan, the two-year residence requirement, the two-year employment requirement, loan-to-value guidelines, property appraisal guidelines, and rules relating to the need for the borrower to pay off previously existing debts.

85.     According to CW11, (1) there was a strong pressure to ramp up loan production at the end of each month, when each regional division was trying to reach its volume targets; (2) people on the sales side of Accredited would pressure the corporate underwriters to approve loans that contained several exceptions; and (3) senior sales managers often overrode underwriting decisions made by CW11 and his staff.  According to CW11, "I was frequently overridden on loans that I thought were pieces of crap.  They wanted units and dollar volume and didn't care how they got there."

86.     Confidential Witness 12 ("CW12") was a Senior Underwriter at Accredited from October 2006 through March 2007 in its Irvine office.  CW12 reported to CW11, the Western Retail Operations Manager.  Prior to October 2006, CW12 had worked for Aames for five years.  CW12's job was to review loan files and either approve or deny the loans based on the borrower's creditworthiness and the underwriting guidelines.  While at Accredited, CW12 was frequently pressured by senior managers to make exceptions to the Company's standard underwriting procedures.  According to CW12, "At Accredited, we were told to make exceptions on everything."  Exceptions could be made in many different categories, including FICO score, loan-to-value, debt ratios, previous employment history and mortgage rating, among others.  CW12 witnessed loans being approved with as many as five exceptions.

87.     When CW12 denied loans, CW12's underwriting decisions frequently were overridden by managers on the sales side of Accredited's operations.  However, CW12's comments on each loan were saved within a system that could be viewed by Accredited's capital markets division to help the capital markets unit determine what type of investor would be most

likely to buy the loan. The investors who bought Accredited's loans were not able to see the underwriters' comments.

88. Despite defendants' statements throughout the Class Period that the Company was focused on credit quality and strict underwriting guidelines, according to CW12, *it wasn't until February 2007 that Accredited finally tightened its lending guidelines*. According to CW12, "it was too late by then."

     b.  The Individual Defendants Closely
        Monitored Accredited's Loan Originations

89. Prior to and throughout the Class Period, defendants publicly assured investors that they personally and closely monitored the Company's origination of loans through a rigorous internal controls process. For instance, several of the Company's SEC filings prior to and throughout the Class Period regularly included language similar or identical to this excerpt from a January 23, 2007 Prospectus describing defendants' oversight of loan underwriting:

> *Quality Control*. **Each month, Accredited's internal audit and quality control department generally reviews and re-underwrites a sample of the loans originated by Accredited**. The statistical sample of loans is chosen by random selection and based on the prior defect rates. In addition, targeted reviews are conducted, including but not limited to the following areas: regulatory compliance, non-performing assets, targeted and discretionary reviews, or where fraud is suspected. The quality control department re-underwrites these loans through an in-depth analysis of the following areas: application, income/employment, appraisals, credit decision, program criteria, net tangible benefits, re-verifications, and compliance. Specifically, these tests focus on verifying proper completion of borrower disclosures and other loan documentation, correct processing of all legally required documentation, and compliance with time frames imposed by applicable law. When fraud is suspected, the quality control department undertakes a comprehensive re-underwriting of not only the loan in question, but any related loans connected by broker, appraiser, or other parties to the transaction. ***All findings of the internal audit and quality control department are reported on a regular basis to members of senior management and the audit committee of the board of directors. The <u>Chief Executive Officer</u> and the <u>Chief Operating Officer</u>, along with the Director of Operations and others analyze the results of the monthly internal audit and quality control department audits as well as performance trends and servicing issues.*** Based upon this analysis, corrective actions are taken.

90. Accredited's Form 10-K for 2005 included a very similar disclosure of the Company's internal controls, further clarifying that when the Quality Control department re-

underwrites these loans, it, among other things, "re-verifies the sources of income, re-verifies employment, and reviews the appraisals to ensure collateral values for the loans are supported."

91.    Accredited used sophisticated software that enabled the Company's management, including defendants, to be able to monitor the Company's deviations from underwriting procedures.  Among other things, according to Accredited's own Form 10-K filing with the SEC, the software provided a detailed analysis of each loan originated by the Company including "a comprehensive review of the total credit profile of the borrower and any exceptions made to our credit policies."  The Form 10-K continued: "We use software provided by ProClarity and Informatica to make this information ***readily available to management***."

92.    Defendants closely monitored the numbers and types of exceptions made to the Company's underwriting guidelines.  According to Accredited's Form 10-K filed with the SEC on March 16, 2006:  "To the extent that an individual loan application does not meet our published underwriting guidelines, our loan origination teams and underwriters can make underwriting exceptions. . . .  Loan exceptions are tracked in our data warehouse and the performance of loans with and without exceptions is monitored."  According to confidential witnesses, defendants monitored these loan exceptions reports.

93.    Similarly, according to CW12, CW3 and CW5, Accredited's San Diego headquarters compiled a list of problem loans each month that contained data on loans that investors had refused to buy (oftentimes referred to as the "bump list" or Problem Loan Report or "PLR").  According to the Confidential Witnesses, the PLR or a summary was circulated to senior management including defendants.  The problem loans list showed:  (i) the mortgage broker who referred the problem loan to Accredited, (ii) the Accredited Account Executive who handled that loan, (iii) the underwriter who worked with the Account Executive to assemble the loan paperwork, (iv) the Corporate Underwriter who approved the loan, (v) whether the loan had been approved on a "business decision" basis, meaning that it fell outside Accredited's normal underwriting guidelines, and (vi) if the loan had been approved using an override, it showed who made the override.

94. The problem loans list was also disseminated to the Company's Operations Managers and Senior Credit Managers, including CW12's superior. As a result of increasing problems with problem loans, according to CW12, low-level underwriters were encouraged to document all loans that had been approved through a management override so that the low-level underwriters could avoid blame if those loans soured. This information was also available to senior management, including defendants.

95. According to the Confidential Witnesses, the "bump list" was growing during the Class Period and was a clear indication to defendants of the Company's declining underwriting standards.

96. In the second half of 2006, as delinquencies and defaults increased, so did investors' scrutiny of Accredited's loan portfolios being sold or securitized. Investors uncovered that Accredited had been making loans in seeming disregard for individuals' ability to pay. Under this newly revamped investor scrutiny, defendants were forced to slash their earnings projections going forward and ultimately buy back faulty and/or delinquent loans in massive amounts. As a result, the Company was forced to the brink of bankruptcy and its stock price collapsed.

4. Defendants' Violations of Accounting Rules and Regulations

97. Throughout the Class Period, the Company issued financial statements that were materially misstated and not presented in accordance with GAAP. Defendants Konrath and Buchanan also repeatedly signed sworn certifications regarding Accredited's financial statements and the adequacy of the Company's internal controls, which were materially misleading as these sworn certifications failed to reveal defendants' knowledge of Accredited's violations of GAAP.

98. GAAP are those principles recognized by the accounting profession as conventions, rules and procedures necessary to define accounting practices at a particular time. The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board. SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC which are not

presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

99.    Accredited delayed publishing its audited financial results for year-end 2006 by 4.5 months, filing its results with the SEC after the end of the Class Period on August 2, 2007. An audit, among other things, addresses management's compliance with GAAP.  The Company's auditor during the Class Period, Grant Thornton, LLP, resigned from its position while performing the audit of the Company's 2006 financial results and did not complete its audit.

a.    Defendants' Manipulation Of Earnings By
Inadequately Reserving For Defaults On
Mortgage Loans Held By The Company For Investment

100.    Through its REIT subsidiary, Accredited securitized non-prime mortgage loans originated by AHL.  Generally, the REIT acquired mortgage assets and assumed funding obligations from AHL, which were accounted for at AHL's carrying value, as contributions from AHL.  According to the Company's SEC filings:

> These securitizations are structured legally as sales, but for accounting purposes are treated as financings under SFAS No. 140.  These securitizations do not meet the qualifying special purpose entity criteria under SFAS No. 140 and related interpretations because after the loans are securitized, the securitization trusts may acquire derivatives relating to beneficial interests retained by Accredited and, Accredited, as servicer, subject to applicable contractual provisions, has discretion, consistent with prudent mortgage servicing practices, to determine whether to sell or work out any loans securitized through the securitization trusts that become troubled.  Accordingly, *the loans remain on the balance sheet as "loans held for investment"*, retained interests are not created, and securitization bond financing replaces the warehouse debt or asset backed commercial paper originally associated with the loans held for investment.

101.    SFAS No. 140 requires that loans transferred to a third party that do not qualify for sale treatment for accounting purposes be reflected on the balance sheet as secured borrowings.  Accredited refers to the loans it securitizes as mortgage loans held for investment ("MLIs").

102.    GAAP required Accredited to establish a reserve for potential credit losses on the MLIs when the underlying borrowers default on their obligation to make monthly mortgage payments.  This reserve is an allowance for loan losses or "ALL".

103.   The SEC provided explicit guidance on the proper accounting that Accredited should have followed, but did not.  SEC Staff Accounting Bulletin: No. 102 – Selected Loan Loss Allowance Methodology and Documentation Issues, states in part:

> The staff normally would expect a registrant that engages in lending activities to develop and document a systematic methodology to determine its provision for loan losses and allowance for loan losses as of each financial reporting date.  *It is critical that loan loss allowance methodologies incorporate management's current judgments about the credit quality of the loan portfolio through a disciplined and consistently applied process.*  A registrant's loan loss allowance methodology is influenced by entity-specific factors, such as an entity's size, organizational structure, business environment and strategy, management style, loan portfolio characteristics, loan administration procedures, and management information systems.  However, as indicated in the AICPA Audit and Accounting Guide, *Banks and Savings Institutions* (Audit Guide), "[w]hile different institutions may use different methods, there are certain common elements that should be included in any [loan loss allowance] methodology for it to be effective."  A registrant's loan loss allowance methodology generally should:
>
> • Include a detailed analysis of the loan portfolio, performed on a regular basis;
>
> • Consider all loans (whether on an individual or group basis);
>
> • Identify loans to be evaluated for impairment on an individual basis under SFAS No. 114 and segment the remainder of the portfolio into groups of loans with similar risk characteristics for evaluation and analysis under SFAS No. 5;
>
> • Consider all known relevant internal and external factors that may affect loan collectibility;
>
> • Be applied consistently but, when appropriate, be modified for new factors affecting collectibility;
>
> • Consider the particular risks inherent in different kinds of lending;
>
> • Consider current collateral values (less costs to sell), where applicable;
>
> • Require that analyses, estimates, reviews and other loan loss allowance methodology functions be performed by competent and well-trained personnel;
>
> • Be based on current and reliable data;
>
> • Be well documented, in writing, with clear explanations of the supporting analyses and rationale . . .; and
>
> • Include a systematic and logical method to consolidate the loss estimates and ensure the loan loss allowance balance is recorded in accordance with GAAP.
>
> For many entities engaged in lending activities, *the allowance and provision for loan losses are significant elements of the financial statements*. Therefore, the

staff believes ***it is appropriate for an entity's management to review, on a periodic basis, its methodology for determining its allowance for loan losses***.

104. Accredited did not establish an adequate ALL, violating GAAP and inflating reported net income.

105. According to Accredited's SEC filings, the Company established the amount of the ALL by segmenting the portfolio by contractual delinquency status and then applying Accredited's historical loss experience and other analytical tools to determine the reasonableness of the reserve. Loss estimates were purportedly reviewed periodically and any adjustments were purportedly reported in earnings.

106. Defendants violated GAAP by manipulating and artificially increasing the Company's reported earnings by not recording sufficient or reasonable ALL in light of the fact the Company substantially deviated from its underwriting guidelines in 2005 and 2006 and provided loans to persons with inferior credit quality that could be expected to default, as set forth in Section II.D.3.

107. Because the defendants caused the Company's employees to deviate from the Company's underwriting guidelines when originating loans, the defendants should have substantially increased the Company's ALL during the Class Period. The Company did not do so but, rather, the ALL actually ***decreased*** as a percentage of the Company's delinquent loans.

108. The table below indicates that beginning with the Company's reported financial results for the third quarter of 2005, in every quarter, the Company drastically reduced the amount of its ALL in proportion to the amount of delinquencies the Company was then experiencing. While the amount of MLI was increasing in the Class Period, and the delinquencies were increasing dramatically every quarter, the Company was dramatically reducing the proportion of its ALL relative to the amount of delinquencies:

|  | Mortgage Loans Held for Investment ($ millions) | Allowance for Loan Losses ($ millions) | MLI 90+ Delinquent ($ millions) | % of MLI 90+ Delinquent | ALL as a % of 90+ Delinquent |
|---|---|---|---|---|---|
| 4Q'06 | 8,694.0 | 138.25 | 316.3 | 3.64% | 43.72% |
| 3Q'06 | 7,396.8 | 124.2 | 136.8 | 1.85% | 90.74% |
| 2Q'06 | 7,809.5 | 125.4 | 96.6 | 1.24% | 129.74% |
| 1Q'06 | 7,763.2 | 115.7 | 85.5 | 1.10% | 135.36% |
| 4Q'05 | 7,321.6 | 106.0 | 71.3 | 0.97% | 148.56% |
| 3Q'05 | 5,874.9 | 95.7 | 49.1 | 0.84% | 195.04% |
| 2Q'05 | 5,214.5 | 84.2 | 36.3 | 0.70% | 231.98% |
| 1Q'05 | 4,667.6 | 69.3 | 29.7 | 0.64% | 233.54% |
| 4Q'04 | 4,102 | 60.1 | 22.6 | 0.55% | 265.70% |
| 3Q'04 | 4,084 | 51.3 | 18.5 | 0.45% | 277.45% |
| 2Q'04 | 3,303 | 40.8 | 12.9 | 0.39% | 316.34% |
| 1Q'04 | 2,142.3 | 24.7 | 8.7 | 0.41% | 283.75% |

109.    As the amount of 90+ days delinquent loans increased during the period (from $8.7 million in 1Q'04 to $136.8 million in 3Q'06 to $316.3 million in 4Q'06), the percentage of the allowance for mortgage loans related to delinquent loans decreased dramatically (from 283.75% in 1Q'04 to 90.74% in 3Q'06 to 43.72% in 4Q'06).  The defendants manipulated and artificially inflated the Company's reported income by not taking adequate ALL reserves.

110.    In each of the six quarters prior to the Class Period, the Company maintained its ALL reserve at no less than 232% of the Company's MLI 90+ Days Delinquent.  During the Class Period, the defendants did not.  Because defendants caused the Company to abandon its underwriting guidelines, the ALL reserve should have been increased to more than 232% of the Company's MLI 90+ Days Delinquent during the Class Period.  Even assuming the proper ALL level as a percentage of delinquencies during the Class Period was the historic low of 232% in 2Q05 (it should have been higher because the Company deviated from its underwriting standards during the Class Period), the amount of the ALL understatement – and corresponding manipulation of publicly reported income – is set forth in the table below (all numbers in $ millions):

| | ALL Reserve Actual | Proper ALL Reserve at 232% MLI 90+ Day Delinquencies | ALL Reserve Deficiency | Cumulative Inflation of Reported Income | Quarterly Inflation of Reported Income |
|---|---|---|---|---|---|
| 4Q'06 | 138.25 | 733.7 | 595.455 | 595.455 | 402.161 |
| 3Q'06 | 124.2 | 317.47 | 193.293 | 193.293 | 94.471 |
| 2Q'06 | 125.4 | 224.212 | 98.8 | 98.8 | 16.22 |
| 1Q'06 | 115.7 | 198.3 | 82.6 | 82.6 | 23.06 |
| 4Q'05 | 106.0 | 165.56 | 59.54 | 59.54 | 41.40 |
| 3Q'05 | 95.7 | 113.87 | 18.14 | 18.14 | 18.14 |

111.     As indicated by the above table, the Company understated the ALL by tens of millions of dollars in each quarter and hundreds of millions of dollars by the end of the Class Period.  The understating of the ALL had a dollar-for-dollar impact on the Company's reported pre-tax income during the Class Period.  (The effect on net income would be reduced by the Company's effective tax rate.)  Thus, the Company reported misleading income numbers during each quarter of the Class Period in violation of GAAP.

b.     Defendants' Manipulation Of Earnings By Inadequately Reserving For Real Estate Owned

112.     "REO" is real estate the Company owns as a result of a borrower's default and a subsequent foreclosure by the Company.  Throughout the Class Period, the Company's gross real estate owned grew dramatically.  Despite the fact the Company's gross REO was growing dramatically during the Class Period, defendants manipulated the Company's reported earnings by not increasing the Company's REO reserve proportionately.

113.     During the Class Period, Accredited sold mortgage loans to third parties.  Gains or losses resulting from loan sales were purportedly recognized at the time of sale, based primarily on the difference between the net sales proceeds and the book value of the loans sold.

114.     Accredited provided purchasers of its mortgage loans with representations and warranties regarding the underwriting standards the Company followed in originating the loans. If a purchaser of the mortgage loans determined that Accredited violated its representations and warranties OR a borrower defaulted during the early months of the loan, the purchaser could require Accredited to repurchase the mortgage loan.

115.    As a part of the Company's business, it regularly was required to buy back loans from purchasers of the Company's loan portfolio.  Generally speaking, the Company normally tried to resell repurchased loans in the "scratch and dent" market.  Sales in this market were normally at a loss because repurchased loans are, by their very nature, considered defective and therefore less valuable.  If, however, the Company could not resell its repurchased loans in the "scratch and dent" market and the loan defaulted, the Company would foreclose on the loan and the property serving as collateral for the loan would become part of REO.

116.    The following table demonstrates that in the reporting periods prior to the Class Period, the Company maintained an REO reserve in excess of 40% of its gross REO.  As the gross REO grew, the Company historically increased the REO reserve.  However, beginning with the Company's year-end 2005 financial results, defendants caused the REO reserve to be increased by disproportionately less, clearly understating the Company's second, third and fourth quarter financial results for 2006 (4Q'06 numbers in the table are from the Company's February 14, 2007 press release).  The REO reserve deficiency is the amount the reported reserve would need to be increased to match the Company's historic 40% REO reserve as a percent of gross REO.

| | Gross REO ($ millions) | REO Reserve ($ millions) | Net REO ($ millions) | REO Reserve as a % of Gross REO | REO Reserve Deficiency ($ millions) |
|---|---|---|---|---|---|
| 4Q'04 | 10.53 | 4.41 | 6.12 | 41.85% | |
| 1Q'05 | 14.90 | 6.40 | 8.50 | 42.95% | |
| 2Q'05 | 16.90 | 7.01 | 9.89 | 41.48% | |
| 3Q'05 | 18.51 | 7.96 | 10.55 | 43.00% | |
| 4Q'05 | 26.81 | 10.73 | 16.09 | 40.00% | |
| 1Q'06 | 34.26 | 13.70 | 20.56 | 39.99% | |
| 2Q'06 | 52.62 | 12.78 | 39.84 | 24.29% | 8.27 |
| 3Q'06 | 69.76 | 17.30 | 52.46 | 24.80% | 10.61 |
| 4Q'06 | 116[3] | 27.275[4] | 88.725 | 23.5% | 19.125 |

117.    As indicated in the table, defendants caused the Company to understate the REO reserve in, at least, the June 30, 2006, September 30, 2006 and December 31, 2006 reporting

[3] Excludes Aames REO for consistency, as the Company did in its 4Q'06 press release.

[4] Excludes Aames REO reserve for consistency, as the Company did in its 4Q'06 press release.

periods. The understating of the Company's REO reserve violated GAAP and overstated net increases.

118. By maintaining the REO reserve at only 24% of Accredited's gross REO – rather than 40% of the gross REO as was the case in historic reporting periods – defendants falsely and misleadingly understated REO reserve by $8.27 million in the second quarter of 2006, $10.61 million in the third quarter of 2006 and $19.125 in the fourth quarter of 2006.

119. As a result of defendants' manipulation of the Company's REO reserve, the defendants falsely and misleadingly inflated the Company's reported pre-tax income by $8.27 million in the second quarter of 2006. (The effect on net income would be reduced by the Company's effective tax rate, approximately 39% in 2Q'06, to about $5 million.) The Company's reported net income for the period was $41.25 million. ***Thus, defendants' manipulation of the REO reserve constituted over 12% of the Company's reported net income in the second quarter of 2006.***

120. Manipulation of the REO reserve in the second quarter of 2006 masked a negative earnings trend developing in 2006. Throughout 2005, Accredited's reported net income had been steadily rising each quarter from $31.29 million to $43.31 million. As of March 31, 2006, Accredited's net income for the quarter was $35.82 million, a decline that defendants attributed to the annual dip in earnings generally experienced in the mortgage banking industry in the first quarter of each year due to the year-end rush to close loans. At that point in time, Accredited's decrease in earnings did not appear to be unusual in nature. However, had defendants not manipulated the Company's REO reserve in the second quarter, Accredited's net income would have been below year-end 2005 levels. But for manipulating the percentage of REO reserves from the historic 40% level to just under 25%, net income would have been nearly flat from the first quarter 2006 results (reported net income for 1Q'06 was $35.82 million and net income but for the manipulation of the REO reserve for 2Q'06 would have been $36.23 million). By reducing the percentage of the REO reserves, defendants were able to artificially inflate reported net income to $41.25 million and show a substantial increase over the prior quarter. By

manipulating the REO reserve, defendants maintained the illusion that Accredited was growing its earnings.

121.   As a result of defendants' manipulation of the Company's REO reserve, the defendants inflated the Company's reported pre-tax income by $10.61 million in the third quarter of 2006 (which includes the $8.27 million of the prior quarter and is therefore cumulative).  Not including the $8.27 million from the prior quarter, the pre-tax income was inflated by $2.34 million in 3Q'06.  (The effect on net income would be reduced by the Company's effective tax rate, approximately 19.85% in 3Q'06, to about $1.876 million.)  The Company's reported net income for the period was only $18.43 million.  ***Defendants' manipulation of the REO reserve constituted at least 10.2% of the Company's reported net income in the third quarter of 2006.***

122.   As a result of defendants' manipulation of the Company's REO reserve, the defendants falsely and misleadingly inflated the Company's reported pre-tax income by $19.13 million in the fourth quarter of 2006 (which includes the $10.61 million of the prior quarters and is therefore cumulative).  Not including the $10.61 million from the prior quarters, the pre-tax income was inflated by $8.52 million in 4Q'06.

123.   After the Class Period, on August 2, 2007, the Company belatedly filed its Form 10-K for 2006 containing its audited financial statements for the full-year 2006.  In the Company's audited financial results for 2006, the Company increased its REO reserve to $40.36 million from $27.275 million as had been previously reported.  The Company's 2006 Form 10-K admits the Company's previous disclosure concerning the Company's 2006 year-end financial results – the unaudited disclosure made during the Class Period on February 14, 2007 – was false and misleading because the Company's REO reserve was understated by $13.1 million (the difference between $40.36 million and $27.275 million).  The Company has, therefore, admitted that during the Class Period it overstated its 4Q'06 income by $13.1 million.

c.   Defendants' Manipulation Of Earnings By Inadequately Reserving For Repurchase Losses On Mortgage Loans Sold To Third Party Investors

124.   During the Class Period, the defendants caused Accredited to report materially and artificially inflated earnings by knowingly or recklessly under-reserving for the Company's

growing obligations to buy back loans from purchasers of the Company's loan portfolio and losses resulting from resale of those loans at decreased values.

125. During the Class Period, Accredited sold mortgage loans to third parties. Gains or losses resulting from loan sales were purportedly recognized at the time of sale, based primarily on the difference between the net sales proceeds and the book value of the loans sold.

126. Accredited provided purchasers of its mortgage loans with representations and warranties regarding the underwriting standards the Company followed in originating the loans. If a purchaser of the mortgage loans determined that Accredited violated its representations and warranties OR a borrower defaulted during the early months of the loan, the purchaser could require Accredited to repurchase the mortgage loan.

127. If Accredited was required to repurchase a loan, either because the borrower had defaulted on the loan or because it had been originated in violation of the underwriting representations and warranties, the loan lost value. Accredited could not resell that loan at its original value but could only do so at a substantial discount. The reserve is expected to cover the difference between the repurchase price and the resale value.

128. As a result, GAAP (including SFAS No. 5, SFAS No. 140 and EITF 92-2) required that Accredited maintain a reserve on its balance sheet to cover future losses and expenses that were expected to arise as a result of repurchase obligations.

129. In accordance with SFAS No. 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities*, a replacement of FASB Statement 125, and EITF 92-2, *Measuring Loss Accruals by Transferors for Transfers of Receivables with Recourse*, the reserve is estimated based on factors including the Company's historical repurchase experience, industry repurchase experience, expected future volume of repurchases, and expected value of underlying collateral.

130. SFAS No. 140 and EITF 92-2 require the reserve to be estimated and recorded as a liability on Accredited's balance sheet in the period in which the loans are sold, with a corresponding reduction of Accredited's gain on whole loan sales in its income statement. Any

subsequent increases/decreases to the reserve are also required to be recorded as a current reduction of/addition to Accredited's gain on whole loan sales.

131.    Defendants caused Accredited to violate GAAP by not maintaining an adequate reserve on its balance sheet for losses resulting from expected repurchase obligations.

132.    As set forth herein at Section II.D.3., the Company substantially deviated from the underwriting guidelines in 2005 and 2006 that had been represented to buyers of the Company's loans.  The Company provided a great many loans to persons with inferior credit quality that could be expected to default, thereby causing the Company to have an increasing amount of repurchase obligations.   The defendants should have substantially increased the Company's reserves for repurchases during the Class Period.

133.    The inadequacy of the Company's reserve for repurchases is evident in several respects.  The table below illustrates the fact that the Company's reserve for repurchases was insufficient at least as early as 2Q'06.  (Note:  Information for the fourth quarter of 2006 is from the Company's press release and analyst conference call during the Class Period on February 14, 2007, which differs from the Company's audited financial results included in the Form 10-K filed with the SEC after the Class Period on August 2, 2007.)[5]

|         | Loans Repurchased | Reserve for Repurchases | Implied Discount |
|---------|-------------------|-------------------------|------------------|
| 3Q'05   | 21.3              | 6.8                     | 31.92%           |
| 4Q'05   | 18.1              | 7.4                     | 40.88%           |
| 1Q'06   | 14.6              | 8.0                     | 54.79%           |
| 2Q '06  | 38.6              | 8.7                     | 22.54%           |
| 3Q'06   | 61.8              | 17.3                    | 27.99%           |
| 4Q'06   | 90.0              | 26.8                    | 29.78%           |

---

[5]  When the Company released its full-year 2006 and 4Q'06 financial results during the Class Period on February 14, 2007, the Repurchases Reserve was listed as $26.797 million.  Defendant Buchanan stated during the Company's conference call:  "The Repurchases Reserve is $27 million."  However, in the Company's audited financial results contained in the Form 10-K filed with the SEC on August 2, 2007 – after the Class Period – the Repurchases Reserve is $43.881 million.  As is detailed further at ¶138, the difference between the size of the Company's reserve disclosed in the unaudited versus the audited financial results is an admission that the Company did not adequately reserve for losses during the Class Period and, therefore, artificially inflated its reported income.

134.    By 2006, the Company was being forced to buy back a growing number of the loans it sold throughout 2005-2006, but the Company did not increase its reserves in step.  This was unreasonable and in violation of GAAP and, as a result of not taking sufficient reserves, defendants manipulated and artificially inflated the Company's reported income in each quarter.

135.    The Company should have been reserving for the increase in loan repurchases as soon as it started routinely deviating from its underwriting guidelines.   The table below illustrates the rapid rate of growth of repurchases as contrasted by the lagging rate of growth of Repurchases Reserve throughout 2006.  While the Repurchases Reserve is established at the time of the initial third-party sale, adjustments to those reserves should be made when repurchase data no longer supports the original estimates for the reserves.  It is clear from the table below that Accredited not only failed to adjust reserves for repurchases in step with the requests for repurchases (Accredited's reserve increases lag the growth in repurchases by one quarter), but it also failed to adjust them by the same order of magnitude.  Requests for repurchases were increasing far faster than the Company's reserves for repurchases of mortgage loans.  As a result of not recording sufficient reserves, defendants violated GAAP and artificially inflated the Company's reported income in each quarter.

|  | Loans Repurchased ($ Millions) | Rate of Growth of Repurchases | Reserve for Repurchases ($ Millions) | Rate of Growth of Reserve |
|---|---|---|---|---|
| 1Q'06 | 14.6 |  | 8.0 |  |
| 2Q'06 | 38.6 | 164.38% | 8.7 | 8.75% |
| 3Q'06 | 61.8 | 60.10% | 17.3 | 98.5% |
| 4Q'06 | 90 | 45.63% | 26.8 | 54.91% |

136.    Generally speaking, Accredited normally tried to resell repurchased loans in the "scratch and dent" market.  Sales in this market were normally at a loss since repurchased loans are, by their very nature, considered defective and therefore less valuable.  Defendants did not increase the Company's Repurchases Reserve to reflect that the valuations for loans sold in the "scratch and dent" market were declining as the number of defective loans increased and purchasers were not willing to pay as much as before.  Instead of increasing reserves to reflect this relationship, Accredited actually did just the opposite, thereby creating a reserve deficiency

starting no later than 2Q'06. (The amount of the reserve deficiency assumes the Company should have maintained an implied discount of 48.75%, which number is taken from the Company's Form 10-K filed with the SEC after the Class Period as explained further at ¶138. All numbers in millions of dollars, except where marked %.)

| | Loans Repurchased | Reserve for Repurchase | Implied Discount | Reserve Deficiency | Reserve Deficiency Non-Cumulative |
|---|---|---|---|---|---|
| 4Q'05 | 18.1 | 7.4 | 40.88% | | |
| 1Q'06 | 14.6 | 8.0 | 54.79% | | |
| 2Q'06 | 38.6 | 8.7 | 22.54% | 10.12 | 10.12 |
| 3Q'06 | 61.8 | 17.3 | 27.99% | 12.8275 | 2.71 |
| 4Q'06 | 90 | 26.8 | 29.78% | 17.075 | 4.25 |

137. Thus, during the Class Period, defendants did not sufficiently record adequate reserves for repurchases to keep pace with growing repurchase amounts and the depressed market in which Accredited tried to resell the repurchased loans. Defendants did not record the Repurchases Reserve sufficiently because doing so would have directly and materially impacted the Company's reported earnings by reducing the reported earnings on a dollar-for-dollar basis. As a result of not properly recording the Company's reserve for repurchases, the Company's financial statements violated GAAP.

138. After the Class Period, on August 2, 2007, the Company filed its Form 10-K for 2006 containing its audited financial statements for the full-year 2006. In the Company's audited financial results for 2006, the Company's reserve for repurchases (excluding Aames) was increased to $43.881 million from the $26.8 million reported during the Class Period. The implied discount for repurchased loans was increased to 48.75% from 29.78%. The Company's 2006 Form 10-K thereby admits the Company's previous disclosure concerning the Company's 2006 year-end financial results – the unaudited disclosure made during the Class Period on February 14, 2007 – was understated by $17.1 million (the difference between $43.881 million and $26.8 million). The Company has therefore admitted that during the Class Period it overstated its 4Q'06 income by $17.1 million.

d.   Net Effect of Defendants' Manipulation Of Reserves

139.   As a result of defendants' manipulation of the Company's reserves, Accredited reported artificially inflated net income in each quarter during the Class Period.  The following table shows the net effect, by quarter, of defendants' manipulation of reserves on the Company's publicly reported net income.  All numbers are in millions of dollars, except the Company's effective tax rate.  The manipulation of the Company's reserves is shown on a non-cumulative basis for each quarter (i.e., the understatement in a particular quarter is not included in subsequent quarters.)  Moreover, as set forth above, the reserve manipulation numbers in the table are based on deviations from Accredited's historic reserves in periods prior to the Class Period.  In truth, because defendants had caused the Company to deviate from its underwriting policies during the Class Period, Accredited should have increased its reserves during the Class Period to take into account the lower credit-quality of its portfolio.  Thus, the table sets forth a conservative analysis of the overstatement of the Company's net income manipulation.

| Reporting Period | 3Q'05 | 4Q'05 | 1Q'06 | 2Q'06 | 3Q'06 | 4Q'06 |
|---|---|---|---|---|---|---|
| Net Income Reported | 41.29 | 43.31 | 35.82 | 41.25 | 18.43 | (37.83) |
| ALL Manipulation | 18.14 | 41.40 | 23.06 | 16.22 | 94.47 | 402.16 |
| REO Reserve Manipulation | | | | 8.27 | 2.34 | 8.52 |
| Repurchases Reserve Manipulation | | | | 10.12 | 2.71 | 4.25 |
| Total Manipulation (Pre-Tax) | 18.14 | 41.40 | 23.06 | 34.61 | 99.52 | 414.93 |
| Effective Tax Rate | 40.25% | 38.15 | 39.21 | 39.31 | 19.85 | 33.01 |
| After-Tax Adjustment to Net Income | 10.84 | 25.27 | 14.07 | 21.01 | 79.77 | 277.98 |
| Adjusted Net Income | 30.45 | 17.70 | 21.80 | 20.24 | (61.34) | (315.81) |

140.   During the Class Period, defendants overstated the Company's pre-tax income by $631.66 million by understating reserves (i.e., the sum of the quarterly Total Manipulation (Pre-Tax), above).

e.    Defendants' Manipulation Of Earnings
And Its Balance Sheet By Not Properly
Accounting For The Aames Acquisition

141.    The Company's Form 10-K filed with the SEC on August 2, 2007, after the Class Period, admits the Company 4Q'06 earnings press release dated February 14, 2007, inflated the Company's reported earnings for the Fourth Quarter of 2006 by $142.4 million, and reported inflated assets on its balance sheet for the same period in an amount equal to $63 million, by improperly accounting for the Company's acquisition of Aames in violation of GAAP and then not recording an impairment of assets in accordance with GAAP.

142.    Accredited agreed to acquire Aames on May 24, 2006.    This merger was subsequently consummated on October 1, 2006.    Accredited paid Aames shareholders $77.6 million cash and 4.4 million shares of Accredited's stock.    On the date the Aames acquisition was announced, Accredited's stock closed at $51.94 per share.    The deal was therefore valued at approximately $329.5 million, of which $235.528 million was in stock.

143.    Under SFAS No. 142, *Goodwill and Other Intangible Assets*, Accredited was required to record goodwill on its balance sheet in connection with the Aames acquisition.    The GAAP requirement is very clear that the amount of goodwill is determined based on the valuation of the deal on the date the transaction is announced.

144.    The requirement for recording acquisitions is made perfectly clear in EITF 99-12: *Determination of the Measurement Date for the Market Price of Acquirer Securities Issued in a Purchase Business Combination*, which states:

> [T]he value of the acquirer's marketable equity securities issued to effect a purchase business combination should be determined, pursuant to the guidance in paragraph 74 of Opinion 16, based on the market price of the securities over a reasonable period of time before and after the terms of the acquisition are agreed to and announced.    In other words, the date of measurement of the value of the acquirer's marketable equity securities should not be influenced by the need to obtain shareholder or regulatory approvals.    Task Force members observed that the reasonable period of time referred to in paragraph 74 of Opinion 16 is intended to be very short, such as a few days before and after the acquisition is agreed to and announced.

145.    Thus, Accredited should have recorded goodwill based on the valuation of the deal as determined on or within "a few days before and after the acquisition [was] agreed to and announced" on May 24, 2006 (date of agreement) or May 25, 2006 (date announced).    When,

however, Accredited consummated its acquisition of Aames on October 1, 2006, Accredited recorded approximately $63 million of goodwill in connection with this transaction, using the stock price of October 1, 2006 (which was $19 less than the stock price on the date the deal was announced, the proper date for valuing the deal under GAAP). There was no basis for using the October 1, 2006 consummation date. The Company should have used the May 24 value and recorded $142.4 million in goodwill, but did not do so during the Class Period in violation of GAAP.

146. In a press release dated March 20, 2007, Accredited admitted that it improperly calculated the purchase price and corresponding goodwill recorded in connection with its acquisition of Aames. Specifically, Accredited admits it calculated the purchase price based on the closing price of its stock on the date the acquisition was consummated.

147. GAAP is unequivocal that the appropriate date for valuing an acquisition is at the time, or shortly before or after, the agreement is announced. Defendants' decision to use the date the deal closed was an attempt to avoid recognizing the entire $142.4 million of goodwill and to avoid taking a huge write-down that would have shown up as a $142.4 million loss on the Company's earnings for the fourth quarter of 2006.

148. Had the Company properly recorded the $142.4 million in goodwill as required by GAAP, the Company would have also been required to write-down that goodwill to zero in the fourth quarter of 2006. The Company has admitted in SEC filings and a press release that the entire balance of the goodwill from the Aames acquisition was impaired and should have been written-down to zero during the fourth quarter of 2006. Had the Company properly recorded the $142.4 million in goodwill as required by GAAP, the result of this write-down would be to decrease Accredited's assets and earnings by $142.4 million as of December 31, 2006.

149. As a result of this accounting violation, as defendants have admitted, the Company was not able to timely file its Form 10-K with the SEC, causing it to be in violation of covenants in its lending agreements and causing the Company to be at substantial risk of being de-listed from the NYSE and NASDAQ markets.

150. When the Company filed its Form 10-K with the SEC after the Class Period, the Company corrected its previously incorrect accounting for the acquisition. In doing so, the Company admitted its reported financial results for 2006 were false and misleading at the time they were published.

        5.       The REIT's And Accredited's Collapse And Near Bankruptcy Resulting From Defendants' Concealment Of The Company's True Financial Condition And Its Undisclosed Contingent Liabilities

151. Throughout the Class Period, defendants concealed Accredited's true financial condition and, by doing so, artificially inflated the price of Accredited securities at all relevant times.

152. Among other things, defendants concealed factors concerning the material risk that a liquidity crisis and/or bankruptcy could result from the increase in the volume of loans that the Company originated in violation of underwriting policies and extending credit to borrowers with poor-credit quality. By not properly stating the Company's reserves for bad loans, defendants further concealed the Company's true creditworthiness and defendants' scheme to inflate lending volume.

153. Near the end of the Class Period, the Company would suffer a crippling liquidity crisis as the Company was forced to make increasing amounts of repurchases of bad loans and the Company was forced to put up cash as collateral in response to margin calls under the Company's credit facilities, as explained below.

154. The Company's credit facilities were of critical importance to its operations and liquidity during the Class Period. During the Class Period, Accredited would typically finance mortgage loans initially through one of nine different secured warehouse credit facilities or through an asset backed commercial paper facility. The Company would then repay the related borrowings under these credit facilities upon sale or securitization of the loans. According to the Company's Form 10-K, these facilities provided the Company with approximately $5.2 billion of credit capacity.

155. The Company's Form 10-K also included the following disclosure concerning the covenants in the Company's credit facilities:

> Our credit facilities contain covenants that restrict our operations and may inhibit our ability to grow our business and increase revenues.
>
> Our credit facilities contain extensive restrictions and covenants that, among other things, require us to satisfy specified ***financial, asset quality and loan performance tests*** and may prohibit inter-company dividends in certain circumstances. If we fail to meet or satisfy any of these covenants, we would be in default under these agreements and our lenders could elect to declare all amounts outstanding under the agreements to be immediately due and payable, enforce their interests against collateral pledged under such agreements and restrict our ability to make additional borrowings. These agreements also contain cross-default provisions, so that if a default occurs under any one agreement, the lenders under our other agreements could also declare a default.
>
> The covenants and restrictions in our credit facilities may restrict our ability to, among other things:
>
> - incur additional debt;
> - make certain investments or acquisitions;
> - repurchase or redeem capital stock;
> - engage in mergers or consolidations;
> - ***finance loans with certain attributes***;
> - reduce liquidity below certain levels; and
> - hold loans for longer than established time periods.
>
> These restrictions may interfere with our ability to obtain financing or to engage in other business activities, which may significantly harm our business, financial condition, liquidity and results of operations.

156. One of the "financial" restrictions posed by the credit facility covenants was that the Company had to be profitable, meaning it had to report positive net income.

157. One of the reasons the Company's credit facilities required the Company to comply with certain loan portfolio tests was that the credit facilities were collateralized by "substantially all mortgage loans held for sale" by the Company. Thus, it was critical to the entities extending the credit facilities to the Company that the Company abide by the Company's underwriting procedures and only extend loans to borrowers willing and able to pay back those loans.

158. During the Class Period, however, defendants repeatedly violated the covenants set forth in the credit facilities and caused the Company to enter into loans that would cause the Company's portfolio to violate the credit facility covenants. Rather than disclose this truth, the defendants repeatedly reassured investors the Company had excellent liquidity, was well-prepared to handle any liquidity issues in the market, and that the Company was in compliance with all covenants. Indeed, the Company's Form 10-K falsely stated: "At December 31, 2005,

Accredited was in compliance with all covenant requirements for each of the facilities." Similarly, each of the Company's Form 10-Qs published during 2006 included a disclosure similar to the Company's Form 10-Q for the third quarter, which was published on November 9, 2006 and falsely stated: "At September 30, 2006, Accredited was in compliance with all covenant requirements for each of the facilities."

159. As the Company set forth in its Form 10-K for 2005, the covenants restricted the Company's ability to "finance loans with certain attributes." However, the Company was financing loans with risky attributes because defendants violated the Company's own underwriting policies when extending loans to risky borrowers in an effort to artificially inflate the Company's reported loan volumes and revenues. The Company's loan portfolio was therefore materially weaker than the Company disclosed.

160. As is detailed further in Section II.F, Lone Star terminated its contemplated acquisition of Accredited because the Company committed "violations of covenants in the Company's core credit facilities" having a material adverse effect to the Company and, along with other factors specific to the Company, causing the Company's "current financial condition and liquidity crisis." Moreover, defendants continue to conceal facts concerning the Company's compliance with covenants in the Company's credit facilities: "Accredited has not provided Lone Star with requested information regarding Accredited's current financial condition and prospects, including information regarding Accredited's compliance with the terms and conditions of its credit facilities and communications between or among Accredited and its creditors regarding the covenants in those credit facilities."

161. The Company's credit facilities also contained covenants requiring the Company to be profitable in any given quarter. No later than 3Q'06, the Company was in violation of the covenant requiring that the Company be profitable. Accredited falsely appeared to be profitable through defendants' manipulating of the Company's reserves, as detailed herein at Section II.D.4.d. Therefore, the Company was not in compliance with the financial covenants in the Company's credit facilities.

162.     The table below further demonstrates the value of the Company's loan portfolio, which served as collateral for its credit facilities, was in steady decline throughout the Class Period and therefore, as defendants knew, the Company faced an increasing risk of potentially debilitating margin calls in connection with the Company's credit facilities.  As indicated in the table, the amount of mortgage loans held for sale ("MLS") that were delinquent was growing steadily.  And, the amount of loans repurchased was growing steadily throughout 2006.  And, throughout the Class Period the Company was increasingly taking possession of real estate that had been collateral for loans where the borrower defaulted – which real estate the Company could not sell – as established by the increase in gross REO.  (All numbers in $ millions, except where marked %.)

|        | MLS     | MLS 90+ Days Delinquent | % of MLS 90+ Days Delinquent | Reserve for Repurchases | Loans Repurchased | Gross REO |
|--------|---------|-------------------------|------------------------------|-------------------------|-------------------|-----------|
| 3Q'05  | 2,370.8 | 18.1                    | 0.77%                        | 6.8                     | 21.3              | 18.51     |
| 4Q'05  | 2,267.6 | 20.9                    | 0.92%                        | 7.4                     | 18.1              | 26.81     |
| 1Q'06  | 1,724.8 | 31                      | 1.80%                        | 8.0                     | 14.6              | 34.26     |
| 2Q'06  | 1,591   | 58.8                    | 3.69%                        | 8.7                     | 38.6              | 52.62     |
| 3Q'06  | 1,862.7 | 94.0                    | 5.05%                        | 17.3                    | 61.8              | 69.76     |
| 4Q'06  | 2,140.5 | 111.6                   | 5.22%                        | 26.8                    | 90                | 116       |

163.     The growing amount of gross REO and loan repurchases also negatively impacted the Company's liquidity.  Repurchasing loans obviously requires cash, which negatively affects liquidity.  Large amounts of REO hurt Accredited's liquidity because unsold REO creates no cashflow.  Increasing gross REO meant Accredited had huge illiquid assets on its balance sheet that did not create cash flow to pay off liabilities the Company assumed in connection with those assets.

164.     Defendants ultimately revealed on March 12, 2007, that the Company was facing a liquidity crisis due to increased obligations to repurchase faulty loans and to answer margin calls on its credit facilities stemming from devaluation of its loan portfolio:

Accredited Home Lenders Holding Co. (NASDAQ:LEND) ("Accredited" or "Company") announced today that it is currently exploring various strategic options, including raising additional capital to enhance liquidity and provide the Company with the flexibility to retain or sell originated loans based on an assessment of the best overall return. ***Accredited's available cash resources have been affected primarily by margin calls under its warehouse and repurchase***

*facilities since January 1, 2007, all of which have been met to date, as well as ongoing loan repurchases*. The Company reported that it has paid approximately *$190 million in margin calls on its facilities since January 1, 2007*. Approximately two-thirds of those margin calls have been received and paid since February 15, 2007.

In addition, Accredited is seeking waivers and extensions of waivers of certain financial and operating covenants under its warehouse and repurchase facilities, *including waivers relating to required levels of net income*. The Company has been operating under various waivers under these facilities since December 31, 2006. There can be no assurance that the Company will be successful in receiving any of the required waivers.

Accredited also reported that it is pursuing certain cost restructuring initiatives, including further workforce reductions.

165. As set forth in the Company's Schedule 14D-9 filed with the SEC on June 19, 2007, defendants attributed the cause of the Company's liquidity crisis to margin calls on the Company's credit facilities as a result of the collateral for those facilities – the Company's loans – being marked down:

During the first two weeks of March, the Company's warehouse lenders aggressively marked down collateral and the Company experienced additional margin calls. *These margin calls placed a severe strain on the Company's liquidity* and caused the Company to conduct an in-depth review of its market position and strategies for dealing with the negative conditions in the market. In connection with this review, members of the Company's senior management met in early March with representatives of two investment banking firms, Bear, Stearns & Co. Inc. ("Bear Stearns") and Friedman, Billings, Ramsey & Co., Inc. ("FBR"), to discuss the ability of the Company to obtain an immediate infusion of capital.

On March 11th, at a special meeting, the Board reviewed and discussed with management the Company's situation, including increased margin calls and the resulting pressure on the Company's liquidity. The Board also noted that the closing price of the Common Stock on the Nasdaq on the preceding business day (Friday, March 9), was $15.78 per share.

The discussion then turned to a possible financing transaction. Management reported that, based on its discussions with Bear Stearns and FBR, it was highly unlikely that any investor would provide debt financing to the Company without an equity incentive, such as warrants to purchase shares of Common Stock, and that an equity capital raise in an amount sufficient to meet the Company's immediate needs would have to be at a level and at a price which would be substantially dilutive to existing stockholders.

An extensive discussion of the available options for the Company followed, including discussion of a possible private placement of equity or debt securities and a possible sale of the Company. Management reported on the potential counterparties with which discussions were being pursued, including Farallon Capital Management, L.L.C. ("Farallon"). *The Board also discussed the possibility that, if the Company were unable to complete a capital raising transaction and conditions in the marketplace continued to deteriorate, with*

*further erosion in the Company's liquidity, a bankruptcy filing might be necessary.*

166.     Thus, the Company suffered a near bankruptcy because, according to Accredited's own admissions, the Company's lenders issued large margin calls after discovering the Company's collateral – its loan portfolio – was impaired.  As set forth herein, the portfolio was impaired because of defendants' fraudulent scheme to inflate loan volume.  *See* Section II.D.3.  Defendants' concealment of material risks concerning the Company's creditworthiness was a substantial factor in causing plaintiffs' losses.

167.     The price of the preferred shares issued by the REIT also collapsed as a result of defendants' fraudulent scheme and near bankruptcy.   Throughout the Class Period, until February 7, 2007, the REIT's preferred shares traded at or above the shares' initial offering price of $25 and the shareholders received an annual dividend of 9.75%.  Prior to December 2006, the preferred stock never closed below $25; and, prior to February 7, 2007, the preferred stock never traded below $24.85.  Then, as a result of defendants' disclosures on and prior to March 13, 2007, revealing the precarious financial condition of the Company, and therefore the REIT, the preferred stock closed at only $8.25 on March 13, 2007.

168.     Defendants' disclosures after the end of the Class Period, as further detailed in Section II.F., further establish that defendants knew about problems with the loan portfolio that created the liquidity crisis, but that defendants concealed facts concerning the extent of the problems with the loan portfolio.

169.     During the last several months of the Class Period, defendants concealed facts concerning the substantial increase in mortgage loans held for investment 90+ day delinquent. After the Class Period, on August 2, 2007, the Company revealed in its Form 10-K that the MLI 90+ days delinquent *as of December 31, 2006* had increased to $316.25 million from only $136.84 million the quarter before and $71.36 million at the end of 2005.  Thus, the Company's 90+ day delinquencies in MLI had grown by over 231% from the prior quarter and over 443% from the prior year.  This dramatic increase in the Company's 90+ day delinquent loans indicated to defendants that the Company's loan portfolio contained a number of mortgages that would not be repaid.  Rather than disclose the fact that the Company's delinquencies had grown by such a

large amount, the defendants concealed the MLI 90+ day delinquency amount until August 2, 2007, when the Company was forced to disclose the amount in its Form 10-K filing.

170. On August 10, 2007, the Company filed a Form 12b-25 with the SEC, signed by defendant Konrath, in which the Company reported it could not timely file its Form 10-Q filings for the periods ending March 31, 2007 and June 30, 2007. Moreover, the Company's Form 10-Q disclosed: "Delinquent loans (30 or more days past due, including foreclosures and real estate owned) comprised 11.71% of the serviced portfolio at June 30, 2007, compared to 8.26% and 3.86% at December 31, 2006 and June 30, 2006, respectively."

E. Defendants' False And Misleading Statements

1. Defendants' Statements Before The Class Period

171. Prior to the Class Period, defendants repeatedly represented to the marketplace that the Company was conservatively growing its business in a diligent manner without sacrificing credit quality to increase the volume of the Company's business.

172. For example, on September 12, 2005, prior to the Class Period, an interview of defendant Konrath was published in the Asset Securitization Report titled: "Accredited's Konrath talks strategy in bubble environment." In the interview, defendant Konrath discussed Accredited's strategy for growing its business successfully. As a part of the discussion, defendant Konrath – as he and the other defendants would do throughout the Class Period – emphasized that Accredited was focused on credit quality more than increasing the volume of loans it originated, and that Accredited's underwriting procedures were better and more conservative than those of other sub-prime lenders. According to Konrath, Accredited paid managers to pursue disciplined growth in volume:

> A large part of the sales manager's compensation is paid on the profits of their particular unit, so I think that helps to drive the pricing discipline. If something changes on a loan, our people are more willing to price the loan to its inherent risk because they are not just paid for volume, but primarily paid for profit. And the portfolio is better protected because if the loan does not sell, or it is repurchased, any loss on that loan is charged back to the origination team.

> *       *       *

> As a result, our people and processes are very focused on rooting out fraud, and other problems that would affect the profitability of a loan.

Another key component of maximizing the profitability of a loan is data integrity. I think we know more about our borrower and what is in our loan files than our competitors know about what is in their loan files. Delivering the most accurate and complete loan files is another way that our people can maximize the profit in their individual units and thereby increase their personal compensation.

173. By the beginning of the Class Period, on November 1, 2005, it was no longer true that Accredited was focused on disciplined growth of its loan originating business. Rather, as detailed in Section II.D.3 above, increasingly during 2005 and by no later than the beginning of the Class Period, Accredited increased the volume of loans it originated by extending credit to individuals whose creditworthiness did not fit within the Company's own credit underwriting guidelines.

            2.        Defendants' Statements During The Class Period, Before Investors Begin To Learn The Truth

174. On November 1, 2005, Accredited issued a false and misleading press release entitled "Accredited Announces 3Q 2005 results; Company Sets Quarterly Records for Net Income, Cost to Originate, Loans On-Balance Sheet, and Originations." The release stated in part:

Accredited Home Lenders Holding Co., a nationwide mortgage company, specializing in non-prime residential mortgage loans, today announced *that net income for the quarter ended September 30, 2005 was $41.3 million, or $1.87 per share* on a fully-diluted basis, an increase of 15.1% compared to net income of $35.9 million, or $1.66 per share, for the comparable period in 2004. Total net revenues for the quarter increased by 19.8% to $151.8 million from $126.6 million for the comparable period in 2004. Net cost to originate mortgage loans was 1.57% for the quarter, compared to 1.92% for the third quarter of 2004.

Chairman and CEO James Konrath said, "Accredited continues to realize its profitability targets, despite a challenging environment. These third quarter results demonstrate the effect of our unwavering focus on reducing costs to drive profitability. Our cost to originate reached a record low of 1.57%, while our on-balance sheet portfolio continued to grow."

Mr. Konrath added, "Our results reflect a proven business model, built on consistent operating disciplines, excellent business partnerships, and experienced and talented employees. We remain confident in our ability to grow our business for the remainder of 2005 and beyond."

                        *      *      *

Loan Originations

The company originated $4.5 billion of mortgage loans for the quarter ended September 30, 2005, compared to $3.2 billion of mortgage loan originations in 3Q 2004, an increase of 39.7%.

*     *     *

Portfolio Performance and Loan Servicing

The company's total serviced portfolio equaled $9.2 billion at September 30, 2005. The serviced portfolio increased 49.4% from $6.1 billion at September 30, 2004. This was primarily due to the company's quarterly securitization program and an increase in the loans held for sale. Delinquent loans (30 or more days past due, including foreclosures and real estate owned) were 1.95% of the serviced portfolio at September 30, 2005, and 1.79%, 1.72%, and 1.74% for the three previous quarters.

*     *     *

Earnings Guidance

***The increase in the portfolio, the reduction in our cost to originate, and the company's strong results for the first three quarters of 2005 provide the basis for reiterating earnings guidance of $7.05 per share for the total year 2005.*** The forecast for the balance of 2005 assumes:

- Origination volume consistent with or slightly higher than the previous two quarters

- Whole loan premiums below the third quarter as rate increases have lagged increases in the cost of funds in the non-prime mortgage origination market

- Continued focus on the cost of origination .

- Continued portfolio growth

Consistent with its practice in prior years, the company plans to issue 2006 guidance before the end of the year; however, ***management reaffirms its goal of 15% average annual growth in earnings per share***.

175.    After issuing the press release on November 1, Accredited hosted a conference call for investors and analysts at which defendants made a number of false and misleading statements consistent with the Company's press release. The defendants participating in the conference call included Konrath, Lydon, Marvin and Buchanan, all of whom acquiesced to each of the other defendants' false and misleading statements. During the call, defendant Konrath reiterated the Company originated $4.5 billion in loans and the Company's "focus on originating profitable loans resulted in net whole loan sales premiums of 3.07%." Defendant Buchanan labeled the Company's loan production a "solid third quarter up 40% from the prior year and 9% from the second quarter." Konrath reaffirmed the Company was "confident in reaffirming management's previously stated goal of 15% average annual growth rate in earnings per share."

Konrath further noted that to achieve these results, "performance of [the loan] portfolio is absolutely critical. As you can see, our delinquency and loss continue at very low levels."

176. Reporting on the Company's published financial results, the *American Banker* noted the Company's "surprising margin" that was "quite a bit higher than their peers." The article also quoted defendant Konrath, who misleadingly spoke with the *American Banker* after the Company's conference call about Accredited's dedication and adherence to underwriting policies:

> "When we talk to our investors, our buyers of whole loans, we ask them, 'For the same portfolio, how does ours perform versus everybody else they're buying from?' And most major loan buyers will say ours perform better," he said in an interview after Accredited's third-quarter earnings conference call Tuesday.
>
> Further, Accredited historically has "approached the underwriting process a little differently," Mr. Konrath said. "We do a second underwrite ... before we send out the note to the borrower to be signed." Because of that practice, "we have a better idea of what's in our files than competitors, and the end result is we know how to price that risk."

177. Analysts responded very favorably to defendants' false and misleading statements. For example, on November 1, 2005, Friedman, Billings, Ramsey & Co., Inc. published an analyst report written by Scott Valentin that stated:

> This morning, LEND reported a very strong quarter of $1.87, ahead of our $1.76 estimate and the Street's $1.84. Aside from the better earnings for the period, the company revised guidance to the upper end of its range of $6.90-$7.05 to $7.05 for 2005. . . . The quarter was fundamentally strong, and we reiterate our Outperform ratings on the shares of LEND, with a $49 price target, while we are putting our EPS estimates under review.

178. Similarly, on November 7, 2005, Roth Capital Partners issued an analyst report commenting on Accredited's third quarter financial results, which stated:

> LEND Get's It! "Profit" Culture Lays Foundation For One Of The Few SFR "Franchises"
>
> • In the single family residential (SFR) lending sector, which is appallingly bereft of barriers to entry and franchise value, LEND has built what few can replicate …
>
> • …a culture of commitment (to return) and a reputation for a quality, which go hand-in-hand
>
> • Because the business is liquidity-driven--i.e., the liquidity provided by the global fixed-income markets--access to liquidity at a reasonable cost is of paramount importance

- To ensure access to this liquidity, ***the overarching goals of the organization are to produce high quality loans***--those likely to perform--that are appropriately priced for the risk elements present

- ***Critical to meeting these goals is the company's "profit" culture***, a system of procedures and incentives designed to encourage "bottom-line" thinking through every level of the organization

\* \* \*

- However, by maintaining its commitment to the variables it can control--credit quality, pricing and cost--LEND may not only navigate through the near-term headwinds, but provide some upside to both our estimates and price target.

179.     As a result of defendants' false statements, as repeated by analysts, Accredited's stock price increased. After closing on October 31, 2005 at $36.14, Accredited's stock price climbed to a close of $38.76 on November 1, 2005.

180.     On November 9, 2005, the Company filed its Form 10-Q for the third quarter of 2005, which included the same false and misleading financial results previously reported to investors on November 1, 2005. The Form 10-Q also falsely stated that the Company was "in compliance with all covenant requirements for each of the [Company's credit] facilities."

181.     The Form 10-Q also included certifications by defendants Konrath and Buchanan attesting to the accuracy of the Company's financial statements and the adequacy of the Company's internal controls over financial reporting. The certifications, attached hereto in full as Exhibits "A" and "B," were substantially identical. Defendant Konrath's certification states:

I, James A. Konrath. certify that:

1.     I have reviewed this Form 10-Q of Accredited Home Lenders Holding Co.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13(a)-15(f) and 15(d)-15(f)) for the

registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal controls over financial reporting, or caused such internal controls over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

    5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent function):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

182. Defendants' statements to the marketplace in ¶¶174-182 were false and misleading for the reasons set forth in Section II.D. As set forth in greater detail in Section II.D.4., the Company violated GAAP by reporting net income for the quarter ended September 30, 2005, was $41.3 million, or $1.87 per share. That number was artificially inflated. Defendants manipulated the Company's ALL by at least $18.14 million in the quarter. *See* Section II.D.4.a. The net income number was also artificially inflated because defendants manipulated the Company's Repurchases Reserve and REO Reserves by not increasing those reserves to take into

account increasing violations of the Company's underwriting policies. *See* Sections II.D.4.b. and II.D.4.c. Furthermore, defendants failed to disclose the Company had deviated substantially from its underwriting policies to drive up loan volume, as set forth in Section II.D.3., which was a material omission making their statements false and misleading. And, defendant Konrath's statements printed in the *American Banker* were false and misleading because his assertion that Accredited's underwriting standards were "better" than competitors and his reference to the Company's historic underwriting process were misleading because he failed to disclose the departure from the stated underwriting policies and procedures at the Company.

183. On November 18, 2005, a Friday, defendant Konrath appeared on the popular cable television show *Jim Cramer's Mad Money*. Cramer had previously been negative on Accredited, but changed his opinion after defendant Konrath's representations addressing Cramer's concerns about Accredited. Among other things, Konrath stated that Accredited had experienced "long-term superior performance on our mortgage-backed securities." This statement was false and misleading because defendant Konrath did not disclose that the Company had abandoned its conservative underwriting policies to increase the volume of loans it was then underwriting. At least in part because of Konrath's appearance on *Mad Money*, Accredited shares spiked. After closing on November 18, 2005 at $42.24, the stock closed on November 21 at $44.85 and closed at $46.48 on November 22.

184. On November 23, 2005, Accredited's REIT subsidiary securitized $1.2 billion of residential mortgages. Accredited issued a false and misleading press release concerning the sale of these asset backed securities ("ABS"), in which defendant Konrath is quoted as stating: "'Pricing for this securitization was exceptional, resulting in some of the tightest spreads found in recent ABS transactions for our industry. We are pleased that the ABS market continues to reward Accredited's ***superior underwriting platform*** and portfolio performance with such favorable pricing.'"

185. Defendant Konrath's statement, issued in the Company's press release, was false and misleading because, as is detailed in Section II.D.3. herein, defendants caused the Company

to deviate from its underwriting policies and caused Accredited to be contractually liable for violations of representations made by it in the sale of its mortgages.

186. On November 29, 2005, defendants Konrath and Lydon presented at the Friedman, Billings, Ramsey & Co., Inc. 2005 Investor Conference. According to a November 30, 2005 analyst report issued by Friedman, Billings, Ramsey, defendants misleadingly represented that the Company's management expected 2006 losses to deteriorate "slightly" from 2005 levels and that the Company's historical loan performance above industry rates could be attributable to the Company's underwriting strategy, including its procedure "which entails each loan being underwritten twice."

187. Defendants Konrath and Lydon's statements during the 2005 Investor Conference were false and misleading, as is detailed in Section II.D.3., because, as defendants knew but failed to disclose, defendants had caused the Company to abandon adherence to its underwriting policies. Therefore, it was misleading to draw comparisons between the Company's historical loan performance and the expected performance of loans then being originated by the Company.

188. On December 19, 2005, the Company issued a press release entitled "Accredited Sets 2006 EPS Guidance." The press release stated in part:

> Accredited Home Lenders Holding Co. announced today its full year 2006 earnings per fully-diluted share (EPS) guidance at $7.70-$8.00. The 2006 forecast assumes:
>
> - Growth in originations from an expanding platform;
>
> - Interest rate spreads on originations below average 2005 spreads resulting in
>
>     - Lower average gain on whole loan sales
>
>     - Reduced margin from the portfolio
>
> - Similar mix of loan dispositions between securitizations and whole loan sales; and
>
> - Continued focus on reducing the cost of origination
>
> Accredited Chairman and CEO James Konrath said, "Accredited has always focused on its fundamental business strategies - profit-based disciplines, diversification, and leveraging our experienced management team - that have served us well over the past 15 years. We believe that the critical issues facing the industry in the months ahead will be the ability to improve spreads and margins through appropriate pricing. Our mandate remains to be a leader in maximizing net revenue and reducing costs in order to deliver consistent profits."

189.    The marketplace responded favorably, as illustrated by PiperJaffray's analyst report issued December 19, 2005, labeling the forecast as "very impressive." As a result of the false and misleading forecast, Accredited's stock rose dramatically from a close on December 15, 2005 of $44.78 to a close on December 16, 2005 of $46.71 and then a close on December 19, 2005 of $48.50.

190.    The December 19, 2005 press release was false and misleading for the reasons set forth in Section II.D.  As set forth in greater detail in Section II.D.4., the Company's reported financial results in the quarter prior to the December 19 press release violated GAAP because defendants manipulated the Company's ALL.  *See* Section II.D.4.a.  The net income number was also artificially inflated because defendants manipulated the Company's Repurchases Reserve and REO Reserves by not increasing those reserves to take into account increasing violations of the Company's underwriting policies.  *See* Sections II.D.4.b. and II.D.4.c.  This made any projection of future financial results building on the Company's prior results false and misleading.  Furthermore, defendants failed to disclose the Company had deviated substantially from its underwriting policies to drive up loan volume, as set forth in Section II.D.3., which was a material omission which made their statements false and misleading in that the financial projections were based on an undisclosed risky business practice.

191.    On February 14, 2006, the Company issued a press release entitled "Accredited Reports Record Results for 2005; Loans On-Balance Sheet up 47%; Originations up 34%; Cost to Originate down 15%; Net Income up 19% in 2005." The press release stated in part:

Accredited Home Lenders Holding Co., a nationwide mortgage company specializing in non-prime residential mortgage loans, today announced record results for the quarter and year ended December 31, 2005.

***Net income for the year ended December 31, 2005 was $155.4 million, or $7.07 per share on a fully-diluted basis, an increase of 18.9% over $130.8 million for the year ended December 31, 2004.*** Total net revenues for the year increased 21.1% to $568.6 million from $469.6 million the prior year.

***Net income for the quarter ended December 31, 2005 was $43.3 million, or $1.96 per share on a fully-diluted basis, an increase of 13.6% over net income of $38.1 million for the comparable period in 2004.*** Total net revenues for the quarter increased by 11.5% to $ 150.1 million from $134.6 million for the comparable period in 2004.

Chairman and CEO James Konrath said, "**_Accredited met the challenge of a volatile 2005 for the non-prime mortgage industry by relying on the strength of our proven business model that features profitable origination and portfolio growth, minimizing our net cost to originate, and leveraging our experienced management team._** In addition, the record results reflect the strength and commitment of our business partners, and of course, our world-class employees across the United States and in Canada."

Mr. Konrath added, "We expect 2006 to present an equally challenging environment that we are confronting with the same determination, confidence and focus, which were successful in 2005. **_To meet that challenge and continue to excel, Accredited will strengthen the primary factors that differentiate it in the marketplace, particularly our commitment to managing for profit, portfolio quality, and diversified loan originations, financing and dispositions._**"

\*      \*      \*

Portfolio Performance and Loan Servicing

The company's servicing portfolio, including $90.2 million of liquidating off-balance sheet securitizations, totaled $9.7 billion at December 31, 2005. The serviced portfolio increased 44.2% from $6.7 billion at December 31, 2004. This was primarily due to the company's quarterly securitization program and an increase in the loans held for disposition. Delinquent loans (30 or more days past due, including foreclosures and real estate owned) were 2.47% of the serviced portfolio at December 31, 2005, compared to 1.95% at September 30, 2005 and 1.74% at December 31, 2004. **_Delinquency levels remain well within management's expectations and continue to be substantially below published industry averages_**.

Liquidity

The company had approximately $5.2 billion in warehouse credit capacity at December 31, 2005. At the end of December, the company had used $2.8 billion of this capacity. The company had a record $356.4 million in available cash and additional liquidity at December 31, 2005.

\*      \*      \*

Earnings Guidance for 2006

For the total year 2006, **_the company affirms its previous earnings guidance of $7.70-$8.00 per share_**. Achieving the earnings growth projected for 2006 will depend, in large part, on the impact of the industry and competitive environment on rates and margins. Earnings per share are expected to be at the top of the range if the industry continues the fourth quarter trend of increasing the spread between the rates to borrowers and the cost of funds. Earnings per share are estimated at the lower end of the range if these spreads remain at year-end 2005 levels.

Earnings Guidance for First Quarter

For the first quarter of 2006, the company expects earnings to increase from prior year in proportion with its annual guidance.

192.    After issuing the press release on February 14, Accredited hosted a conference call for investors and analysts at which defendants made a number of false and misleading

statements. The defendants participating in the conference call included Konrath, Lydon, Marvin and Buchanan, all of whom acquiesced to each of the other defendants' false and misleading statements.

193. During the conference call, defendant Konrath falsely and/or misleadingly responded to a question from Jim Fowler, an analyst with JMP Securities, concerning the credit quality of Accredited's loan portfolio and how the Company's expected delinquency rates would be impacted if financing costs continued to rise:

> FOWLER: [ ] I guess the question is also, what happens if we see financing costs continue to rise and borrowers need to have lower mortgage payments in order for delinquency rates not to rise. . . .
>
> Would you expect delinquency and loss rates to rise materially for the industry, for yourselves? I know it's a bit of conjecture, but we have seen this migration of different products that have served to make payments lower even though affordability rates continue to rise.
>
> JAMES KONRATH:
>
> *     *     *
>
> And so, the answer, I guess, to your question is what happens to delinquency and losses do they increase and I think the answer is absolutely yes. I think they increase for the industry and I think they would increase for us as well. But having said that, I think we have to look at where delinquency and losses have been. They are extremely low. They are at rates and ratios that quite frankly in the -- now almost 30 years that I've been making loans to borrowers who are probably not Fannie Mae borrowers, this is as low as it's ever been. And I think part of that has been the decline in interest rates and the rising housing prices.
>
> ***However, if we look at our own portfolio, and we see some of the strongest credit in terms of FICO score, we see good income coverage, what we're seeing is lots of borrowers have more equity now than when they took out the loan, lots of the salary and wage markets have been strong, so borrowers have increased income. It may not be quite as easy as it was, but I think the portfolio is extremely strong, and while we do expect to see some problems at least under this economic scenario, we don't think they're going to be very severe at all.***

194. Defendant Lydon similarly responded to a question about the creditworthiness of the Company's loan portfolio, stating falsely and/or misleadingly: "[W]e've been in the business, managing risk for a long time. We have got excellent credit people who understand the concept of rate versus risk. And we're pretty confident that we can manage this topic pretty well. At the end of the day, we've got reserve levels at 145 basis points. And we think we've got more than adequate coverage on that front as well."

195. Defendants' statements to the marketplace in ¶¶191-194 were false and misleading for the reasons set forth in Section II.D. As set forth in greater detail in Section II.D.4., the Company violated GAAP by reporting net income for the quarter ended December 31, 2005, was $43.3 million, or $1.96 per share. That number was artificially inflated. Defendants manipulated the Company's ALL by at least $41.40 million (in the quarter, with a cumulative effect of $59.54 million). *See* Section II.D.4.a. The net income number was also artificially inflated because defendants manipulated the Company's Repurchases Reserve and REO Reserves by not increasing those reserves to take into account increasing violations of the Company's underwriting policies. *See* Sections II.D.4.b. and II.D.4.c. Furthermore, defendants failed to disclose the Company had deviated substantially from its underwriting policies to drive up loan volume, as set forth in Section II.D.3., which was a material omission which made their statements false and misleading. Defendants' assertion that the Company was committed to "portfolio quality" to "differentiate it in the marketplace" from other sub-prime lenders was false and misleading for the same reasons. And, defendant Konrath's statements during the conference call that "the portfolio is extremely strong" (in terms of credit quality) and that problems caused by an economic downturn would not "be very severe at all" were false and misleading in light of the true facts concerning the Company's complete deviation from its underwriting guidelines as set forth in Section II.D.3. Defendant Lydon's assertion that the Company's reserves were "more than adequate" was also false and misleading as the Company had not accounted for the reserves sufficiently so that it could falsely manipulate earnings, as set forth in Section II.D.4.

196. The Company's financial results set forth in ¶¶191-194 were primarily in line with expectations and sustained the stock price.

197. On March 16, 2006, the Company filed its Form 10-K for the fiscal year 2005, which included the same false and misleading financial results previously reported to investors on February 14, 2006.

198. The Form 10-K also included certifications by defendants Konrath and Buchanan attesting to the accuracy of the Company's financial statements and the adequacy of the

Company's internal controls over financial reporting. The certifications, attached hereto in full as Exhibits "C" and "D," were substantially identical and both are similar to the certification included herein at ¶181.

199. In Accredited's Form 10-K for the fiscal year 2005, filed with the SEC on March 16, 2006, defendants falsely and misleadingly assured investors that the Company was taking a "disciplined" strategy to growing the business by implementing specific business practices that would ensure the Company originated profitable loans and did not – as investors feared was the case with certain of Accredited's rival sub-prime lenders – seek to grow volume by sacrificing credit quality. Defendants described Accredited thusly:

**Description of Our Business**

We are a mortgage banking company operating throughout the United States and in Canada that originates, finances, securitizes, services and sells non-prime mortgage loans secured by residential real estate. We focus on borrowers who may not meet conforming underwriting guidelines because of higher loan-to-value ratios, the nature or absence of income documentation, limited credit histories, high levels of consumer debt, or past credit difficulties. ***We originate loans primarily based upon the borrower's willingness and ability to repay the loan and the adequacy of the collateral. Our experienced management team has developed incentive programs, technology tools and business processes that focus our employees on originating non-prime mortgage loans with the financial and other characteristics that generate profits for us.*** We believe that this business approach has contributed to our ***disciplined growth*** in both origination volume and profits.

200. Defendants further misleadingly described the Company's purported zeal in achieving "disciplined growth" while "maximizing the quality and profitability of each loan originated" in the Form 10-K:

Our business processes incorporate cross-departmental review and feedback that are designed to assist each department in ***maximizing the quality and profitability of each loan originated***. We have developed our incentive programs, technology tools and business processes over time, and we are constantly reviewing and updating them to meet our evolving needs. We believe that this business approach has contributed to our ***disciplined growth*** in both origination volume and profits.

201. The Form 10-K also includes false and misleading statements lauding the Company's purported structural integrity designed to assure the origination of high-quality loans that strengthened the Company's "relationships with warehouse line providers, whole loan purchasers, rating agencies and others with whom [Accredited did] business," when in fact that

was misleading as the Company and its employees were intentionally deviating from this system of checks and balances by continually overriding the decisions of the Company's underwriting teams as detailed in Section II.D.3.:

*Our Business Processes—Teamwork and Checks And Balances*

We have two principal components to our business. We originate and underwrite loans, and we sell or securitize and service our loans. We have an integrated approach to these activities that encourages teamwork and the sharing of information across divisions. Our approach also promotes slightly different goals for different divisions that results in **meaningful, real-time, daily checks and balances** throughout our organizational structure.

\* \* \*

For example, origination team personnel can process and present loans, but if the loans do not meet the quality standards of the corporate underwriting teams or the profit objectives of the origination team and division, **the loans will not be approved** or, if approved, will not be eligible for bonuses or commissions.

These checks and balances have been built into our origination and underwriting processes and are bolstered by our incentive programs and technology tools. Our loan officers and account executives work closely with our underwriting group to ensure that **the loan applications that they originate meet the quality standards necessary to make it through the underwriting and funding process.** The first step is a comprehensive underwriting by the origination team supporting our account executives and loan officers. Then, before the loan documents can be prepared, the loan is reviewed and audited by a corporate underwriter who does not report to the origination team. When the team has gathered any required conditions (sometimes called stipulations), loan documents are reviewed by the documents and funding team or a corporate underwriter before funding. After funding the loan documents are reviewed by our documents and funding teams again to ensure accuracy, to make corrections to the documents if necessary and to reflect any changes that may have been made by the closing agent.

\* \* \*

**We believe that our commitment to originating high-quality loans strengthens our relationships with warehouse line providers, whole loan purchasers, rating agencies and others with whom we do business**.

202. Accredited's Form 10-K also falsely described the Company's underwriting criteria, misleadingly assuring purchasers of Accredited securities that the Company engaged in a "rigorous" process of reviewing creditworthiness of borrowers and aimed to achieve "high-quality" loans when, in fact, Accredited was knowingly inflating its earnings by increasing volume while sacrificing credit quality:

Our Underwriting Process and Guidelines

**Each mortgage loan that we originate is underwritten prior to loan closing in accordance with our underwriting guidelines.** We have developed underwriting

processes and criteria that we believe generate **high-quality non-prime loans**. Our underwriting guidelines are designed to help us evaluate a borrower's credit history, his or her capacity, willingness and ability to repay the loan, and the value and adequacy of the collateral. In addition, we review credit scores derived from the application of one or more nationally recognized credit-scoring models. Our underwriting philosophy is to analyze the overall situation of the borrower and to take into account compensating factors that may be used to offset certain areas of weakness, including employment stability, number of years at residence and disposable income. Based upon this analysis and the information derived from the Revenue Calculator, we determine loan terms and conditions to produce loans that we believe are appropriately priced and sized, **meet our quality standards**, and are profitable. In addition, our underwriters must determine what we believe to be a benefit to the borrower for each loan they underwrite. **Our underwriting process and guidelines require a rigorous application review and documentation designed to maximize the value of our mortgage loans.**

203. Notably, defendants sought to differentiate themselves from other sub-prime lenders by expressly claiming to be more "conservative" and committed to "sustained profitability" when, in fact, Accredited was engaging in reckless lending practices to falsely inflate growth:

We believe that our competitive strengths are:

- **Growth Using Conservative Management Principles**. We focus on originating **high-quality loans** and generating predominately cash earnings rather than non-cash gain on sale earnings. We have increased our loan originations and revenue every year since inception using our **conservative management principles**.

- *Profit-Based Business Model and Supporting Tools*. We have created a culture that provides economic incentives to our employees to assess the risk in our loans correctly, report the risk accurately, and price the risk so as to assure both fairness to the borrower and profits to our company. We believe that our profit-oriented philosophy and technology tools give us a competitive advantage by directly rewarding our employees for contributing to our fundamental business goal of **sustained profitability**.

*              *              *

We believe these strengths enable us to originate **better-performing**, non-prime loans, and grow a more profitable, **more conservatively managed company than many of our competitors**.

204. Defendants' statements contained in the Form 10-K were false and misleading for the reasons set forth in Section II.D. The Company's "business approach" did not result in "disciplined growth" but rather defendants were causing the Company to disregard underwriting policies and originate risky loans in an effort to grow loan volume. The Company wasn't originating loans primarily based on the borrower's willingness and ability to pay, but rather was

originating loans to borrowers who likely could not repay them in an effort to meet financial projections (particularly at the end of reporting periods). The Company said "loans [that] do not meet the quality standards of the corporate underwriting teams … will not be approved or, if approved, will not be eligible for bonuses or commissions," but it was a regular practice at the Company for loans to be approved over the denial of the Company's underwriting teams and such loans still qualified for bonuses and commissions. The Company did not have a "commitment to originating high-quality loans" but disregarded loan quality to drive up loan volume. It was not true that "each mortgage loan" the Company originated was "underwritten prior to loan closing in accordance with [the Company's] underwriting guidelines." It was misleading to describe Accredited as "more conservatively managed" than its competitors because Accredited had abandoned its underwriting standards to achieve greater volume.

205. The market reacted favorably to defendants' false and misleading statements in the Company's Form 10-K. After the Company's stock closed at $49.86 on March 15, 2006, it closed at $52.50 on March 16 and $53.05 on March 17.

206. Shortly after issuing the Company's Form 10-K for 2006, Defendants caused the Company to issue a false and misleading annual report to shareholders that the Company posted to its website. The annual report incorporates the Company's false and misleading Form 10-K and also includes a false and misleading letter to shareholders from defendants Konrath and Lydon, which states:

To our Fellow Stockholders

Accredited Home Lenders turned in another record year of business and profit growth in 2005.

Our solid performance in 2005 gave testimony to a proven business model and the profit-driven orientation that permeates our culture. Many industry experts expect that competition for non-prime loans will remain intense in the months ahead. We have no doubt that your company is up to the challenge of this competitive marketplace.

\*      \*      \*

To continue to excel in 2006, Accredited intends to further strengthen those primary factors that distinguish us from others, notably our commitment to manage for profit, the quality of our portfolio, and our ability to diversify loan originations, financing and dispositions.

*        *        *

**Managing Through Turbulent Waters**

Accredited's focus on profitability will be the primary driver as we navigate through the challenges and uncertainties and capitalize on the opportunities emerging from any turmoil in the market.

We continue to renounce the push for volume over margin.

*        *        *

Over the past year, we have introduced or augmented such vehicles as our pre-qualification engine, automated underwriting engine, broker portal, paperless credit files, and a host of other innovations designed to improve management reporting and follow-up, integrate vendor services, and expedite the loan documentation process.

All of these measures sharpen our focus on profitability and help distinguish us from the competition. Our approach is to continue to strive for steady incremental gain, to stick with the fundamental profit-making drivers of our business in the face of competitive and industry challenges, and to advance – deliberately and strategically – one step at a time.

**Ensuring Portfolio Quality**

***The quality of the portfolio is another focus at Accredited that will continue to differentiate us.***

Unlike other mortgage lenders, Accredited's Director of Operations is responsible for both loan underwriting and loan collection. In other words, the same person that evaluates the risk of a potential loan is also responsible for dealing with the consequences of underwriting decisions once the loan is closed and payments are due.

***This unique approach enables us to constantly track the factors that impact portfolio quality, maintain an "early warning system" to spot problems in the portfolio, and implement the changes necessary to fix those problems in order to maintain superior portfolio quality.***

We also employ a double underwriting process that includes an appraisal review for every loan made at Accredited. . . .

Finally, up and down the line at Accredited, loan profitability drives accountability. Nearly all of our incentive systems are based on team, branch, region, or division profitability. Defective loans that are not sold at appropriate prices, or that become delinquent, impact the employees responsible for making them. This tends to focus the entire team – from sales people to managers to support staff – on evaluating potential borrowers in terms of making profitable, quality loans.

A host of measurements reflect this emphasis on quality. Most importantly, our 2005 delinquency and loss rates of 2.47% and 0.27% respectively, are among the lowest reported in our industry, and our borrower credit scores last year averaged 639.

**Facing Challenges With Confidence**

At Accredited, we are as fit and ready as ever to meet whatever terrain lies ahead.

We have spent 15 years developing the underlying platforms that make us different from many of our competitors. These differentiating strengths give us great confidence that we will continue to perform and grow, even in the face of a more challenging mortgage lending environment.

Unlike most of our peers, our company chose not to become an REIT. We were unconvinced the associated impact on liquidity would be worth the price. Today, with the highest equity and liquidity in our history, we are not only well positioned to face the future, but to potentially take advantage of opportunities that present themselves during challenging times.

207. Defendants' letter to shareholders was misleading. Defendants falsely sought to "distinguish" Accredited from others in the sub-prime market on the basis of the credit quality of Accredited's loans. Defendants falsely stated Accredited utilized a "unique approach" that was "unlike other mortgage lenders" and that Accredited would "continue to renounce the push for volume" and was "ensuring portfolio quality" by employing multiple safeguards and "constantly track[ing] factors that impact portfolio quality." In truth, defendants were causing the Company to sacrifice credit quality to maintain a high volume of loan origination even if it meant making extraordinary exceptions to the Company's underwriting policies (as set forth in Section II.D.3.). In addition, the letter to shareholders was misleading in that it strongly reassured investors that the Company was well prepared to handle a downturn in the market for the Company's services. Defendants falsely stated the Company was "as fit and ready as ever to meet whatever terrain lies ahead" as a result of the Company's "highest equity and liquidity in [its] history." In truth, the Company's origination of poor-quality loans and failure to take proper reserves caused the Company to be extremely vulnerable to a liquidity crunch, as occurred in 2007 resulting in the Company's near total collapse (as set forth in Section II.D.5.).

208. On March 28, 2006, Accredited announced its REIT subsidiary securitized $1 billion of residential mortgages.

209. On May 2, 2006, the Company issued a press release entitled "Accredited Reports 1Q 2006 Results; Net Income up 15% in 1Q 2006; Net Cost to Originate down 19%; Loans On-Balance Sheet up 30%; Originations up 11%." The press release stated in part:

Accredited Home Lenders Holding Co., a nationwide mortgage company specializing in non-prime residential mortgage loans, today announced results for the quarter ended March 31, 2006.

***Net income for the quarter ended March 31, 2006 was $35.8 million, or $1.61 per share on a fully-diluted basis, an increase of 14.5% over net income of $31.3 million for the comparable period in 2005***. Total net revenues for the quarter increased by 15.2% to $141.7 million from $123.0 million for the comparable period in 2005.

Chairman and CEO James Konrath said, "***Our company delivered another solid quarter of earnings*** and cost discipline, along with an increase in loan originations and portfolio growth. These results were accomplished during a quarter with the anticipated seasonally softer origination volume and a number of competitors lowering interest rates to borrowers while the cost of money was increasing. Continued healthy demand for non-prime loans was again evident by our growth in origination volume when measured against the same period in 2005, as well as the strong volume during the last month of the quarter."

Mr. Konrath added, "We are also pleased with the growth and performance of our portfolio in the first quarter. Accredited continues to achieve superior executions on its securitizations, including a first quarter transaction with some of the tightest spreads in our history, and portfolio performance results that continue to outpace both the industry and our forecasts. All of this underscores our continued confidence that our profit-based business model, diversification in all facets of our business, and best-in-class employees will drive profitability for the remainder of 2006 and beyond."

\*　　\*　　\*

Loan Originations

The company originated $3.6 billion of mortgage loans for the quarter ended March 31, 2006, compared to $3.2 billion of mortgage loan originations in 1Q 2005, an increase of 11.1%.

\*　　\*　　\*

Portfolio Performance and Loan Servicing

The company's servicing portfolio, including $81.8 million of liquidating off-balance sheet securitizations, totaled $9.6 billion at March 31, 2006. The serviced portfolio increased 28.5% from $7.5 billion at March 31, 2005. This was primarily due to the company's quarterly securitization program. Delinquent loans (30 or more days past due, including foreclosures and real estate owned) were 2.85% of the serviced portfolio at March 31,2006, compared to 2.47% at December 31,2005 and 1.72% at March 31, 2005. ***Delinquency levels remain within management's expectations and continue to be substantially below published industry averages.***

\*　　\*　　\*

Earnings Guidance for 2006

For the total year 2006, ***the company reaffirms its previous earnings guidance of $7.70-$8.00 per share***. This forecast for the balance of the year, as well as the second quarter, assumes:

- Continued growth in origination volume

- Additional reductions in the cost to originate

- Improvement in the spread of interest rates to borrowers over the cost of funds from current market place levels

- An increase in net premium received in whole loan sales from current market levels

210. After issuing the press release on May 2, Accredited hosted a conference call for investors and analysts at which defendants continued to make false and misleading statements. The defendants participating in the conference call included Konrath, Lydon, Marvin and Buchanan, all of whom acquiesced to each of the other defendants' false and misleading statements.

211. During the conference call, defendant Konrath stated: "As anticipated, delinquency did increase in the quarter. But I would point out it has moved up from a very low base, and by historical standards, for comparison with other industry participants, delinquency numbers and loss numbers remain extremely low."

212. Also during the conference call, defendant Lydon responded to a question from analyst Robert Napoli concerning the credit quality of the Company's loan portfolio by reassuring him and the market generally that delinquencies were not problematic, and that the Company was closely monitoring the issue and was as committed as ever to maintaining credit quality: "***We're not alarmed by the delinquencies.*** I would tell you this -- that we spent a whole lot of time nosing in on it, and making sure that ***we have got our arms around the details*** and we're making adjustments -- ***all of the things that we have done for years***. That's about all that I can leave you with is -- [we] can't give you specific numbers. ***We don't think it's anything to be overly concerned with***."

213. Defendants' statements to the marketplace in ¶¶209-212 were false and misleading for the reasons set forth in Section II.D. As set forth in greater detail in Section

II.D.4., the Company violated GAAP by reporting net income for the quarter ended March 31, 2006 was $35.8 million, or $1.61 per share. That number was artificially inflated. Defendants manipulated the Company's ALL by at least $23.06 million in the quarter (with a cumulative effect of $82.6 million). *See* Section II.D.4.a. The net income number was also artificially inflated because defendants manipulated the Company's Repurchases Reserve and REO Reserves by not increasing those reserves to take into account increasing violations of the Company's underwriting policies. *See* Sections II.D.4.b. and II.D.4.c. Furthermore, defendants failed to disclose the Company had deviated substantially from its underwriting policies to drive up loan volume, as set forth in Section II.D.3., which was a material omission which made their statements false and misleading. And, defendant Lydon's assurances that investors need not be "alarmed" or "overly concerned" about the Company's growing delinquencies were false and/or misleading in light of the true facts then known to defendants as set forth in Section II.D.

214. Analysts and the market did not react strongly to defendants' false and misleading statements in ¶¶209-212, as the Company's financial results were primarily in line with expectations and prior statements to the marketplace about the Company's conservative lending practices. However, had defendants not falsified the Company's financial results and pumped up loan volume by disregarding the Company's underwriting policies, then the Company's stock price would have declined.

215. On May 5, 2006, Fitch Ratings issued a press release announcing it had upgraded Accredited's residential primary servicer rating from a 3 to a 3+. Fitch noted Accredited had "established loan administration policies and procedures" as a basis for the upgrade. Fitch also commented on the Company putting a "greater emphasis on front-end delinquencies" and that it "created a dedicated early intervention unit to focus on first payment defaults." In truth, defendants' false and misleading statements concealing the Company's true financial condition and creditworthiness, which was much more precarious than the Fitch rating reflected for the reasons set forth in Section II.D.

216. On May 10, 2006, the Company filed its Form 10-Q for the first quarter of 2005, which included the same false and misleading financial results previously reported to investors

on May 2, 2006. The Form 10-Q also falsely stated that the Company was "in compliance with all covenant requirements for each of the [Company's credit] facilities."

217. The Form 10-Q also included certifications by defendants Konrath and Buchanan attesting to the accuracy of the Company's financial statements and the adequacy of the Company's internal controls over financial reporting. The certifications, attached hereto in full as Exhibits "E" and "F," were substantially identical and both are similar to the certification included herein at Paragraph 181.

218. The Form 10-Q including the certifications was false and misleading for the reasons detailed in Section II.D.

219. On May 25, 2006, Accredited announced it would acquire Aames Investment Corporation, another sub-prime lender in a deal valued at approximately $340 million. Aames shareholders received approximately 32% of the purchase price in cash and 68% in Accredited stock.

220. After announcing the acquisition, Accredited hosted a conference call for investors and analysts at which defendants made a number of false and misleading statements. The defendants participating in the conference call included Konrath, Lydon, Marvin and Buchanan, all of whom acquiesced to each of the other defendants' false and misleading statements.

221. During the conference call, defendant Konrath falsely and/or misleadingly stated, among other things:

> I'm extremely pleased and excited to announce that Accredited Home Lenders will acquire Aames Investment Corporation in a merger transaction. We believe this is truly a win-win situation for both shareholders and employees of both organizations.
>
> This merger will immediately increase our origination capacity, especially in the retail channel. Aames' retail channel has shown strong, disciplined growth over the past several years. In this regard, we look forward to having the two managers of that – or the senior management group of that team join us here at Accredited.
>
> There are a host of other synergies that will result from this combination, including significant cost reductions throughout the combined organizations.

*       *       *

Accredited has a strong and deep management team. It has grown a profitable wholesale channel. On the retail side, we have 45 branches that are also exceptionally profitable at this point in time. Throughout the organization, we have a profit culture, and many of you have heard us speak to it in the past. We are the low-cost leader -- of or we are the cost leader of companies that are reporting on a public basis and *we also have excellent credit quality*. That shows up not only in a portfolio with the excellent results of that portfolio but also in our loan sales and the appetite for our product.

\*     \*     \*

So, in summary, we see this as a strategic consolidation in the sector. And as Jay said, it is the first in the sector, and we would not be surprised if there were not others to follow. It will be accretive in 2007. We believe it creates exceptional shareholder value on both ends of the equation, both the Aames and the Accredited shareholders. There are significant costs and operational synergies.

222.     Also, defendant Lydon falsely and/or misleadingly stated during the conference call, among other things:

[W]e're fairly sensitive to loan quality, and our '05 vintage delinquencies were running ahead of where our '02, '03 and '04 vintages were. So that has caused us in the last five or six months to start nosing in on that topic of loan quality. And so we've been – I think I told you on a call recently that if you go back to December and you start talking about what was going on with the secondary market, everybody was saying that it was just a price issue. It was my view that it wasn't just a price issue.

\*     \*     \*

***But we still see our competitors out there. So I fear that there's some of our brethren out there trying to get their volume numbers by loosening their credit standards. But as I said, and we're playing close attention to the credit side, so I don't want to claim that we're lily-white on this topic, what I am kind of putting forth to all of you is that we're tuned into the topic and we're managing it.***

***And by the way, we think that our reserves are more than adequate to cover any additional losses.*** Of course, you, I think, know that as well.

223.     Defendants' false and misleading statements had their desired effect. Analysts covering Accredited were very positive on the announced acquisition, repeating and further disseminating many of defendants' misleading statements. For example, a May 30, 2006 analyst report issued by Roth Capital Markets stated:

A strong competitor gets stronger; Lend to acquire AIC; reiterate Buy rating

\*     \*     \*

We believe the terms of the proposed acquisition of AIC by LEND are very attractive – to shareholders of both companies

\*     \*     \*

Finally, and ***perhaps most important – especially to Accredited – in addition to sharing a similar credit regime, both companies embrace a certain "profit culture"***. From what we could gather, this was particularly true of Aames' retail origination platform. As we have discussed at length in our previous reports, a "profit culture" is one in which individuals are rewarded on the basis of their contribution to the firm's overall profitability ***and not necessarily sheer loan volume*** or some other isolated operation performance metric.

\*     \*     \*

In summary, we think those industry participants that will not only survive, but prosper, in the noncomforming mortgage space are those that can attain significant economies of scale, drive the marginal cost of producing a loan toward zero ***and maintain the highest quality credit standards***. ***We always felt Accredited was well on the way to achieving these goals. We now believe, in the wake of the proposed AIC transaction, Accredited will get there sooner.*** In short, a good story just got better. Taking this conclusion into consideration along with our new price target of $65 (see Valuation) – representing a potential return of 17% from the levels at which LEND is not trading – we are reiterating our Buy rating on Lend shares.

224. Friedman, Billings, Ramsey also issued a positive analyst report commenting on the proposed merger and repeating defendants' false and misleading statements. The May 26, 2006 report upgraded Friedman, Billings, Ramsey's rating on Accredited stock to Outperform and increased the price target to $63 from $60. The report did not disclose that Friedman, Billings, Ramsey owned shares of Aames at the time it issued the analyst report. According to Aames's and Friedman, Billings, Ramsey's SEC filings, Friedman, Billings, Ramsey was at that time the second largest stockholder in Aames – owning 4.7 million shares of Aames equivalent to 7.6% of the outstanding stock.

225. Defendants' statements to the marketplace in ¶¶220-224 were false and misleading for the reasons set forth in Section II.D. As set forth in greater detail in Section II.D.3., defendants failed to disclose the Company had deviated substantially from its underwriting policies to drive up loan volume, which was a material omission which made their statements concerning the Company's focus on credit quality false and misleading. Moreover, defendants violated GAAP by manipulating the Company's ALL (*see* Section II.D.4.a.), REO Reserve (*see* Section II.D.4.b.), and Repurchases Reserve (*see* Section II.D.4.c.), and it was therefore misleading for defendant Lydon to state "we think that our reserves are more than adequate to cover any additional losses."

226. Upon announcement of the acquisition and after defendants' false and misleading statements, Accredited's stock price increased from a close on May 24, 2006 at $51.94 to a close on May 26, 2006 at $55.58.

227. On or shortly before May 31, 2006, defendant Lydon spoke to investors at a conference call hosted by Friedman, Billings, Ramsey, at which he assured investors that credit quality of Accredited's loan portfolio was not a problem. Lydon did not disclose the true facts then known to him, that Accredited was having to make multiple exceptions to its underwriting policies to drive up volume. Friedman, Billings, Ramsey issued an analyst report on May 31 repeating defendant Lydon's false statements and provided the following summary of Lydon's comments:

> In our latest installment of "Financially Speaking" conference call series, we examined current credit trends within the mortgage industry with guest speakers: Joe Lydon, chief operating officer of Accredited Home Lenders (LEND), and Curt Culver, chairman and chief executive officer of MGIC Investment Corp., (MTG). We came away from that conference call with added confidence that credit losses remain within historical expectations and do not pose an immediate threat to the companies that we cover or the industry generally, as long as employment trends remain strong.

228. On June 29, 2006, analyst Scott Valentin at Friedman, Billings, Ramsey, published a report repeating false and misleading statements made by defendants to investors. The report stated, in part:

> We recently accompanied senior management to European investor meetings. In summary, while investors remain highly concerned by both the state of the U.S. housing market and consumer, it appears that relatively stable subprime market conditions and strong execution by LEND are producing improved profitability. Origination volumes continue to increase on a YOY basis; both whole loan premiums and cost to originate have improved from 1Q06 levels; and **credit quality continues to perform better than expected**. While conditions in the subprime sector remain challenging, we believe **LEND remains the best positioned company in our coverage universe by virtue of its profitable mortgage banking platform, strong credit performance, and excess liquidity.** Furthermore, we continue to expect the Aames acquisition will provide meaningful accretion in FY07. We reiterate our Outperform rating and 12-month price target of $63.

229. On June 29, 2006, Accredited announced its REIT subsidiary securitized $1.05 billion of residential mortgages with an additional $350 million to be delivered in July and August. Defendant Konrath commented that there was "a strong investor demand for our bonds."

230.    Defendants' statements to investors as reported in the June 29, 2006 analyst report and the June 29 announcement by Accredited were false and misleading, as detailed in Section II.D., in that defendants knew, but did not disclose, that the Company was no longer abiding by its own underwriting guidelines and that, as a result, credit quality was substantially reduced and that there was a grave threat investor demand for the Company's bonds would plummet.

            3.      The Marketplace Begins To Learn The Truth Concerning Accredited
                    But Defendants Continue To Make False And Misleading Statements

231.    On August 9, 2006, the Company shocked investors when it ***partially*** disclosed the true financial condition of the Company by significantly reducing its financial projections from previous guidance of $7.70-$8 and revealing a growing number of delinquencies that substantially impacted earnings for the quarter.  The Company's press release stated:  "The company revises its full-year 2006 earnings per fully-dilutive share guidance to a range of $4.50 to $5.00."  Moreover, the Company revealed delinquencies were 3.76% in the second quarter, compared to only 2.85% in the prior quarter and 2.47% in the same quarter in 2005.  As a result, Accredited increased its repurchase provision to $11.8 million (a negative $0.30 impact on earnings per share), which was triple the impact from the prior year ($2.7 million, or $0.10 per share).

232.    After issuing the press release on August 9, Accredited hosted a conference call for investors and analysts at which defendants provided some clarity on what caused the Company to originate a lower volume of loans in the quarter and suffer increased delinquencies that impacted earnings in the quarter and would negatively affect earnings going forward.  Defendants admitted – but certainly did not disclose the full truth – that the 2005 and 2006 "vintages" of loans originated by the Company were not performing as well as the 2002-2004 vintages.  Partially disclosing the truth, defendants said this was an expected result of their having "take[n] a ***little*** more risk."  As a result of the growing delinquencies and repurchases, the defendants admitted loan volume was down "slightly" in the quarter because the Company was now "focused on originating higher-quality loans in a competitive market."  Thus, defendants admitted that the volume gains experienced in 2005 and early 2006, upon which the Company's

projections were based, were premised upon the Company relaxing its underwriting standards. Defendants, however, did not disclose that, in fact, the defendants had entirely disregarded the Company's underwriting policies as detailed in Section II.D.3. above.

233. The market was surprised by the defendants' sudden partial disclosure of the truth. As a result of the partial disclosures concerning the Company's true financial condition, Accredited's stock price dropped significantly from an opening price of $44.29 per share on August 8, 2006 to a closing price of $34.99 per share on August 9, 2006, a drop of 21%.

234. Even though the defendants partially disclosed the true financial condition of the Company, the Company's August 9, 2006 press release was also false and misleading. The press release was entitled "Accredited Reports 2Q 2006 Results; Net Income up 4% in 2Q 2006, Net Cost to Originate down 22%, Loans On-Balance Sheet up 16% from 2005." The press release falsely and/or misleadingly stated, in part:

> Accredited Home Lenders Holding Co., a mortgage company specializing in non-prime residential mortgage loans, today announced results for the quarter ended June 30, 2006.
>
> ***Net income for the quarter ended June 30, 2006 was $41.2 million, or $ 1.84 per share on a fully-diluted basis, an increase of 4.2% over net income of $39.6 million for the comparable period in 2005.*** Total net revenues for the quarter increased by 6.6% to $153.2 million from $143.7 million for the comparable period in 2005.
>
> Chairman and CEO James Konrath said, "***We are pleased with profit and cost results in the second quarter and the first half of 2006*** that presented some of the most challenging market conditions in recent memory. Our unwavering commitment to originating profitable loans at the lowest cost continues to generate margins that act as a counterweight to continuing intense price competition, fluctuating secondary market appetites, and higher funding costs."
>
> \*      \*      \*
>
> ***[T]he reserve balance on loans held for investment increased in dollars and as a percentage of the principal balance outstanding from last year and the last quarter. The reserve rate is now 1.6%, compared to 1.4% at June 30, 2005 and 1.5% at March 31, 2006.***
>
> \*      \*      \*
>
> Portfolio Performance and Loan Servicing
>
> The company's servicing portfolio, including $73.5 million of liquidating off-balance sheet securitizations, totaled $9.5 billion at June 30, 2006. The serviced portfolio increased 14.9% from $8.3 billion at June 30, 2005. This was primarily due, to the company's quarterly securitization program. Delinquent loans (30 or

more days past due, including foreclosures and real estate owned) were 3.76% of the serviced portfolio at June 30, 2006, compared to 2.47% at December 31, 2005 and 1.79% at June 30, 2005. ***In spite of the increase, delinquency levels remain within management's expectations and continue to be substantially below published industry averages.***

Liquidity

The company had approximately $5.2 billion in warehouse credit capacity at June 30, 2006. At the end of June, the company had used $1.6 billion of the available capacity. The company had $316.4 million in available cash and additional liquidity at June 30, 2006.

\*  \*  \*

Earnings Guidance for 2006

***The company revises its full year 2006 earnings per fully-dilutive share guidance to a range of $4.50 to $5.00.*** As reported in May 2006, the company anticipates the dilutive impact of the Aames merger on earnings per share in 2006 to be in the range of $1.00 to $1.35, depending on the closing date. The most significant items in further revising the 2006 forecast include:

- Lower than anticipated origination volume

- Net gain on whole loan sales below previous expectations The forecast for the balance of the year assumes:

- Completion of the Aames acquisition in early October

- Implementation of more competitive pricing in the company's wholesale platform resulting in:

  - Lower net gains on whole loan sales

  - Year-over-year volume growth

  - Steady net cost to originate

235. Also on August 9, 2006, the Company filed its Form 10-Q for the second quarter of 2006, which included the same false and misleading financial results previously reported to investors via the Company's press release. The Form 10-Q also falsely stated that the Company was "in compliance with all covenant requirements for each of the [Company's credit] facilities."

236. The Form 10-Q also included certifications by defendants Konrath and Marvin attesting to the accuracy of the Company's financial statements and the adequacy of the Company's internal controls over financial reporting. The certifications, attached hereto in full as Exhibits "G" and "H," were substantially identical and both are similar to the certification included herein at ¶181.

237.    After issuing the press release on August 9, Accredited hosted a conference call for investors and analysts at which defendants made a number of false and misleading statements consistent with the Company's press release. The defendants participating in the conference call included Konrath, Lydon, Marvin and Buchanan, all of whom acquiesced to each of the other defendants' false and misleading statements. For instance, defendant Lydon stated:

> In '05, on these earnings calls, we made it clear that we were definitely going to take a little more risk. Our delinquencies remain the best in the industry, so we felt that together with the delinquency and the reserves that we have in place, there was plenty of room for us to take a little more risk and maintain the margins. And we did that. And so now we are seeing that vintages are up. Well, that is not surprising. We kind of knew that that was going to take place. And nothing is at a point where it is alarming.

> But that said, *we watch our delinquencies in all of our vintages on a monthly basis*. So we are paying attention to what is going on. And so *earlier in the year, when the secondary market started to tighten down and we started to see more repurchase activity, we said, okay, we are going to have to tighten down some of the control points as well. So that has been happening now for six, seven or eight months*.

> Generally speaking, it takes you about eight months or so to really get past the repurchase cycle, if you will. So my sense is that we will see some repurchase activity in the third quarter as well. But by the fourth quarter, we will see some decline in what is going on in that arena.

238.    Defendants' statements to the marketplace in ¶¶234-237 were false and misleading for the reasons set forth in Section II.D. As set forth in greater detail in Section II.D.4., the Company violated GAAP by reporting net income for the quarter ended June 30, 2006 was $41.2 million, or $1.84 per share. That number was artificially inflated. Defendants manipulated the Company's ALL by at least $16.22 million in the quarter (with a cumulative effect of $98.8 million) (*see* Section II.D.4.a.), and defendants manipulated the REO Reserve by at least $8.27 million (*see* Section II.D.4.b.), and defendants manipulated the Company's Repurchases Reserve by at least $10.12 million (*see* Section II.D.4.c.). Furthermore, defendants failed to disclose the Company had deviated substantially from its underwriting policies to drive up loan volume, as set forth in Section II.D.3., which was a material omission which made their statements false and misleading. And, as is detailed in Section II.D.3., the Company had a practice of disregarding its own underwriting policies. Moreover, in August 2006, the Company had not begun to tighten its lending standards "six, seven or eight months" prior. Rather, the

Company had continued to disregard its own underwriting policies in an effort to maintain volume.

239. As a result of defendants' false and misleading statements, investors and analysts continued to be misled as to management's purported conservatism and the true financial prospects and condition of the Company. For instance, on August 15, 2006, analyst Scott Valentin of Friedman, Billings, Ramsey reported:

> We are adding LEND to the FBR Top Picks list, as we believe the recent sell-off is overdone and current price levels offer a potentially attractive investment return. Our reasoning is supported by our tandem beliefs that LEND will continue to have one of the most profitable mortgage banking platforms in our coverage universe, despite the expectation of a deteriorating margin as a result of the strategy shift, as well as one of the most conservative management teams, in our opinion.

240. From mid-August to mid-October, Accredited's stock traded generally in the range of $30 to $35, bolstered by defendants' false and misleading statements during the period and the Company's decision to buy back stock. On September 14, 2006, Accredited's Board of Directors authorized Accredited to repurchase up to 5 million shares of the Company's stock.

241. On September 27, 2006, Accredited hosted its annual investor day, which was attended by and included presentations by defendants Konrath, Lydon, Marvin and Crawford, each of whom acquiesced to the false and misleading statements of the other defendants. During the annual investor day conference, defendants again admitted that they had let credit quality slip some but defendants misleadingly and/or falsely assured investors that the Company had moved quickly to "get credit back up to the levels where [defendants] felt comfortable with it." Defendants misleadingly reassured investors "the credit quality topic is first and foremost a high priority for us" and explained the steps then purportedly being taken at the Company to address credit quality. Defendant Lydon stated:

> [W]e also are adjusting compensation plans across the board to put more weight on the credit quality topic. So as most of you know, all of our management - almost all of our people are paid based on the profits in loans and so they're - those profits can be impacted by higher loss rates. But just so that we get our point across to our people, we're starting to incent (sic) them more for higher quality loans and we're doing that with bonus programs.

242. Defendants also falsely assured investors that these measures were working. Defendant Lydon stated: "[W]e think we're making very good progress on this initiative and we

think that -- probably as we get in towards the end of the year we should have our arms around it in total and feel good about all of the issues around credit quality."

243. Defendants also falsely told investors that the Company had been able to grow its business in the month of August even while placing this "high priority" on credit quality. Defendant Konrath stated: "[T]he preliminary results that we have so far is August and our August volume was up 49% over our July volume." Similarly, defendant Lydon stated: "In August we had a pretty solid month in terms of production."

244. Defendants also reiterated the uniqueness of the Company's underwriting policies to assure that the Company did not undertake unnecessary risk. Defendant Crawford stated:

> With respect to the underwriting element, and we think this continues to be fairly unique in the industry, *we underwrite loans twice before we close them*. That means we have two sets of underwriters in each one of our production platforms. The first underwriter is typically done by all lenders and that's the part of our production group, they're team underwriters and their job is to underwrite the loans, to process, to re-verify all the information, package that transaction, get it ready for closing.

> Before the loan closes however we then pass off that file to a team that sits in that same production center and it goes through the second underwriting process. Now the second group of underwriters we refer to as our corporate underwriting group. And even though they reside and work with the production units they're really part of my organization structure and they report up to me.

> These underwriters are our most experienced and on average they have about 15 years underwriting experience and *we look to that group of people as our conscience just to make sure that everything was done correctly in the processing of that loan*. That the loan as packaged and that is ready to close, has been *thoroughly investigated and evaluated and fits the guidelines*.

245. The market responded favorably to defendants' false and misleading disclosures. For instance, analyst Matthew Howlett of Fox-Pitt, Kelton Equity Research wrote:

> LEND's Investor Day provided three positive take aways, in our view. 1.) *Origination volumes have picked up substantially in August, while product quality has improved*. 2.) LEND's strategic initiatives (AIC, Alt A, Canada) are primarily on track and their contribution to earnings should increase (primarily in 2007). 3.) *The company has taken the necessary steps to address repurchases (through valuation allowances and underwriting changes), while portfolio credit remains well contained*.

246. Defendants' statements to investors detailed in ¶¶241-245 were false and misleading for the reasons detailed in Section II.D. The Company had not made "the credit quality topic [ ] first and foremost a high priority" as defendants knew the Company was

constantly overriding the Company's underwriting guidelines and overruling decisions by the Company's underwriting staff to originate loans to persons of poor-credit quality in an effort to boost loan volume and report higher earnings. Similarly, the Company was not making "very good progress" on the issue of credit quality nor was it reasonable for defendants to say they "feel good about all the issues around credit quality" in light of the undisclosed material facts then known to defendants concerning constant overrides of the Company's underwriting policies then taking place. Defendants further misled investors by asserting the Company had substantially grown volume in August while putting a "high priority" on credit quality, because, among other things, according to CW5 (*see* ¶64) the Company changed its compensation scheme for Account Executives in August 2006 such that they were compensated regardless of credit quality and this caused the origination of more bad credit-quality loans.

247. On October 2, 2006, Accredited announced it completed on October 1, 2006 its acquisition of Aames, paying $77.6 in cash and issuing approximately 4.4 million shares of common stock.

248. On October 16 and October 23, 2006, the *National Mortgage News* published two articles quoting defendant Marvin's comments made during an analyst conference hosted by investment bank Friedman, Billings, Ramsey. Marvin misleadingly reassured investors that although Accredited was dealing with increased repurchases of faulty loans, the Company was readily able to do so. The October 16, 2006 article, quoted Marvin in the title as follows: "Buybacks Double at Accredited; The buyback problem is 'clearly manageable. It's under focus and being dealt with on a daily basis.'" The October 23 article provided the entire quote, noting Marvin stated: "'What we see is higher repurchase activity in 2006, consistent with the industry, compared to 2005, and, at Accredited, we believe it's clearly manageable,' said the executive. 'It's under focus and being dealt with on a daily basis.'"

249. The statements in ¶248 were false and misleading as the buyback problem Accredited was then facing was material and to assert that it was "clearly manageable" without disclosing the true facts known to defendants concerning the Company's substantial deviation from its underwriting policies was misleading and concealed substantial risks that threatened to

force the Company into bankruptcy and wipe out earnings, as is detailed in Section II.D.5. Moreover, as is detailed in Section II.D.4., the Company was then understating its reserves set aside to deal with repurchases, real estate owned, and delinquencies in the securitized portfolio to manipulate reported earnings, further concealing the true extent of the Company's buyback problem.

250. Notably, the article reported that defendant Marvin admitted loan buybacks were predictable and could be expected in advance by analyzing only three "leading" indicators, all of which were then available to Accredited's management and which further support a strong inference that defendants knew or were reckless in not knowing that the Company would be forced to buy back substantial portions of its loans in 2007 causing the Company to suffer a liquidity crisis:

> Over the past few months some mortgage executives have told this newsletter anecdotal tales of early payment defaults caused by third-party subservicers that were not properly posting loan payments. The executives declined to go on the record about what they heard.

> Mr. Marvin said there are what he called *"leading" indicators* of loan buybacks, chief among them *credit score, loan-to-value ratio and documentation*.

> He said when there is a combination of the three, "clearly, the repurchase activity is heightened compared to when there's only one attribute."

251. Only a few days after defendant Marvin reassured investors and less than a month after the Company's investor conference, the Company was forced to lower guidance partly because of growing delinquencies and the Company's inability to sell its loans to third-party investors at profitable rates. Before the market opened on October 19, 2006, the Company issued a press release entitled "Accredited Updates 2006 Outlook; Sets 3Q Call Date." The press release stated in part:

> Oct. 19, 2006--Accredited Home Lenders Holding Co. (NASDAQ:LEND) ("Accredited") announced today it anticipates fully-diluted earnings per share for the year will not reach the lower end of the company's previous 2006 guidance of $4.50.

> Increasing turbulence in the non-prime mortgage market has impacted the company's ability to achieve its previous earnings guidance. The most significant factors underlying this turbulence include:

> • Origination volume and loan submissions have not increased as much as the company anticipated and continue to be adversely affected by a

combination of pricing competition and product contraction that has been prevalent in the market throughout 2006.

- ***Whole loan premiums and securitization returns are under more pressure than previously anticipated***, caused a decrease in whole loan investor appetite for certain products, as well as changes in credit standards and equity requirements promulgated by the various rating agencies.

- ***Delinquency from production periods in 2005 and 2006 has risen above previous expectations, which requires the company to further bolster its reserves to prudently value the loan portfolio and potential exposure.***

Accredited's Chairman and CEO, James Konrath commented, "We believe the ferocity of pricing competition is due, in part, to the current wave of merger and acquisition activity as several non-prime mortgage originators attempt to maintain production levels to become or remain attractive to potential investors."

Mr. Konrath added, "We intend to capitalize on the fundamental strengths of the company -- a deeply experienced management team, diversification in all operational areas, and a profit culture driven to all levels of the company -- as we navigate through the current turbulent cycle in the non-prime mortgage industry."

252. The marketplace was surprised by defendants' revelations. For example, analyst Scott Valentin at Friedman, Billings, Ramsey issued a report on Accredited downgrading the stock as a result of the defendants' disclosures. The report noted concerns about rising delinquencies and the fact that Accredited's management had "lost credibility":

Before the market open on October 19, LEND announced it will not reach the lower end of previous FY06 EPS guidance of $4.50. The lowered expectations were based on a trifecta of concerns: ***lower origination volumes, lower whole-loan premiums, and higher than expected delinquencies*** . . . ***[W]e believe management has lost credibility; in order for investors to remain comfortable owning a subprime mortgage company, management credibility is paramount.*** Reflecting the more difficult operating environment, we are reducing our FY06 EPS estimate from $4.59 to $4.17 and our FY07 EPS from $5.41 to $4.29. As such, we are downgrading shares of LEND from Outperform to Market Perform and lowering our price target from $42 to $35, which equates to 8x our FY07 EPS estimate and approximately 1.1x book value.

253. Other analysts also believed management had "lost credibility." On October 24, 2006, Stifel Nicolaus issued an analyst report stating:

Last week, LEND preannounced 2006 EPS projections below its prior guidance of $4.50-$5.00. Our 2006 estimate was $4.70 and consensus was $4.84.

Mgmt attributed the miss to 3 factors:

- Origination volume below expectations due to price competition and "product contraction" (i.e. 80/20 combo loans)

- Lower gain-on-sale margins due to further reduced appetite for lower quality loans and increased rating agency conservatism

- Poor delinquency trends in 2005 and 2006 originations that necessitated loss reserve building

In our view, these are the three most critical profit "and valuation" drivers in subprime mortgage stocks.

What's worse, we believe *mgmt credibility is now severely questioned* as LEND held an upbeat investor day only three weeks ago, the last week of 3Q06. Although mgmt indicated that conditions have deteriorated significantly since that meeting, it will likely be challenged to rebuild its reputation.

254.     Similarly, on October 25, 2006, SunTrust Robinson Humphrey issued a report stating: "The company has a credibility issue since this news follows a recent investor day where the company communicated a more stable secondary market and improving 3Q06 volumes."

255.     Others in the marketplace viewed with incredulity defendants' assertion that market competition required Accredited to lower estimates. In an article published on October 20, 2006, titled "Accredited: Deal Fervor is Fueling a Loan-Price War," the *American Banker* reported:

> *Analysts were not convinced that heavier competition was entirely to blame for Accredited's troubles*. "So much of volume comes from big guys, it's hard to see if it affects pricing to that extent," said Bose George of Keefe, Bruyette & Woods Inc.
>
> Accredited had already revised its full-year guidance in August when it reported modest gains in second-quarter earnings, and it said during an investor day last month that it was optimistic despite tighter margins and higher delinquencies. Analysts said the company's rapidly changing outlook could damage its reputation.
>
> "*People start questioning credibility*," Mr. George said. "This management team has always been considered the best in the industry, so it comes as somewhat of a surprise."

256.     As a result of these partial disclosures concerning the Company's true financial condition, Accredited's stock price dropped significantly from a close of $34.20 on October 18, 2006 to a close of $30.45 on October 19, 2006.

257.     On November 6, 2006, the Company issued a press release entitled "Accredited Reports 3Q Results." The Company reported: "*Net income for the quarter ended September*

*30, 2006 was $18.4 million, or $0.83 per share on a fully-diluted basis*, down from $41.3 million for the comparable period in 2005."

258.  The November 6, 2006 press release was false and misleading for the reasons set forth in Section II.D.  As set forth in greater detail in Section II.D.4., the Company violated GAAP by reporting net income for the quarter ended September 30, 2006 was $18.4 million, or $0.83 per share.  That number was artificially inflated.  Defendants had manipulated the Company's ALL by at least $94.47 million in the quarter ($193.29 million on a cumulative basis) (*see* Section II.D.4.a.), and manipulated the REO Reserve by at least $2.34 million ($10.61 million on a cumulative basis) (*see* Section II.D.4.b.) and manipulated the Company's Repurchases Reserve by at least $2.71 million ($12.83 million on a cumulative basis) (*see* Section II.D.4.c.).  Indeed, adjusting for these manipulations and the effective tax rate, the Company's actual net income reflected the Company lost at least $61.34 million.  *See* Section II.D.4.d.  Furthermore, defendants failed to disclose the Company had deviated substantially from its underwriting policies to drive up loan volume, as set forth in Section II.D.3., which was a material omission which made their statements false and misleading.

259.  Notably, the earnings release revealed that the Company's number of "[d]elinquent loans (30 or more days past due, including foreclosures and real estate owned) comprised 5.44% of the serviced portfolio at September 30, 2006, compared to 2.47% at December 31, 2005 and 1.95% at September 30, 2005."  This substantial increase suggested to investors underlying problems with Accredited's business, but the Company also issued favorable false and misleading statements at the same time it made this partial disclosure.

260.  On November 6, 2006, the defendants falsely reassured investors and analysts during the Company's conference call to discuss the third quarter results.  The conference call was attended by defendants Marvin, Konrath, Lydon and Buchanan, all of whom acquiesced to the statements made by the other defendants.  Defendant Konrath falsely reassured investors that the Company was using strict underwriting guidelines to reduce repurchase obligations, that the Company had taken out adequate reserves for such obligations, and it was in excellent financial condition without any liquidity problems:

On slide 14, we show the trend in repurchase activity at Accredited since the first quarter of 2005. We have seen a significant increase in this activity during the most recent two quarters. As reported previously, repurchases have increased as a result of higher early payment defaults and whole loan investors focusing on repurchase clauses in sales agreements. We expect this upward industry trend to continue in the near term, but *we believe the significant reduction in the origination of higher-risk products, as well as changes in our underwriting guidelines and processes, will mitigate this trend during the first half of 2007.*

As shown on slide 15, *we have substantially increased our reserve for repurchases in recognition of this continued trend. This reserve is designed to cover the losses on future loan repurchases.*

\* \* \*

On slide 17 we show some of the changes we have made to reduce the repurchase activity. The most significant change has been the revision to our product guideline. There has been a significant reduction in the origination of higher-risk loans, especially on high-LTV products. While this is the most prominent change, there have been many other product changes as we continually analyze the attributes of loans with early payment defaults. This analysis of EPD has also served as the basis for us to refocus our underwriters and help them recognize those loans that have a risk of early default in this rapidly-changing real estate market.

\* \* \*

*The Company is in excellent financial condition*, our sources of funding are strong and diversified in all aspects of the business, and we have *strong liquidity*. . . .

*We have increased a strong reserve position on one of the best-performing portfolios in the industry.* We are confident in our ability to manage through this cycle and take advantage of any opportunities it may present. We are also confident that we will be in an excellent position to again profitably grow our business as the current industry turmoil subsides

261. On November 9, 2006, the Company filed its Form 10-Q for the third quarter of 2006, which included the same false and misleading financial results previously reported to investors via the Company's press release. The Form 10-Q also falsely stated that the Company was "in compliance with all covenant requirements for each of the [Company's credit] facilities."

262. The Form 10-Q also included certifications by defendants Konrath and Marvin attesting to the accuracy of the Company's financial statements and the adequacy of the Company's internal controls over financial reporting. The certifications, attached hereto in full as Exhibits "I" and "J," were substantially identical and both are similar to the certification included herein at ¶181.

263. Defendants' statements to investors detailed in ¶¶260-262 were false and misleading for the reasons detailed in Section II.D. For instance, the Company's net income was artificially inflated in violation of GAAP as the defendants had manipulated the Company's Repurchases Reserve, REO Reserves and ALL. *See* Sections II.D.4. Defendants had not made "changes in … underwriting guidelines and processes" that might be expected to reduce delinquencies and defaults in the first half of 2007. The Company had not "substantially increased our reserve for repurchases … designed to cover the losses on future loan repurchases" as the Company's Repurchases Reserve was proportionately lower than it had been past quarters and the Company knew repurchases were going to be increasing greatly in the future as a result of the defendants' scheme to drive up loan volume. *See* Section II.D.3. The Company was not "in excellent financial condition" and did not have "strong liquidity" in light of the fact the defendants were manipulating the Company's financial statements and the Company faced a potentially debilitating liquidity crisis as set forth in Section II.D.5. The Company did not have "a strong reserve position" as the reserves were inadequate and in violation of GAAP. *See* Section II.D.4.

264. On January 11, 2007, the Company completed a $56 million offering of trust preferred securities through its subsidiary, Accredited Preferred Securities Trust I. The trust preferred securities are to bear interest at a fixed rate of 9.01% until January 30, 2012, whereupon the rate floats at three-month LIBOR plus 3.95% thereafter until their maturity in January 2037, unless earlier redeemed.

265. On February 14, 2007, the Company issued a press release entitled "Accredited Reports 2006 Results." The Company reported net loss for the quarter ended December 31, 2006 was ($37.8) million, or ($1.49) per share on a fully-diluted basis, which income amount was false and misleading and artificially inflated for the reasons set forth in Section II.D. Defendants had manipulated the Company's ALL by at least $402.16 million in the quarter ($595.455 million on a cumulative basis) (*see* Section II.D.4.a.), and manipulated the REO Reserve by at least $8.52 million ($19.125 million on a cumulative basis) (*see* Section II.D.4.b.) and manipulated the Company's Repurchases Reserve by at least $4.25 million ($17.075 million

on a cumulative basis) (*see* Section II.D.4.c.).   Indeed, adjusting for these manipulations and the effective tax rate, the Company's actual net income reflected the Company lost at least $315.81 million.  *See* Section II.D.4.d.  Moreover, defendants improperly accounted for the Company's acquisition of Aames, which the defendants have admitted, causing the Company's reported income to be artificially inflated by $142.4 million (which is in addition to the manipulation of income resulting from understated reserves).  Because of the improper accounting for the Aames acquisition, and failure to write-down the goodwill related thereto, the Company's financial results were also false and misleading in that the Company's reported assets on its balance sheet were overstated by $63 million.  *See* Section II.D.4.e.

266.   While the February 14, 2007 press release was false and misleading, defendants did disclose that the Company's financial results in the fourth quarter of 2006 were substantially lower than the prior year fourth quarter and substantially below analyst expectations.  The earnings miss was in large part because delinquent loans had grown to 7.18% of the Company's loan portfolio (which number excluded loans made by Aames) versus only 2.47% in the prior year – an increase in delinquencies of 290%.  With delinquencies from the Aames loans, the delinquency rate increased to 8.26%.  As a result of the Company's growing delinquencies, Accredited had been forced to implement and/or re-implement underwriting policies to address the large number of loan delinquencies being experienced by the Company.  The Company's press release stated:

> The company originated $3.9 billion of mortgage loans for the quarter ended 4Q 2006, compared to $4.7 billion of mortgage loan originations in 4Q 2005, a decrease of 18%.  Wholesale and retail originations for the quarter represented 77% and 23% of total loan production, respectively, reflecting the impact of the merger on the retail channel.

> Volume from the wholesale channel decreased from $4.2 billion in 4Q 2005 to $3.0 billion in 4Q 2006, a decline of 29.6%.  ***The primary reasons for the lower volume in the wholesale channel were continuation of credit quality initiatives***, and pricing and product competition in the wholesale market.

> *       *       *

> Delinquent loans (30 or more days past due, including foreclosures and real estate owned) comprised 7.18% (excluding Aames loans remaining in the portfolio) of the serviced portfolio at December 31, 2006, compared to 5.45% at September 30, 2006.

* * *

The decrease in total net revenues from 4Q 2005 to 4Q 2006 is primarily the result of lower gain on sale premiums on loans sold, higher provisions for repurchases and lower net interest income. Net interest income after provision declined primarily due to lower spreads and increasing provision for losses on loans held for investment and REO.

267. The Company also disclosed that loan repurchases had grown to $90 million in the 4th quarter of 2006 – which was five times the amount of loans repurchased in the fourth quarter of 2005.

268. Analysts and the media were surprised by defendants' revelations. For example, on February 20, 2007, Fox-Pitt, Kelton issued an analyst report lowering its earnings estimates as follows:

Weak 4Q06 leads to lower 2007 and 2008 estimates: We are lowering our 2007 and 2008 EPS estimates to -$0.62 (from $4.30) and $3.25 (from $5.88) respectively, following LEND's 4Q06 earnings release.

* * *

In loss mitigation mode; retrenchment necessary and should improve operating outlook: LEND's greater than expected 4Q06 loss was largely driven by the sharp deterioration in credit (mainly pertaining to the 2006 book of business), which resulted in $76 million (or $1.79 p/s after tax) in total reserve build. Going forward, increasing reserves along with tightening underwriting standards appears to be priority one for management. While these actions are likely to drive operating losses for the next two quarters, we think the changes are necessary to cushion the balance sheet from the 2006 vintage and improve mortgage banking margins through the development of a higher quality product.

269. However, defendants continued to make false and misleading statements to investors during the Company's conference call, which was attended by defendants Marvin, Konrath, Lydon and Buchanan. Defendant Konrath falsely stated:

I will now discuss many of the initiatives we have embarked upon to improve credit quality. It is important to understand that there are several drivers associated with strong portfolio performance. Product attributes is one very significant driver, but the integrity of the Company's processing and underwriting process is also a second important driver. We have been making adjustments to both the products we offer and our processing and underwriting disciplines. ***These efforts to begin adjusting underwriting guidelines and standards began in early 2006.***

In the second quarter, in response to what we were hearing from the whole loan buyers, we began making adjustments to products with high CLTVs, products with low credit scores and products with less than full income documentation. Additionally, particular attention was given to the layering of risk of these particular underwriting elements. We made significant reductions in our product

offering, including the elimination of stated income loans to borrowers with FICOs less than 640 on higher CLTVs, the curtailment of first-time homebuyer programs and the dramatic reduction of combo loan products, which significantly cut back second mortgage production.

While curtailing the product offering, we also turned our attention to our underwriting disciplines and re-examined our routines throughout the processing and underwriting environment. In addition, we also bolstered oversight by adding more senior management to both the wholesale and retail channels. All production-level incentive plans were adjusted to reward people for excellent credit quality and penalize those with unacceptable credit quality. The feedback loop from our capital markets group to the front-line underwriting personnel was enhanced to improve communication and accelerate improvement measures. Finally, we began using a number of tools to help us better manage the quality of appraisals being used. CoreLogic's HistoryPro is one tool we have integrated into our appraisal review process.

***This process of eliminating products, adjusting underwriting guidelines and reinforcing disciplines has been an ongoing effort for at least a year now***. . . .

[O]ur principal focus at this point in time is on producing profitable volume, so the emphasis on credit quality is vital to this objective.

\*       \*       \*

***We're confident that the many changes we have made to the curtailment of products and the underwriting disciplines will result in a return to the repurchase levels we have enjoyed in past years***.

270.    Defendant Konrath also falsely assured investors that the Company was not facing a liquidity problem:

I think the lead-in to your question that the ***liquidity was impressive*** at the end of the year is really the key. All of the questions that we have heard here regarding capital markets, whole loan sales markets, et cetera, all speak to how good is liquidity. ***We're happy with our liquidity position***, and we're also happy with the additional things we have been able to do, as Stu talked to the trust preferred, et cetera.

But we think that, given the amount of turbulence and where the market is and where the ABX spreads are, that right now is probably the time to maintain a very, very strong liquidity position, and we fully intend to do that.

271.    And, defendant Konrath misleadingly assured investors the Company was prepared to weather problems in the sub-prime market based on its strong liquidity position and quality portfolio:

Over the longer term, we continue to see ourselves as a company that can grow originations while producing those loans with some of the lowest costs to originate in the industry. We also believe the depth and expertise of our management team, our strong balance sheet, liquidity of $345 million as of the end of the year, as well as the quality of our portfolio will help us through the current cycle and provide expanded opportunities in the future.

272.    Defendants' statements to investors detailed in ¶¶266-271 were false and misleading for the reasons detailed in Section II.D.  For instance, the Company had not been "adjusting underwriting guidelines and standards [since] early 2006" in an effort "to improve credit quality" as defendant Konrath stated.  Rather, the Company had continued to disregard underwriting policies and procedures in 2006 in an effort to inflate and maintain origination volume.  The Company had not "bolstered oversight" or "adjusted" incentive plans to "reward people for excellent credit quality" – and certainly had not been "adjusting guidelines and reinforcing disciplines … for at least a year."  Rather, according to CW12, it wasn't until February 2007 that Accredited finally tightened its lending guidelines and, according to CW12, "it was too late by then."  Thus, it was misleading for defendant Konrath to suggest the Company expected repurchase levels to return to historic rates.  Defendant Konrath also misleadingly represented that the Company's "liquidity was impressive" and that the Company balance sheet was "strong" and that the quality of the Company's loan portfolio would help it through a downturn in the market.  In reality, the Company faced significant risks of suffering a liquidity crisis as a result of defendants' scheme to increase loan origination volume by disregarding the Company's underwriting policies.  *See* Section II.D.5.  Defendants' statements were particularly misleading in that defendants did not disclose that as of December 31, 2006, the Company's MLI 90+ days delinquent as of December 31, 2006 had increased to $316.25 million from only $136.84 million the quarter before and $71.36 million at the end of 2005.

273.    The Company's statements on February 14, 2007 were also false and misleading as the Company admitted in its Form 10-K for 2006, published after the Class Period on August 2, 2007, that the Company did not maintain effective internal controls:

As of December 31, 2006, we did not maintain effective operation of internal control over the application of U.S. generally accepted accounting principles relating to the merger of Aames Investment Corporation, which resulted in material adjustments to the Company's preliminary annual consolidated financial statements for the year ended December 31, 2006.  Most notable, the Company initially established goodwill based upon the market price of the Company's common stock on the closing date of the merger as opposed to the market price of the Company's common stock on the date the transaction was announced. This resulted in total goodwill initially estimated of approximately $65 million in the fourth quarter of 2006 instead of $142 million.

274. As a result of defendants' false and misleading statements in its press release and conference call, market reaction to the Company's partial disclosures was mixed and the stock price did not react strongly to the negative news.

275. On March 2, 2007, the Company filed a Form 12b-25 with the SEC signed by defendant Marvin stating the Company would not be filing its Form 10-K for the year 2006 as required.

276. Failure to file the Company's Form 10-K caused the Company to be in default of its warehouse covenants, which lenders supplied the Company with the necessary liquidity it needed to continue operations. As a result, market concerns about the Company's liquidity increased. At least in part because of this news, and growing suspicion among the marketplace of rampant improprieties in the industry, the Company's stock price declined from a close on March 1, 2007 at $22.53 to a close at $21.70 on March 2 and a close on the next trading day, March 5, at $16.06.

277. On March 13, 2007, after the market closed, the Company issued a press release further revealing the true financial condition of the Company, particularly the liquidity crisis it was suffering under as a result of the defendants' scheme to falsely inflate Accredited's financial results by originating risky loans. The Company also disclosed it would not be able to publish its Form 10-K within the time extension it had requested from the SEC. The press release stated in part:

> Accredited Home Lenders Holding Co. ("Accredited" or "Company") announced today that it is currently exploring various strategic options, including raising additional capital to enhance liquidity and provide the Company with the flexibility to retain or sell originated loans based on an assessment of the best overall return. ***Accredited's available cash resources have been affected primarily by margin calls under its warehouse and repurchase facilities since January 1, 2007***, all of which have been met to date, as well as ongoing loan repurchases. The Company reported that it has paid approximately $190 million in margin calls on its facilities since January 1, 2007. Approximately two-thirds of those margin calls have been received and paid since February 15, 2007.

> *          *          *

> [I]t is unlikely that the Company will file its Annual Report on Form 10-K by March 16, 2007 as previously contemplated in its Notification of Late Filing on Form 12b-25 filed with the Securities and Exchange Commission on March 1, 2007.

278.     Analysts were shocked by the size of the Company's defaults. "No one, including those of us who follow the company, expected the size of the early payment defaults that they reported," said Richard Eckert, a senior research analyst with Roth Capital Partners.

279.     On March 13, 2007, SunTrust Robinson Humphrey issued an analyst report on Accredited titled:  "On the Brink of Survival; Seeking Funding or Partner."  The report summarized the crisis:  "This morning, LEND announced that it is in a severe liquidity crisis due to margin calls and repurchase obligations. . . .  With the stock trading around $4, it is difficult to determine if LEND can survive or sell itself in time."

280.     Similarly, Fox-Pitt, Kelton issued an analyst report on March 14 rating the Company a sell and lowering its price target:

> We are lowering our price target to $3 following yesterday's announcement the company is pursuing liquidity driven capital raising alternatives.  Our new PT is based on a discounted book value estimate.  We believe there is less than a 50% chance LEND will be successful in shoring up its liquidity base through a capital raise or completing an outright sale of the company.

> Liquidity Strained During Depressed Times:  Since Jan 1, the company has burned through nearly $345 million in cash and available liquidity.  Draining the company's cash positions has been a combination of margin calls, EPD related buybacks and reduced residual repo financing availability.  More specifically, LEND and (sic) have been forced to post $190M in conjunction with margin calls on their warehouse lending facilities.  Given the quarter and the size of the company's warehouse inventory ($2.1B), we were surprised at the amount of the margin calls, which indicates that value of their loans has declined by 7-9 points, based on our estimate.

281.     On March 13, 2007, in direct response to defendants' disclosure of the day prior, Accredited's stock collapsed $7.43 per share to close at $3.97 per share, a one-day decline of 65% on volume of 41.9 million shares, 20 times the average three-month volume.

F.     Post-Class Period Events

282.     Accredited's shares initially rebounded from their close on March 13 at $3.97; however, this increase resulted from rumors that Accredited would be saved from bankruptcy by being acquired.

283.     On March 16, 2007, Accredited announced it had agreed to sell $2.7 billion of its mortgages to an undisclosed buyer at a "substantial discount" in an effort to provide the Company time in dealing with its looming liquidity crisis.  The press release stated: "The $2.7

billion of loans held for sale will be sold at a substantial discount in order to alleviate recent pressures from margin calls. . . .  The Company estimates that this discounted loan sale will result in a pre-tax charge of approximately $150 million."  Moreover, by the terms of the sale, $40 million of the payment was placed in a holdback reserve to satisfy early defaults.  The fact that no buyer would pay the face value of the loans, let alone the typical premium to compensate the Company for its work in originating the loans, further evidences the poor credit quality of the portfolio originated by Accredited.

284.    Further, on March 16, 2007, the Company announced it had received a letter from the NASDAQ Stock Market indicating the Company's common stock was subject to delisting as a result of its failure to file a timely Form 10-K with the SEC.

285.    On March 20, 2007 Accredited announced it had received a commitment for a $200 million loan from Farallon Capital Management, LLC at an interest rate of 13% per year, which also included issuance of some 3.3 million warrants to Farallon with an exercise price of $10 per share.  The unfavorable terms of the loan evidence Accredited's desperation to secure financing to bail itself out of its liquidity crisis.  As set forth by Morningstar analyst Ryan Lentell, "It's expensive, surely.  But I don't think it's completely ridiculous given the situation the company's in."

286.    On March 27, 2007, Accredited's auditor Grant Thornton LLP advised the Company it was resigning.  Accredited announced the resignation of Grant Thornton in an SEC filing dated April 2, 2007.  As set forth in the SEC filing, Grant Thornton had served as the Company's auditor since the firing of the Company's prior auditor in June 2005.

287.    On April 3, 2007, Fox-Pitt, Kelton issued an analyst report commenting that Grant Thornton's departure was "an unprecedented move" and that Grant Thornton had "run for the hills."

288.    Similarly, Stifel, Nicolaus & Company issued an analyst report on April 4 stating:

•     The resignation of Grant Thornton without completing the 2006 audit is a significant negative in our view.  We expect that this will postpone reporting for several more months, putting LEND in violation of various regulatory and NASDAQ requirements, and to some degree leaving aspects of its fate in the hands of others.  While LEND is not yet facing

delisting or state cease and desist orders, the continued inability to report timely financials exposes it to this risk.

- All in, we maintain our Sell rating on the shares as we believe 2007 will be a very difficult year, and survival risk still remains. Our revised estimates are ($5.88) and ($9.87) for 1Q07 and 2007, respectively.

289. On April 9, 2007, Accredited engaged Squar, Milner, Peterson, Miranda & Williamson, LLP ("Squar Milner") as its independent public accountant.

290. On May 11, 2007, Accredited filed with the SEC a Form 12b-25 signed by defendant James A. Konrath announcing Accredited was unable to timely file its Form 10-Q for the first quarter of 2007, but that the Company would file its Form 10-Q for the first quarter of 2007 and its Form 10-K for 2006 upon Squar Milner's completion of its audit of Accredited.

291. The May 11, 2007 Form 12b-25 further reported certain of Accredited's financial results and information for the first quarter. Notably, the Form 12b-25 reported that the poor quality of Accredited's loans had caused the Company to sell its mortgage portfolio for substantially less than it had in the past and below the cost to Accredited – causing the Company to incur a substantial loss. The financial results further evidenced (1) the Company's 2005-2006 growth in origination volume resulted from disregarding underwriting guidelines and was unsustainable, and (2) the substantial deterioration of the Company's financial condition resulting from poor-quality loans originated prior to and during the Class Period:

**Originations**

The Company originated approximately $1.9 billion of mortgage loans in the U.S. and Canada during the quarter ended March 31, 2007, down 47%, from $3.6 billion for the comparable period in the prior year.

**Loan Dispositions**

As previously announced, the Company closed a $760 million asset-backed, on-balance sheet securitization on January 30, 2007 compared to a $1.0 billion securitization in the first quarter of 2006.

During the first quarter 2007, as previously disclosed, the Company sold approximately $3.5 billion in mortgage loans for cash. Of the $3.5 billion sold, approximately $800 million of loans were sold at a weighted average net price of 100.63% and $2.7 billion of loans, which included substantially all performing and non-performing loans in inventory on March 6, 2007, were sold at a substantial discount to par value and resulted in a pre-tax charge of approximately $160 million. During the comparable quarter of 2006, the Company sold $3.0 billion in mortgage loans at a weighted average net premium to par value of approximately 2.10%.

In March 2007, the Company signed a $400 million forward sale agreement, priced at 100.625%, for loans to be delivered in the second quarter.

**Portfolio Performance and Loan Servicing**

The Company's servicing portfolio totaled approximately $9.1 billion at March 31, 2007. The serviced portfolio decreased approximately $500 million from approximately $9.6 billion at March 31, 2006. This was primarily due to the decline in the number and sizes of the Company's securitizations in 2006 and 2007. Delinquent loans (30 or more days past due, including foreclosures and real estate owned) comprised 8.96% of the serviced portfolio at March 31, 2007, compared to 8.26% and 2.85% at December 31, 2006 and March 31, 2006, respectively.

**Financial Results**

As previously reported, the Company's recent performance has been and continues to be negatively impacted by fierce pricing competition, ongoing product contraction, higher delinquencies and losses, and activities associated with the acquisition of Aames Investment Corporation that was effective on October 1, 2006.

\* \* \*

The Company anticipates a significant loss in the quarter ended March 31, 2007 compared to net income of $35.8 million for the comparable period in 2006. Among other items affecting the results for the quarter ended March 31, 2007, were the losses on loan dispositions in the first quarter, expenses associated with higher delinquencies and cost restructuring initiatives discussed above. As previously disclosed, the Company is evaluating the recoverability of tax assets and the amount of necessary valuation allowance. The Company believes that approximately $100 million is recoverable from taxes paid in prior years, and the realization of any additional tax benefit will be dependent on future taxable income.

292. On May 15, 2007, the Company announced it had received a letter from the NASDAQ Stock Market indicating the Company's common stock was subject to delisting as a result of its failure to file a timely Form 10-Q with the SEC. The May 15, 2007 deficiency letter from the NASDAQ was in addition to the deficiency letter received previously on March 16, 2007.

293. On June 4, 2007, Accredited announced it had agreed to be acquired by Lone Star Fund V via a tender offer priced at $15.10 per share, valuing the Company at approximately $400 million.

294. On August 2, 2007, the Company filed its Form 10-K for 2006 with the SEC after having delayed filing for 4.5 months. The Form 10-K made a number of disclosures substantiating Lead Plaintiff's allegations, including among others:

- "We recorded a net loss of $205.7 million for the year ended December 31, 2006, or $9.09 per diluted share, compared to net income of $155.4 million, or $7.07 per diluted share in 2005."

- "The total provision for losses outlined below increased $116.1 million or 143%, from $81.4 million in 2005 to $197.4 million in 2006. This provision increase was one of the key reasons for our profit decline from 2005 to 2006 and was driven by increasing delinquencies in our mortgage loan portfolio."

- "Loans more than 30 days delinquent rose consistently during 2006, from 2.49% at December 31, 2005 to 7.18% at December 31, 2006 (excluding mortgage loans acquired from Aames)."

- "The provision for LOCOM on loans held for sale increased $59.0 million, from $6.0 million in 2005 to $65.0 million in 2006, and represented the largest portion of the increase in the total provision for losses. This provision increase was the result of increasing delinquencies in loans originated and repurchased, coupled with a sharp decline in secondary market prices for first and second lien non-prime mortgage loans."

- "The provision for repurchase losses also increased $39.6 million in 2006, from $4.1 million in 2005 to $43.7 million in 2006. As secondary market prices declined and early payment defaults increased in 2006, investors began to more aggressively enforce the early payment default terms and misrepresentations and warranty claims of their purchase and sale contracts, including those with Accredited."

- "During the five months ended May 31, 2007, we repurchased approximately $152 million in mortgage loans and paid $39.2 million in cash settlements to eliminate the requirement to repurchase mortgage loans in the future from investors."

- As of December 31, 2007, the Company's MLI 90+ days delinquent had grown to $316.25 million.

- "As of December 31, 2006, we did not maintain effective operation of internal control over the application of U.S. generally accepted accounting principles relating to the merger of Aames Investment Corporation, which resulted in material adjustments to the Company's preliminary annual consolidated financial statements for the year ended December 31, 2006. Most notable, the Company initially established goodwill based upon the market price of the Company's common stock on the closing date of the merger as opposed to the market price of the Company's common stock on the date the transaction was announced. This resulted in total goodwill initially estimated of approximately $65 million in the fourth quarter of 2006 instead of $142 million."

- "[T]he Company determined that the amount of goodwill established in the acquisition of Aames of approximately $142.4 million had been impaired and therefore was charged-off."

295.    On August 10, 2007, the Company filed a Form 12b-25 with the SEC, signed by defendant Konrath, in which the Company reported it could not timely file its Form 10-Q filings for the periods ending March 31, 2007 and June 30, 2007.  Moreover, the Company's Form 10-Q disclosed: "Delinquent loans (30 or more days past due, including foreclosures and real estate

owned) comprised 11.71% of the serviced portfolio at June 30, 2007, compared to 8.26% and 3.86% at December 31, 2006 and June 30, 2006, respectively."

296.    Later on August 10, 2007, Lone Star stated in a filing with the SEC that it had "informed the Chairman of the Special Committee of the Board of Directors of the Company that, in light of the drastic deterioration in the financial and operational condition of the Company, among other things, as of today, the Company would fail to satisfy the conditions to the closing of the tender offer."

297.    In response, on August 10, 2007, Accredited "announced that it believes all conditions to the closing of the pending tender offer for Accredited's common stock will be satisfied" and on August 11, 2007, Accredited filed an action in the Court of Chancery for New Castle County, Delaware, seeking specific performance requiring Lone Star to complete the acquisition.

298.    On August 20, 2007, Lone Star filed its answer to the complaint and counterclaims. According to Lone Star, Accredited's "precipitous descent into a severe liquidity crisis" was attributable to the Company deviating from its underwriting policies: "Accredited has amassed a large and growing pool of 'scratch and dent' loans that were put back to Accredited because they were issued in violation on the underwriting criteria applicable to those loans." ¶30.

299.    Lone Star also alleged the Company had committed "violations of covenants in the Company's core credit facilities" having a material adverse effect to the Company and, along with other factors specific to the Company, causing the Company's "current financial condition and liquidity crisis." ¶¶60-62.

300.    Lone Star further alleges defendants continue to conceal facts concerning the Company's compliance with covenants in the Company's credit facilities: "Accredited has not provided Lone Star with requested information regarding Accredited's current financial condition and prospects, including information regarding Accredited's compliance with the terms and conditions of its credit facilities and communications between or among Accredited and its creditors regarding the covenants in those credit facilities." ¶46.

G.     Loss Causation

301.     Throughout the Class Period, as detailed above, the prices of the Company's securities were artificially inflated as a direct result of defendants' misrepresentations and omissions regarding the Company.  When the truth about the Company was partially revealed to the market beginning with the Company's disclosure on August 9, 2006 (and leakage preceding that disclosure that resulted in the stock price decline on August 7 and August 8), the inflation that had been caused by defendants' misrepresentations and omissions was eliminated from the price of the Company's securities, causing significant damages to Lead Plaintiff and the other Class members.  Accredited's securities consistently reacted to information in the market place, including, but not limited to, the following:

- On November 1, 2005, Accredited reported misleading 3Q'05 financial results including net income of $41.3 million, up from $35.9 million in 3Q'04.  The stock price increased 7.25%.

- On November 18, 2005, defendant Konrath appeared on *Jim Cramer's Mad Money*.  The stock price closed up 6.18% on the next trading day (November 21, 2005).

- On December 19, 2005, Accredited reported misleading full-year 2006 guidance of $7.70-$8.00 per share.  The stock price closed up 3.8%.

- On March 16, 2006, Accredited filed its misleading Form 10-K with the SEC.  The stock price closed up 5.29%.

- On May 5, 2006, Accredited was upgraded by Fitch Ratings.  The stock closed up 4.03%.

- On May 25, 2006, Accredited announced the acquisition of Aames Investment Corporation for $340 million.  Accredited closed at $55.58 on May 26, 2006 after closing at $51.94 on May 24, 2006.

- On August 9, 2006, the Company partially disclosed the truth concerning its growing number of delinquencies and reduced its earnings projections for 2006.  After declining by large amounts on the two prior days, Accredited declined 17.2% after the disclosure.

- On August 11, 2006, the Company was downgraded by Roth Capital.  The stock dropped 6.7%.

- On October 16, 2006, the Company was downgraded by Stifel Nicolaus. The stock dropped 3.9%.

- On October 19, 2006, the Company announced higher delinquency rates and lowers 2006 earnings projections. Analysts reported management had "lost credibility." The stock dropped 11% on the day.

- On January 1, 2007, Accredited sold $56 million of preferred securities to investors. Accredited common stock increased 5.4%.

- On February 8, 2007 through February 12, 2007, Accredited stock price dropped from $29 to $24.50 in anticipation of the Company's release of 2006 financial results and as a result of industry news concerning declining credit quality.

- On March 2, 2007, the Company failed to file its Form 10-K with the SEC as required. The stock dropped 3.68%.

- On March 5, 2007, the next trading day after the Company failed to file its Form 10-K, Company was downgraded by Stifel Nicolaus. The stock price dropped 26%.

- On March 12, 2007, after the Company's stock price dropped 28% on the day, the Company issued a press release, after the market closed, disclosing a liquidity crisis resulting from loan repurchases and margin calls on the Company's credit facilities.

- On March 13, 2007, the Company's stock dropped over 65% in response to the Company's press release and disclosure of a severe liquidity crisis.

302. The declines in the Company's securities prices following these revelations, and the resulting damages suffered by Lead Plaintiff and the other members of the Class, are directly attributable to the market's reaction to the disclosure of information that had previously been misrepresented or concealed by defendants, and to the market's adjustment of the Company's securities prices to reflect the newly emerging truth about the Company's condition. Had Lead Plaintiff and the other members of the Class known of the material adverse information not disclosed by defendants named herein, or been aware of the truth behind these defendants' material misstatements, they would not have purchased Accredited securities at artificially inflated prices.

303. Moreover, throughout the Class Period, defendants concealed the true financial condition of the Company, its true underwriting procedures, and material risks to the Company's liquidity. As a result, investors in Accredited securities were misled as to, among other things, the creditworthiness of the Company and its future prospects and ability to fund its operations. The material risks, including those relevant to evaluation of the Company's potential to suffer a liquidity crisis and possible bankruptcy, materialized to the detriment of plaintiffs causing the Company's securities to be devalued and damages to plaintiffs.

H.     Presumption Of Reliance

304. The market for the Company's securities was, at all times, an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the prices of the Company's securities. Throughout the Class Period:

(a)     Accredited stock was actively traded on the NASDAQ;

(b)     The market price of Accredited securities reacted promptly to the dissemination of public information regarding the Company;

(c)     Securities analysts followed and published research reports regarding Accredited that were publicly available to investors;

(d)     The average weekly trading volume for Accredited stock during the Class Period was approximately 5 million shares, or approximately 20% of average total outstanding shares; and

(e)     The Company's market capitalization was as high as $1.2 billion during the Class Period and the Company had over 25 million shares outstanding as of November 2006.

305. Throughout the Class Period, the Company was consistently followed by securities analysts as well as the business press. During this period, Accredited and certain defendants continued to pump materially false information into the marketplace regarding the financial condition of the Company. This information was promptly reviewed and analyzed by the ratings agencies, analysts and institutional investors; assimilated into the ratings agencies' ratings for the preferred shares issued by the REIT and into analysts and investors' analysis of

the creditworthiness and the probability of default on the preferred shares; and reflected in the market price of the preferred shares.

306. The REIT's preferred shares traded on the NYSE with 100,000 shares outstanding and a market capitalization of approximately $2.5 million.

307. As a result of the misconduct alleged herein (including defendants' misstatements and omissions), the market for Accredited securities was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies.

308. Lead Plaintiff and the other Class members justifiably relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of Accredited securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

309. Had Lead Plaintiff and the other members of the Class known of the material adverse information not disclosed by the defendants, or been aware of the truth behind the defendants' material misstatements, they would not have purchased Accredited securities at artificially inflated prices.

I.    No Safe Harbor Protection

310. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false or misleading statements pleaded in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements. To the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, defendants had actual knowledge that the particular forward-looking statement was

materially false or misleading. In addition, to the extent any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events, and defendants failed to update those statements which later became inaccurate.

### Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against All Defendants

311. Plaintiffs repeat and re-allege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

312. Throughout the Class Period, defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the United States mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Accredited, including its true financial results and prospects, as specified herein. Defendants employed devices, schemes and artifices to defraud while in possession of material, adverse non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Accredited not misleading. Specifically, defendants knew or, but for their recklessness, should have known that the Company's reported financial results during the Class Period, as filed with the SEC and disseminated to the investing public, were materially overstated and were not presented in accordance with GAAP. Further, defendants knew of existing adverse facts which undermined their representations about Accredited's existing business and prospects during the Class Period.

313. Accredited and the Individual Defendants, as top executive officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as officers of the Company, each of the Individual Defendants was able to and did control the content of the public statements disseminated by Accredited. With knowledge of the falsity and/or misleading nature of the statements contained therein and in reckless disregard of the true financial results of the Company, the defendants caused the

heretofore complained of public statements to contain misstatements and omissions of material facts as alleged herein.

314. Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were among the senior management of the Company, and were therefore directly responsible for the false and misleading statements and/or omissions disseminated to the public through press releases, news reports and filings with the SEC.

315. Defendants' misrepresentations and/or omissions were intentional or reckless and done for the purpose of enriching themselves at the expense of Lead Plaintiff and the Class and to conceal the Company's true operating condition from the investing public. Defendants engaged in this scheme to inflate the Company's reported revenues and prospects in order to create the illusion that Accredited was a successful, strong and growing sub-prime lending company.

316. As a result of those deceptive practices and false and misleading statements and/or omissions, the market price of Accredited's securities was artificially inflated throughout the Class Period. In ignorance of the false and misleading nature of the representations and/or omissions described above and the deceptive and manipulative devices employed by defendants, Lead Plaintiff and the other members of the Class, in reliance on either the integrity of the market or directly on the statements and reports of defendants, purchased Accredited securities at artificially inflated prices and were damaged thereby.

317. Had plaintiffs and the other members of the Class known of the material adverse information not disclosed by defendants, or been aware of the truth behind defendants' material misstatements, they would not have purchased Accredited securities at artificially inflated prices.

318. By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## Violations Of Section 20(a) Of The Exchange Act Against the Individual Defendants and Accredited

319. Plaintiffs repeat and re-allege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

320. Accredited, as indirect owner of all the common stock of the REIT, was, at the time of the wrongs alleged herein, a controlling person of the REIT within the meaning of Section 20(a) of the Exchange Act. It had the power and influence and exercised the same to cause the REIT to engage in the illegal conduct and practices complained of herein.

321. Defendant Konrath, by virtue of his position with Accredited and his specific acts, was, at the time of the wrongs alleged herein, a controlling person of Accredited and the REIT within the meaning of Section 20(a) of the Exchange Act. He had the power and influence and exercised the same to cause Accredited and the REIT to engage in the illegal conduct and practices complained of herein. Konrath was the Company's CEO and Chairman of the Board of Directors, as well as for the REIT, and actively managed the Company and the REIT and its reporting to investors and its lending practices. Defendant Konrath was thereby and otherwise a culpable participant in the fraud perpetrated by Accredited and the REIT.

322. Defendant Lydon, by virtue of his position with Accredited and his specific acts, was, at the time of the wrongs alleged herein, a controlling person of Accredited and the REIT within the meaning of Section 20(a) of the Exchange Act. He had the power and influence and exercised the same to cause Accredited and the REIT to engage in the illegal conduct and practices complained of herein. Lydon was the Company's President and Chief Operating Officer and served on the Company's Board of Directors, as well as for the REIT, and actively managed the Company and the REIT and its reporting to investors and its lending practices. Defendant Lydon was thereby and otherwise a culpable participant in the fraud perpetrated by Accredited and the REIT.

323. Defendant Marvin, by virtue of his position with Accredited and his specific acts, was, at the time of the wrongs alleged herein, a controlling person of Accredited and the REIT within the meaning of Section 20(a) of the Exchange Act. He had the power and influence and

exercised the same to cause Accredited and the REIT to engage in the illegal conduct and practices complained of herein. Marvin was the Company's Executive Vice President and one of its three members of the Executive Management (along with Konrath and Lydon). He was also Executive Vice President of the REIT and its Secretary. He actively managed the Company and the REIT and its reporting to investors and its lending practices. Defendant Konrath was thereby and otherwise a culpable participant in the fraud perpetrated by Accredited and the REIT.

324. Defendant Buchanan, by virtue of his position with Accredited and his specific acts, was, at the time of the wrongs alleged herein, a controlling person of Accredited and the REIT within the meaning of Section 20(a) of the Exchange Act. He had the power and influence and exercised the same to cause Accredited and the REIT to engage in the illegal conduct and practices complained of herein. Buchanan was the Company's CFO, as well as for the REIT, and actively managed the Company and the REIT and its reporting to investors and its lending practices. Defendant Buchanan was thereby and otherwise a culpable participant in the fraud perpetrated by Accredited and the REIT.

325. Defendant Crawford, by virtue of his position with Accredited and his specific acts, was, at the time of the wrongs alleged herein, a controlling person of Accredited within the meaning of Section 20(a) of the Exchange Act. He had the power and influence and exercised the same to cause Accredited to engage in the illegal conduct and practices complained of herein. Crawford was the Company's Director of Operations and actively managed the Company and its reporting to investors and its lending practices and had direct oversight of the Company's underwriting function. Defendant Crawford was thereby and otherwise a culpable participant in the fraud perpetrated by Accredited and the REIT.

326. By reason of the conduct of Accredited as alleged in this Complaint, the Individual Defendants are liable for the aforesaid wrongful conduct of Accredited and liable to Lead Plaintiff and the Class for the substantial damages which they suffered in connection with their purchases or acquisitions of shares as a result of Accredited's violations of the Exchange Act.

III. **THIRD CLAIM FOR RELIEF – For Violations Of Section 14(a) Of The Exchange Act And Rule 14a-9 Promulgated Thereunder Against Defendants Accredited, Konrath, Lydon, Gunderson, Pratt, Erickson, Espy, Berglund And Marvin**

327. Plaintiffs incorporate by reference all paragraphs above as though fully set forth herein.

328. This claim is asserted against defendants Accredited, James A. Konrath, Joseph J. Lydon, Jody A. Gunderson, Richard T. Pratt, Gary M. Erickson, Bowers W. Espy, James H. Berglund and Stuart D. Marvin on behalf of all members of the Class who held common stock of Aames on August 1, 2006, and held those shares on September 14, 2006, for violations of Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9, 17 C.F.R. § 240.14a-9. Each defendant named in this Claim solicited proxies by means of the Joint Proxy Statement and Prospectus, which was distributed to Accredited and Aames shareholders, by permitting the use of their names in the Joint Proxy Statement and Prospectus and/or by recommending in the Joint Proxy Statement and Prospectus that Accredited and Aames shareholders approve the merger.

329. Defendants James A. Konrath, Joseph J. Lydon, Jody A. Gunderson, Richard T. Pratt, Gary M. Erickson, Bowers W. Espy, and James H. Berglund were all directors of the Company at the time the Joint Proxy Statement and Prospectus was approved, and at all relevant times. Defendants Konrath, Lydon, Gunderson, Pratt, Erickson, Espy, and Berglund signed the S-4 Registration Statement that contained the Joint Proxy and Prospectus allowing it to be filed with the SEC. Defendant Marvin was Secretary of the Board of Directors and signed the Joint Proxy and Prospectus on behalf of the entire Accredited Board of Directors.

330. The Joint Proxy Statement and Prospectus described herein was a "proxy solicitation" within the meaning of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

331. The Joint Proxy Statement and Prospectus contained numerous false and misleading statements. At page 6 of the Joint Proxy Statement and Prospectus, Accredited's business is falsely and misleadingly described. The Joint Proxy Statement and Prospectus states: "Accredited originates loans primarily based upon the borrower's willingness and ability to repay the loan and the adequacy of the collateral. Its experienced management team has

developed incentive programs, technology tools and business processes intended to focus Accredited's employees on originating non-prime mortgage loans with the financial and other characteristics that generate profits."

332. The Joint Proxy Statement and Prospectus included Accredited's false and misleading 2005 financial results that had been artificially inflated as a result the Company's increased loan volume driven by deviations from the Company's underwriting policies as set forth in Section II.D.

333. The Joint Proxy Statement and Prospectus included false and misleading pro forma financial information purporting to show the combined Company's financial results for 2005 and the first quarter of 2006, which pro forma results were misleading for the reasons set forth in Section II.D.4.

334. The Joint Proxy Statement and Prospectus referenced, and attached as an exhibit, the Company's representations and warranties made in the Merger Agreement. Among other things, the Company falsely and misleadingly represented:

> Acquiror has filed or furnished, as applicable, on a timely basis all forms, statements, reports and documents required to be filed or furnished by it with the SEC under the Exchange Act or the Securities Act since the Applicable Date (the forms, statements, reports and documents filed or furnished since the Applicable Date and those filed or furnished subsequent to the date hereof including any amendments thereto, the "*Acquiror Reports*"). Each of the Acquiror Reports, at the time of its filing or being furnished, ***complied, or if not yet filed or furnished, will comply, in all material respects with the applicable requirements of the Securities Act, the Exchange Act and the Sarbanes-Oxley Act***, and any rules and regulations promulgated thereunder applicable to the Acquiror Reports. As of their respective dates (or, if amended prior to the date hereof, as of the date of such amendment) ***the Acquiror Reports did not, and any Acquiror Reports filed or furnished with the SEC subsequent to the date hereof will not, contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading***.

335. Similarly, the Merger Agreement falsely represented that the Company maintained disclosure controls and procedures required by Rule 13a-15 or 15d-15 under the Exchange Act and other such internal controls over financial reporting to provide "reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements."

336.     As set forth herein, the Company filed SEC filings that did contain untrue statements of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading, and the Company either did not have or defendants disregarded the Company's disclosure controls and procedures and other such internal controls over financial reporting.

337.     The Joint Proxy Statement and Prospectus included false and misleading risk disclosures that failed to disclose that the Company had substantially deviated from its underwriting guidelines to maintain and/or increase loan volume as set forth in Section II.D.3. Moreover, the Joint Proxy Statement and Prospectus was false and misleading in that, at page 27, it discussed potential deviation from underwriting standards as a hypothetical future event and not something that had already been occurring at the Company for well over a year: "If Accredited's competitors adopt less stringent underwriting standards, it will be pressured to do so as well, which would result in greater loan risk without compensating pricing. If Accredited does not relax underwriting standards in response to its competitors, it may lose market share."

338.     Defendants misleadingly represented at page 28 that the Company employed "appropriate underwriting policies" and that "Aames's [historic] higher delinquency rate is due to the lower credit quality of its typical borrower as compared to Accredited's." This statement was false and misleading because the Company did not abide by its underwriting policies and Aames's underwriting standards were stricter than those utilized by Accredited at the time of the Joint Proxy Statement and Prospectus, as set forth in Section II.D.3.

339.     The Joint Proxy Statement and Prospectus included the false and misleading statement at page 34: "Accredited believes that it has qualified personnel at all levels and has established controls to ensure that all loans are originated to the market's requirements, but Accredited cannot assure you that it will not make mistakes, or that certain employees will not deliberately violate its lending policies." This statement was false and misleading because the Company did not abide by its "established controls" at the time the Joint Proxy Statement and Prospectus was issued.

340. The Joint Proxy Statement and Prospectus included the false and misleading assertion at page 61 that, based upon financial projections for 2006-2009 provided by Accredited's management, the Company then had an "implied equity value [] per share" of $55.18 to $88.31.

341. The Joint Proxy Statement and Prospectus incorporated by reference: (i) the Company's Form 10-K filed with the SEC on March 16, 2006; (ii) the Company's Form 10-Q filed with the SEC on May 10, 2006; (iii) numerous of the Company's Form 8-K filings filed with the SEC between February 6, 2006 and June 30, 2006; and (iv) any SEC filing between the date of the Joint Proxy Statement and Prospectus and the date of the special meeting of the Accredited and Aames shareholders (which includes the Company's Form 10-Q for the quarter ended June 30, 2006, filed with the SEC on August 9, 2006). Plaintiffs repeat and re-allege all allegations in ¶¶173-281 pertaining to the false and misleading statements contained in Accredited's SEC filings incorporated by reference in the Joint Proxy Statement and Prospectus.

342. The acquisition required and received the affirmative vote of Aames's shareholders at the Special Meeting on September 14, 2006. Thus, the Joint Proxy Statement and Prospectus was an essential link in the accomplishment of the acquisition.

343. As a result of the foregoing, defendants named in this Claim have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

IV. <u>FOURTH AND FIFTH CLAIMS FOR RELIEF – For Violations Of Sections 11 And 15 Of The Securities Act Against Defendants Accredited, Konrath, Lydon, Gunderson, Pratt, Erickson, Espy, And Berglund</u>

344. These claims for relief do ***not*** incorporate by reference the paragraphs above.

345. Plaintiff William F. Kornfeld ("Kornfeld") asserts these claims for violations of Sections 11 and 15 of the Securities Act, 15 U.S.C. Section 77k, against defendants Accredited, Konrath, Lydon, Gunderson, Pratt, Erickson, Espy and Berglund on behalf of themselves and other members of the Class who acquired Accredited stock in exchange for Aames stock. Each of the plaintiffs bringing these Claims acquired Accredited's shares issued and registered pursuant to Accredited's Registration Statement on Form S-4 filed with the SEC on July 14, 2006 (the "Registration Statement"). The Registration Statement included a Joint Proxy and

Prospectus. These Claims also assert against defendants Konrath and Lydon for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, by virtue of their direct and indirect control of Accredited.

346. The defendants named in these Claims signed the Registration Statement and were directors of Accredited at the time the Registration Statement was filed with the SEC.

347. The Registration Statement contained numerous false and/or misleading statements, as is detailed herein.

348. Accredited issued the shares registered by the Registration Statement on October 1, 2006. The shares were issued in connection with Accredited's acquisition of Aames Investment Corporation, which acquisition closed on October 1, 2006. Plaintiffs in the Class who acquired Accredited stock in exchange for Aames stock pursuant to the acquisition received 0.07 shares of Accredited for each share of Aames exchanged. Plaintiffs acquired their Accredited shares in connection with the merger without knowledge of the false statements and omissions alleged herein. As a direct and proximate result, plaintiffs have suffered substantial damages.

349. In connection with the issuing of the Registration Statement, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of national securities exchanges.

350. This action was brought within one year after the discovery of the untrue statements and omissions (and within one year after such discovery should have been made in the exercise of reasonable diligence) and within three years after the acquisition of Aames by Accredited.

A. Jurisdiction And Venue

351. The claims in this Count arise under Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o.

352. This Court has jurisdiction over these claims under Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), 28 U.S.C. §§ 1331 and 1337 for these claims.

353. Venue is proper in this District under Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a). The wrongs alleged herein occurred, in substantial part, in this District. At all relevant times, Accredited conducted, and still conducts, significant business in this District and maintains its principal place of business in San Diego. At all relevant times, defendants named herein conducted substantial business and/or resided in this District or committed violations of U.S. law by acts committed in this District.

B. The Parties

354. Court-appointed Lead Plaintiff, the Arkansas Teacher Retirement System ("ATRS" or "Lead Plaintiff"), was established in 1937 to provide retirement benefits to the employees of the state's education community. For the fiscal year ending June 30, 2006, ATRS's total assets equaled $11.27 billion with 85,916 active members and 24,050 retirees receiving benefits through the system. During the Class Period, ATRS purchased Accredited common stock. As a result of these purchases and the violations of the securities laws alleged herein, ATRS suffered substantial damages. On June 25, 2007, the Court appointed ATRS as Lead Plaintiff in this litigation.

355. Plaintiff William F. Kornfeld ("Kornfeld") acquired 561 shares of Accredited common stock in exchange for 6,000 shares of Aames common stock pursuant to Accredited's acquisition of Aames and, as a result, and because of the violations of the securities laws alleged herein, Kornfeld suffered substantial damages.

356. Accredited Home Lenders Holding Co. ("Accredited" or the "Company" or "Lend") is a mortgage banking company operating throughout the United States and in Canada. The Company originates, finances, securitizes, services and sells sub-prime (a/ka/ non-prime) mortgage loans secured by residential real estate. Accredited focuses on borrowers who may not qualify for loans from traditional banking entities because of higher loan-to-value ratios, the nature or absence of income documentation, limited credit histories, high levels of consumer debt, or past credit difficulties.

357. James A. Konrath ("Konrath") is a founder of the Company and was at all relevant times Chairman of the Board and Chief Executive Officer of Accredited and labeled by

the Company as part of its Executive Management. Prior to founding Accredited, Mr. Konrath was the President and Chief Executive Officer of Security Pacific Financial Services, Inc., where he managed over 1,900 people in more than 300 consumer finance offices, from 1986 to 1989. From 1983 to 1986, Mr. Konrath was the President and Chief Executive Officer of Security Pacific Housing Services, where he founded a new subsidiary focused on manufactured housing loans. Mr. Konrath earned a Bachelor of Arts degree in Accounting with a minor in Economics from the University of Wisconsin—Whitewater in 1969.

358. Joseph J. Lydon ("Lydon") was at all relevant times President and Chief Operating Officer of Accredited and served on the Company's Board of Directors and was labeled by the Company as part of its Executive Management. Mr. Lydon is a veteran of more than two decades in the mortgage banking industry, having joined Accredited in 1997 from Ford Consumer Finance, a division of The Associates First Capital Corporation, where he served as Executive Vice President for the western division from 1993 to 1997. From 1977 to 1993, Mr. Lydon worked at Security Pacific Financial Services, Inc., rising to the level of Senior Vice President in charge of six operating divisions. Mr. Lydon earned a Bachelor of Science degree in Management from Pepperdine University in 1991.

359. Jody A. Gunderson ("Gunderson") has served as a director of Accredited since January 2000. Ms. Gunderson is chairperson of the Audit Committee of Accredited's Board. Ms. Gunderson currently serves as a managing director at Cargill Value Investment, a position that she has held since 1998. In that position Ms. Gunderson manages investments in portfolios of credit-intensive residential mortgage loans and consumer loans and manages co-investment and servicing relationships. From 1994 to 1998, Ms. Gunderson served as an investment manager at Cargill Value Investment, providing capital to sub-prime mortgage companies and other specialty finance companies. From 1985 to 1994, Ms. Gunderson worked at PricewaterhouseCoopers LLP. She was a manager in the financial services industry practice where she served investment fund, commercial banking and thrift clients. Ms. Gunderson earned her Bachelor of Science degree in Accounting from the University of Minnesota in 1986 and is a certified public accountant in Minnesota (inactive).

360.    Richard T. Pratt, DBA ("Pratt"), has served as a director of Accredited since March 2003. Dr. Pratt is a member of the Audit and Nominating and Corporate Governance Committees of Accredited's Board. Dr. Pratt is currently the Chairman of Richard T. Pratt Associates, a position he has held since 1992, at which he performs consulting activities. Dr. Pratt held the positions of Associate Professor and Professor of Finance at the David Eccles School of Business at the University of Utah from 1966 to 1997, when he retired. From 1991 to 1994, Dr. Pratt served as a Managing Director of the Financial Institutions Group of Merrill Lynch. From 1983 to 1991, Dr. Pratt served as Chairman of Merrill Lynch Mortgage, Inc., a subsidiary of Merrill Lynch & Company. Dr. Pratt was Chairman of the Federal Home Loan Mortgage Corporation from 1981 to 1983, and served as Chairman of the Federal Savings and Loan Insurance Corporation during that time. Dr. Pratt was also the presidential appointee serving as Chairman of the Federal Home Loan Bank Board from 1981 to 1983. In addition, Dr. Pratt served as a director of American Residential Investment Trust, Inc., from 1997 to 2005. Dr. Pratt currently serves as a director of Celtic Bank, Salt Lake City, a position he has held since 2001. Dr. Pratt received his Bachelor of Science degree in Finance from the University of Utah in 1960, his Masters in Business Administration from the University of Utah in 1961, and his Doctor of Business Administration from Indiana University in 1966.

361.    Gary M. Erickson ("Erickson") has served as a director of Accredited since March 2003. Mr. Erickson is a lawyer with his own law firm and President and Chief Executive Officer of Seacoast Real Estate & Development Co., Inc., a San Diego real estate investment and development firm.

362.    Bowers W. Espy ("Espy) has served as a director of Accredited since July 2004. Mr. Espy has 30 years of experience in mortgage and corporate finance. Mr. Espy joined Merrill Lynch as vice president, mortgage finance officer and mortgage securities trader in 1983. In 1985, he established Merrill Lynch's first residential and commercial whole loan trading department. In 1987, he was named executive vice president and chief operating officer of Merrill Lynch Mortgage Capital Inc., responsible for all mortgage securitization activity, CMO issuance and the operation of Merrill Lynch's mortgage banking subsidiary. From 1989 to 1993,

as managing director of investment banking and head of the financial institutions restructuring group, Mr. Espy had responsibility for the acquisition of residential and commercial loan portfolios and consumer receivables, primarily from the Resolution Trust Corporation. He was named co-head of the depository institutions' mergers and acquisitions department in 1993 where, among other assignments, he served as senior advisor to Dime Savings Bank of New York in a financial institution rights offering. Mr. Espy earned a Bachelor of Science degree in Business Administration in 1972 and a Master of Arts degree in Economics in 1976 from the University of Florida.

363. James H. Berglund ("Berglund") has served as a director of Accredited since September 1999. Berglund currently serves as a general partner and managing director of Enterprise Partners Venture Capital, positions he has held since 1985. Mr. Berglund earned a Bachelor of Science degree in Economics from the University of Wisconsin in 1954.

C.      Background

364. In 2005 and throughout the Class Period, including the months prior to the closing of the Aames acquisition, the Company originated loans to borrowers who were unable and/or unwilling to repay the loans. During this period, the Company's underwriters and management failed to insure that the Company originated loans that complied with underwriting standards. In fact, the Company originated many loans that were not in compliance with the Company's underwriting policies. In many instances, the Company's underwriters and/or appraisers denied loan applications that did not comply with the Company's underwriting policies but their decisions were overridden and the loans were extended nonetheless.

365. Because the decisions of the Company's appraisers were being overridden, the Company originated many loans that were not adequately collateralized. As a result, purchasers of these loans were able to force the Company to repurchase the loans, which happened often when the borrower defaulted on the loan. Many of the Company's loan repurchases at the end of the Class Period were the result of inadequate collateral.

366. The Company's financial statements issued for 2005, 1Q'06 and 2Q'06, which were all incorporated by reference in the Registration Statement, were false and misleading

because they did not comply with Generally Accepted Accounting Principles ("GAAP"). GAAP are those principles recognized by the accounting profession as conventions, rules and procedures necessary to define accounting practices at a particular time. The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board. SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC which are presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

367. During the Class Period, Accredited securitized loans. Accredited refers to the loans it securitizes as mortgage loans held for investment ("MLIs"). GAAP required Accredited to establish a reserve for potential credit losses on the MLIs when the underlying borrowers default on their obligation to make monthly mortgage payments. This reserve is an allowance for loan losses or "ALL".

368. The SEC provided explicit guidance on the proper accounting that Accredited should have followed but did not. SEC Staff Accounting Bulletin: No. 102 – Selected Loan Loss Allowance Methodology and Documentation Issues, states in part:

> The staff normally would expect a registrant that engages in lending activities to develop and document a systematic methodology to determine its provision for loan losses and allowance for loan losses as of each financial reporting date. ***It is critical that loan loss allowance methodologies incorporate management's current judgments about the credit quality of the loan portfolio through a disciplined and consistently applied process.*** A registrant's loan loss allowance methodology is influenced by entity-specific factors, such as an entity's size, organizational structure, business environment and strategy, management style, loan portfolio characteristics, loan administration procedures, and management information systems. However, as indicated in the AICPA Audit and Accounting Guide, Banks and Savings Institutions (Audit Guide), "[w]hile different institutions may use different methods, there are certain common elements that should be included in any [loan loss allowance] methodology for it to be effective." A registrant's loan loss allowance methodology generally should:
>
> • Include a detailed analysis of the loan portfolio, performed on a regular basis;
>
> • Consider all loans (whether on an individual or group basis);
>
> • Identify loans to be evaluated for impairment on an individual basis under SFAS No. 114 and segment the remainder of the portfolio into groups of loans with similar risk characteristics for evaluation and analysis under SFAS No. 5;

- Consider all known relevant internal and external factors that may affect loan collectibility;

- Be applied consistently but, when appropriate, be modified for new factors affecting collectibility;

- Consider the particular risks inherent in different kinds of lending;

- Consider current collateral values (less costs to sell), where applicable;

- Require that analyses, estimates, reviews and other loan loss allowance methodology functions be performed by competent and well-trained personnel;

- Be based on current and reliable data;

- Be well documented, in writing, with clear explanations of the supporting analyses and rationale . . .; and

- Include a systematic and logical method to consolidate the loss estimates and ensure the loan loss allowance balance is recorded in accordance with GAAP.

For many entities engaged in lending activities, ***the allowance and provision for loan losses are significant elements of the financial statements***. Therefore, the staff believes ***it is appropriate for an entity's management to review, on a periodic basis, its methodology for determining its allowance for loan losses***.

369.    Accredited did not establish an adequate ALL, violating GAAP and inflating net income.

370.    The table below indicates that beginning with the Company's reported financial results for the third quarter of 2005, in every quarter the Company reduced the amount of its ALL in proportion to the amount of delinquencies the Company was then experiencing. While the amount of MLI was increasing in the Class Period, and the delinquencies were increasing dramatically every quarter, the Company reduced the proportion of its ALL relative to the amount of delinquencies:

|  | Mortgage Loans Held for Investment ($ millions) | Allowance for Loan Losses ($ millions) | MLI 90+ Delinquent ($ millions) | % of MLI 90+ Delinquent | ALL as a % of 90+ Delinquent |
|---|---|---|---|---|---|
| 2Q'06 | 7,809.5 | 125.4 | 96.6 | 1.24% | 129.74% |
| 1Q'06 | 7,763.2 | 115.7 | 85.5 | 1.10% | 135.36% |
| 4Q'05 | 7,321.6 | 106.0 | 71.3 | 0.97% | 148.56% |
| 3Q'05 | 5,874.9 | 95.7 | 49.1 | 0.84% | 195.04% |
| 2Q'05 | 5,214.5 | 84.2 | 36.3 | 0.70% | 231.98% |
| 1Q'05 | 4,667.6 | 69.3 | 29.7 | 0.64% | 233.54% |
| 4Q'04 | 4,102 | 60.1 | 22.6 | 0.55% | 265.70% |
| 3Q'04 | 4,084 | 51.3 | 18.5 | 0.45% | 277.45% |
| 2Q'04 | 3,303 | 40.8 | 12.9 | 0.39% | 316.34% |
| 1Q'04 | 2,142.3 | 24.7 | 8.7 | 0.41% | 283.75% |

371.    As the amount of 90+ days delinquent loans increased during the period (from $8.7 million in 1Q'04 to $96.6 million in 2Q'06), the percentage of the allowance for mortgage loans related to delinquent loans decreased dramatically (from 283.75% in 1Q'04 to 129.74% in 2Q'06).   This, along with the facts alleged concerning the Company's deviation from its underwriting policies and procedures, demonstrate the Company was not taking out adequate ALL reserves.

372.    In each of the six quarters prior to the Class Period, the Company maintained its ALL reserve at no less than 232% of the Company's MLI 90+ Days Delinquent.   During the Class Period, the defendants did not.   Assuming the proper ALL level as a percentage of delinquencies during the Class Period was the historic low of 232% in 2Q05 (it should have been higher because the Company deviated from its underwriting standards during the Class Period), the amount of the ALL understatement – and corresponding inflation of publicly reported income – is set forth in the table below (all numbers in $ millions):

| | ALL Reserve Actual | Proper ALL Reserve at 232% MLI 90+ Day Delinquencies | ALL Reserve Deficiency | Cumulative Inflation of Reported Income from Manipulation |
|---|---|---|---|---|
| 2Q'06 | 125.4 | 224.212 | 98.8 | 98.8 |
| 1Q'06 | 115.7 | 198.36 | 82.6 | 82.6 |
| 4Q'05 | 106.0 | 165.56 | 59.54 | 59.54 |
| 3Q'05 | 95.7 | 113.87 | 18.14 | 18.14 |

373. The Company's reserves for Real Estate Owned ("REO") also violated GAAP. REO is real estate the Company owns as a result of a borrower's default and a subsequent foreclosure by the Company. Throughout the Class Period, the Company's gross REO grew dramatically. Despite the fact the Company's gross REO was growing dramatically during the Class Period, the Company did not increase the Company's REO reserve proportionately.

374. During the Class Period, Accredited sold mortgage loans to third parties. Gains or losses resulting from loan sales were purportedly recognized at the time of sale, based primarily on the difference between the net sales proceeds and the book value of the loans sold.

375. Accredited provided purchasers of its mortgage loans with representations and warranties regarding the underwriting standards the Company followed in originating the loans. If a purchaser of the mortgage loans determined that a loan was not in compliance with the representations and warranties OR a borrower defaulted during the early months of the loan, the purchaser could require Accredited to repurchase the mortgage loan.

376. As a part of the Company's business, it regularly was required to buy back loans from purchasers of the Company's loan portfolio. Generally speaking, the Company normally tried to resell repurchased loans in the "scratch and dent" market. Sales in this market were normally at a loss because repurchased loans are, by the very nature, considered defective and therefore less valuable. If, however, the Company could not resell its repurchased loans in the "scratch and dent" market and the loan defaulted, the Company would foreclose on the loan and the property serving as collateral for the loan would become a part of REO.

377. The following table demonstrates that in the reporting periods prior to the Class Period, the Company maintained an REO reserve in excess of 40% of its gross REO. As the

gross REO grew, the Company historically increased the REO reserve. However, beginning in 2Q'06 the Company's REO reserve was clearly understated in violation of GAAP.

| | Gross REO ($ millions) | REO Reserve ($ millions) | Net REO ($ millions) | REO Reserve as a % of Gross REO | REO Reserve Deficiency ($ millions) |
|---|---|---|---|---|---|
| 4Q'04 | 10.53 | 4.41 | 6.12 | 41.85% | |
| 1Q'05 | 14.90 | 6.40 | 8.50 | 42.95% | |
| 2Q'05 | 16.90 | 7.01 | 9.89 | 41.48% | |
| 3Q'05 | 18.51 | 7.96 | 10.55 | 43.00% | |
| 4Q'05 | 26.81 | 10.73 | 16.09 | 40.00% | |
| 1Q'06 | 34.26 | 13.70 | 20.56 | 39.99% | |
| 2Q'06 | 52.62 | 12.78 | 39.84 | 24.29% | 8.27 |

378. As indicated in the table, the Company understated the REO reserve in, at least, the June 30, 2006 reporting period.

379. By maintaining the REO reserve at only 24% of Accredited's gross REO – rather than 40% of the gross REO as was the case in historic reporting periods – the Company falsely and misleadingly understated REO reserve by $8.27 million in the second quarter of 2006 and overstated net income.

380. The understating of the Company's REO reserve was a clear violation of GAAP.

381. In addition, GAAP (including SFAS No. 5, SFAS No. 140 and EITF 92-2) required that Accredited maintain a reserve on its balance sheet to cover future losses and expenses that were expected to arise as a result of repurchase obligations.

382. In accordance with SFAS No. 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities*, a replacement of FASB Statement 125, and EITF 92-2, *Measuring Loss Accruals by Transferors for Transfers of Receivables with Recourse*, the reserve is estimated based on factors including the Company's historical repurchase experience, industry repurchase experience, expected future volume of repurchases, and expected value of underlying collateral.

383. SFAS No. 140 and EITF 92-2 require the reserve to be estimated and recorded as a liability on Accredited's balance sheet in the period in which the loans are sold, with a corresponding reduction of Accredited's gain on whole loan sales in its income statement. Any

subsequent increase or decrease to the reserve is also required to be recorded as a current reduction or addition to Accredited's gain on whole loan sales.

384. Accredited violated GAAP by not maintaining an adequate reserve on its balance sheet for losses resulting from expected repurchase obligations.

385. The Company deviated from the underwriting guidelines in 2005 and 2006 that had been represented to buyers of the Company's loans. The Company provided a great many loans to persons with inferior credit quality, thereby causing the Company to have an increasing amount of repurchase obligations. The Company should have substantially increased the Company's reserves for repurchases during the Class Period.

386. The inadequacy of the Company's reserve for repurchases is evident in several respects. The table below illustrates the fact that the Company's reserve for repurchases was insufficient at least as early as 2Q'06. The reserve deficiency is calculated as the amount the reserve would have to be increased to equal an implied discount of 48.75%, which is the amount that Accredited used in its Form 10-K for 2006 filed with the SEC after the Class Period on August 2, 2007.

| | Loans Repurchased | Reserve for Repurchase | Implied Discount | Reserve Deficiency |
|---|---|---|---|---|
| 4Q'05 | 18.1 | 7.4 | 40.88% | |
| 1Q'06 | 14.6 | 8.0 | 54.79% | |
| 2Q'06 | 38.6 | 8.7 | 22.54% | 10.12 |

387. By 2Q06, the Company was being forced to buy back a growing number of the loans it sold throughout 2005-2006, but the Company did not increase its reserves in step. This was unreasonable and in violation of GAAP and, as a result of not taking sufficient reserves, the Company's reported income was inflated in 2Q'06.

D. The Registration Statement

388. The Registration Statement contained numerous false and misleading statements. Accredited's business is falsely and misleadingly described. The Registration Statement states: "Accredited originates loans primarily based upon the borrower's willingness and ability to repay the loan and the adequacy of the collateral. Its experienced management team has developed incentive programs, technology tools and business processes intended to focus

Accredited's employees on originating non-prime mortgage loans with the financial and other characteristics that generate profits."

389. This statement was false and misleading because the Company did not originate loans primarily based upon the borrower's willingness and ability to pay but rather the Company originated many loans to borrowers who either did not intend to repay them or did not have the ability to repay them, as set forth in Section IV.C. Moreover, the Company originated loans with inadequate collateral, as set forth in Section IV.C.

390. The Registration Statement included Accredited's false and misleading 2005 financial results that were false and/or misleading as a result of the Company's failure to establish adequate ALL, among other things, resulting from the Company's deviations from its underwriting policies as set forth in Section IV.C.

391. The Registration Statement included false and misleading pro forma financial information purporting to show the combined Company's financial results for 2005 and the first quarter of 2006, which pro forma results were misleading because the Company's financial results were false and/or misleading as a result of the Company's failure to adequately establish ALL, among other things, resulting from the Company's deviations from its underwriting policies as set forth in Section IV.C.

392. The Registration Statement referenced, and attached as an exhibit, the Company's representations and warranties made in the Merger Agreement. Among other things, the Company falsely and misleadingly represented:

> Acquiror has filed or furnished, as applicable, on a timely basis all forms, statements, reports and documents required to be filed or furnished by it with the SEC under the Exchange Act or the Securities Act since the Applicable Date (the forms, statements, reports and documents filed or furnished since the Applicable Date and those filed or furnished subsequent to the date hereof including any amendments thereto, the "*Acquiror Reports*"). Each of the Acquiror Reports, at the time of its filing or being furnished, ***complied, or if not yet filed or furnished, will comply, in all material respects with the applicable requirements of the Securities Act, the Exchange Act and the Sarbanes-Oxley Act***, and any rules and regulations promulgated thereunder applicable to the Acquiror Reports. As of their respective dates (or, if amended prior to the date hereof, as of the date of such amendment) ***the Acquiror Reports did not, and any Acquiror Reports filed or furnished with the SEC subsequent to the date hereof will not, contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading***.

393.     These statements were false and/or misleading because the Company filed SEC filings that did contain untrue statements of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading.  The Company's filings with the SEC included financial results that were false and/or misleading, as set forth in Section IV.C.

394.     Moreover, the Company's SEC filings were false and/or misleading in that they failed to disclose that the Company was substantially deviating from its underwriting policies as set forth in Section IV.C.  Rather, the Company's SEC filings misleadingly and falsely assured investors that the Company had rigid underwriting policies designed to ensure the credit quality of the Company's portfolio, such as this disclosure in the Company's Form 10-K filed with the SEC on March 16, 2006:

> Our loan officers and account executives work closely with our underwriting group to ensure that ***the loan applications that they originate meet the quality standards necessary to make it through the underwriting and funding process.***
>
>         *      *      *
>
> ***Each mortgage loan that we originate is underwritten prior to loan closing in accordance with our underwriting guidelines.***  We have developed underwriting processes and criteria that we believe generate ***high-quality non-prime loans***. Our underwriting guidelines are designed to help us evaluate a borrower's credit history, his or her capacity, willingness and ability to repay the loan, and the value and adequacy of the collateral.
>
>         *      *      *
>
> ***Our underwriting process and guidelines require a rigorous application review and documentation designed to maximize the value of our mortgage loans.***

395.     Similarly, the Merger Agreement attached to the Registration Statement falsely represented that the Company maintained disclosure controls and procedures required by Rule 13a-15 or 15d-15 under the Exchange Act and other such internal controls over financial reporting to provide "reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements."

396.     The Company either did not have or defendants negligently disregarded the Company's disclosure controls and procedures and other such internal controls over financial

reporting, that resulted in the Company reporting false and misleading financial results as set forth in Section IV.C.

397. The Registration Statement included false and misleading risk disclosures that failed to disclose that the Company had substantially deviated from its underwriting guidelines to maintain and/or increase loan volume, thereby making the Risk Disclosures misleading. Moreover, the Registration Statement was false and misleading in that it discussed potential deviation from underwriting standards as a hypothetical future event and not something that had already been occurring at the Company for well over a year: "If Accredited's competitors adopt less stringent underwriting standards, it will be pressured to do so as well, which would result in greater loan risk without compensating pricing. If Accredited does not relax underwriting standards in response to its competitors, it may lose market share."

398. The Registration Statement misleadingly represented that the Company employed "appropriate underwriting policies" and that "Aames's [historic] higher delinquency rate is due to the lower credit quality of its typical borrower as compared to Accredited's." This statement was false and misleading because the Company did not follow its underwriting policies and Aames's underwriting standards were stricter than those utilized by Accredited at the time of the Registration Statement.

399. The Registration Statement included the false and misleading statement: "Accredited believes that it has qualified personnel at all levels and has established controls to ensure that all loans are originated to the market's requirements, but Accredited cannot assure you that it will not make mistakes, or that certain employees will not deliberately violate its lending policies." This statement was false and misleading because the Company did not abide by its "established controls" at the time the Registration Statement was issued.

400. The Registration Statement included the false and misleading assertion that, based upon financial projections for 2006-2009 provided by Accredited's management, the Company then had an "implied equity value per share" of $55.18 to $88.31. The Company's true equity value was not in this range, nor would reasonable financial projections for the Company justify any such valuation at that time.

401. The Registration Statement incorporated by reference: (i) the Company's Form 10-K filed with the SEC on March 16, 2006; (ii) the Company's Form 10-Q filed with the SEC on May 10, 2006; (iii) numerous of the Company's Form 8-K filings filed with the SEC between February 6, 2006 and June 30, 2006; and (iv) any SEC filing between the date of the Registration Statement and the date of the special meeting of the Accredited and Aames shareholders (which includes the Company's Form 10-Q for the quarter ended June 30, 2006 filed with the SEC on August 9, 2006). These SEC filings contained numerous false and misleading statements, including the Company's reported financial results which were in violation of GAAP as set forth in Section IV.C.

402. Similarly, the Company's SEC filings misleadingly and falsely assured investors that the Company had rigid underwriting policies designed to ensure the credit quality of the Company's portfolio, such as this disclosure in the Company's Form 10-K filed with the SEC on March 16, 2006:

> Our loan officers and account executives work closely with our underwriting group to ensure that *the loan applications that they originate meet the quality standards necessary to make it through the underwriting and funding process.*
>
>          \*        \*        \*
>
> *Each mortgage loan that we originate is underwritten prior to loan closing in accordance with our underwriting guidelines.* We have developed underwriting processes and criteria that we believe generate *high-quality non-prime loans*. Our underwriting guidelines are designed to help us evaluate a borrower's credit history, his or her capacity, willingness and ability to repay the loan, and the value and adequacy of the collateral.
>
>          \*        \*        \*
>
> *Our underwriting process and guidelines require a rigorous application review and documentation designed to maximize the value of our mortgage loans.*

403. None of the defendants named in these Claims made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and Prospectus were accurate and complete in all material respects. Had they exercised reasonable care, these defendants could have known of the material misstatements and omissions alleged herein.

404. At all relevant times, as detailed above, the price of the Company's common stock was artificially inflated as a direct result of defendants' misrepresentations and omissions regarding the Company. When the truth about the Company was partially revealed to the market, the inflation that had been caused by defendants' misrepresentations and omissions was eliminated from the price of the Company's common stock, causing significant damages to holders of Aames common stock who exchanged their stock in Aames for Accredited common stock. For instance, Accredited's common stock reacted to information in the market place, including, but not limited to, the following:

- On October 19, 2006, the Company announced higher delinquency rates and lowers 2006 earnings projections. Analysts reported management had "lost credibility." The stock dropped 11% on the day.

- On February 8, 2007 through February 12, 2007, Accredited stock price dropped from $29 to $24.50 in anticipation of the Company's release of 2006 financial results and as a result of industry news concerning declining credit quality.

- On March 2, 2007, the Company failed to file its Form 10-K with the SEC as required. The stock dropped 3.68%.

- On March 5, 2007, the next trading day after the Company failed to file its Form 10-K, Company was downgraded by Stifel Nicolaus. The stock price dropped 26%.

- On March 12, 2007, after the Company's stock price dropped 28% on the day, the Company issued a press release, after the market closed, disclosing a liquidity crisis resulting from loan repurchases and margin calls on the Company's credit facilities.

- On March 13, 2007, the Company's stock dropped over 65% in response to the Company's press release and disclosure of a severe liquidity crisis.

405. The declines in the Company's securities prices following these revelations, and the resulting damages suffered by plaintiffs are directly attributable to the market's reaction to the disclosure of information that had previously been misrepresented or omitted by defendants, and to the market's adjustment of the Company's securities prices to reflect the newly emerging truth about the Company's condition. Had members of the Class known of the material adverse

1  information not disclosed by defendants named herein, or been aware of the truth behind these

2  defendants' material misstatements, they would not have exchanged their Aames shares for

3  Accredited shares at the artificially inflated price.

4       406.    By reason of the foregoing, defendants named in these Claims violated Section 11

5  of the Securities Act and are liable to the members of the Class who acquired Accredited stock in

6  exchange for Aames stock pursuant to the Registration Statement, each of whom has been

7  damaged by reason of such violations.

8  V.    SIXTH AND SEVENTH CLAIMS FOR RELIEF – For Violations Of Sections 12(a)(2)
         And 15 Of The Securities Act Against Defendants Accredited, Konrath, Lydon,
9        Gunderson, Pratt, Erickson, Espy, Berglund And Marvin

10      407.    Plaintiffs incorporate by reference the allegations of the Fourth and Fifth Claims

11 for Relief at ¶¶344-406 above as though fully set forth herein.

12      408.    Lead Plaintiff and Plaintiff William F. Kornfeld ("Kornfeld") assert these Claims

13 on behalf of themselves and the other members of the Class who acquired Accredited stock in

14 exchange for Aames stock pursuant to the Registration Statement against defendants Accredited,

15 Konrath, Lydon, Gunderson, Pratt, Erickson, Espy, Berglund and Marvin for violations of

16 Section 12(a)(2) of the Securities Act, 15 U.S.C. §§ 77l(a)(2).  This Claim is also asserted

17 against defendants Konrath and Lydon for violation of Section 15 of the Securities Act, 15

18 U.S.C. §§ 77o, by virtue of their direct and indirect control and domination of Accredited.

19 Defendants named in this Claim caused plaintiffs in the Class to acquire their Accredited shares

20 by use of the Prospectus, included as part of the Registration Statement.

21      409.    The allegations giving rise to these Claims do not rest upon, involve or derive

22 from any allegations of fraud or fraudulent conduct by defendants named in these Claims.

23      410.    By use of the Prospectus, which contained the materially misleading statements

24 and omitted material facts in the Registration Statement as set forth above in ¶¶388-403,

25 Accredited exchanged its common stock for the Aames stock owned by plaintiffs in the Class.

26 The defendants named in these Claims actively and jointly caused to be drafted, revised and

27 approved the Prospectus, which was provided to plaintiffs, finalized it and caused it to become

28 effective.  But for these defendants having drafted, filed or signed the Registration Statement

including the Prospectus, the merger between Accredited and Aames would not have closed and plaintiffs named in these Claims would not have acquired Accredited shares, as further alleged herein. These defendants also solicited the exchange of Aames shares by institutional investors, fund managers and other investment professionals by means of the Prospectus.

411. Absent the effort by defendants named in these Claims, as set forth above, the exchange of Accredited shares for Aames shares could not and would not have been accomplished. At all relevant times, these defendants knew, or in the exercise of reasonable care should have known, of the material untrue statements in and omissions from the Prospectus, as set forth above.

412. None of the untrue statements and omissions from the Prospectus as described herein were known to plaintiffs at the time they acquired Accredited shares, pursuant to the Prospectus.

413. By reason of the conduct alleged herein, the defendants named in these Claims violated Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2). As a direct and proximate cause of defendants' violation of Section 12(a)(2), plaintiffs named in these Claims have sustained damages. These plaintiffs seek rescission to recover the consideration paid for their Aames common stock. These plaintiffs hereby tender their Accredited shares, or proceeds from the sale thereof, to defendants named in these Claims in exchange for the value of the consideration paid for such shares, plus interest. In the alternative, these plaintiffs seek recovery of damages in an amount to be proven at trial.

414. This action was brought within one year after the discovery of the untrue statements and omissions (and within one year after such discovery should have been made in the exercise of reasonable diligence) and within three years after the acquisition of Aames by Accredited and within three years after the shares were sold to plaintiffs named in these Claims.

VI. CLASS ACTION ALLEGATIONS – APPLICABLE TO ALL CLAIMS

415. Plaintiffs incorporate ¶¶1-414 of Claims I-VII of the Complaint.

416. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all those who purchased or acquired the securities of

Accredited between November 1, 2005 and March 12, 2007 (the "Class"), and who were damaged thereby.  Plaintiffs also bring claims arising under the Securities Act on behalf of all Class members who acquired Accredited shares issued pursuant to a Registration Statement and Prospectus for the merger between Accredited and Aames.  Excluded from the Class are defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

417.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Accredited common shares were actively traded on the NASDAQ National Market under the ticker symbol LEND.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  As of November 3, 2006, Accredited had 25,261,309 issued and outstanding shares of common stock.  In 2004, Accredited's REIT subsidiary issued approximately 4 million shares of preferred shares equivalent to approximately $100 million.  The preferred shares were traded on the New York Stock Exchange under the ticker symbol AHH.PrA.  Prior to its acquisition by Accredited, Aames had approximately 32 million shares outstanding.  Record owners and other members of the Class may be identified from records maintained by Accredited or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

418.    Lead Plaintiff's claims and those of plaintiff Kornfeld are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

419.    Lead Plaintiff and plaintiff Kornfeld will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

420. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Accredited; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

421. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

VII.  PRAYER FOR RELIEF – APPLICABLE TO ALL CLAIMS

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

(i) Determining that this action is a proper class action and certifying Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

(ii) Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including prejudgment and post-judgment interest thereon;

(iii) Awarding Lead Plaintiff and the Class their reasonable costs, expenses and attorneys' fees incurred in connection with this action; and

(iv) Awarding such other and further relief as the Court finds just and proper.

VIII.   JURY DEMAND – APPLICABLE TO ALL CLAIMS

        Plaintiffs demand a trial by jury.

Dated:  August 24, 2007                    Respectfully submitted,

                                           BERNSTEIN LITOWITZ BERGER
                                             & GROSSMANN LLP


                                                 /s/ David R. Stickney
                                                DAVID R. STICKNEY

                                           DAVID R. STICKNEY
                                           MATTHEW P. SIBEN
                                           12481 High Bluff Drive, Suite 300
                                           San Diego, CA 92130
                                           Tel:    (858) 793-0070
                                           Fax:    (858) 793-0323
                                                      -and-
                                           CHAD JOHNSON
                                           1285 Avenue of the Americas
                                           New York, NY  10019
                                           Tel:    (212) 554-1400
                                           Fax:    (212) 554-1444

                                           *Attorneys for Lead Plaintiff Arkansas Teacher*
                                           *Retirement System and Lead Counsel to the Class*


                                           CHIMICLES & TIKELLIS, LLP
                                           MICHAEL D GOTTSCH
                                           KIMBERLY M. DONALDSON
                                           361 West Lancaster Avenue
                                           Haverford, PA 19041
                                           Tel:    (610) 642-8500
                                           Fax:    (610) 649-3633


                                           SARRAF GENTILE LLP
                                           RONEN SARRAF
                                           JOSEPH GENTILE
                                           485 Seventh Avenue, Suite 1005
                                           New York, NY 10018
                                           Tel:    (212) 868-3610
                                           Fax:    (212) 918-7967


                                           *Attorneys for Plaintiff William F. Kornfeld, Jr.*

# TABLE OF CONTENTS TO EXHIBITS

**Page**

Exhibit A: Certification of Chief Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 signed by James A. Konrath on November 9, 2005.................................................................. 1

Exhibit B: Certification of Chief Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 signed by John S. Buchanan on November 9, 2005.................................................................. 2

Exhibit C: Certification of Chief Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 signed by James A. Konrath on March 15, 2006.................................................................. 3

Exhibit D: Certification of Chief Executive (sic) Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 signed by John S. Buchanan on March 15, 2006.................................................................. 4

Exhibit E: Certification of Chief Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 signed by James A. Konrath on May 9, 2006.................................................................. 5

Exhibit F: Certification of Chief Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 signed by John S. Buchanan on May 9, 2006.................................................................. 6

Exhibit G: Certification of Chief Executive Officer Pursuant to Rule 13a-14a/15d-14(a) signed by James A. Konrath on August 9, 2006....... 7

Exhibit H: Certification of Principal Financial Officer Pursuant to Rule 13a-14a/15d-14(a) signed by Stuart D. Marvin on August 9, 2006......... 8

Exhibit I: Certification of Chief Executive Officer Pursuant to Rule 13a-14a/15d-14(a) signed by James A. Konrath on November 9, 2006..... 9

Exhibit J: Certification of Principal Financial Officer Pursuant to Rule 13a-14a/15d-14(a) signed by Stuart D. Marvin on November 9, 2006...... 10

EXHIBIT 31.1

**Certification of Chief Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, James A. Konrath, certify that:

1. I have reviewed this Form 10-Q of Accredited Home Lenders Holding Co.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13(a)-15(f) and 15(d)-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal controls over financial reporting, or caused such internal controls over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent function):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: November 9, 2005

By:    /s/  JAMES A. KONRATH

                James A. Konrath
                Chief Executive Officer and
                Chairman of the Board

EXHIBIT 31.2

### Certification of Chief Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

I, John S. Buchanan, certify that:

1. I have reviewed this Form 10-Q of Accredited Home Lenders Holding Co.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13(a)-15(f) and 15(d)-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal controls over financial reporting, or caused such internal controls over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent function):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: November 9, 2005

By:    /s/  JOHN S. BUCHANAN

**John S. Buchanan**
**Chief Financial Officer**

Exhibit 31.1

## Certification of Chief Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

I, James A. Konrath, certify that:

1. I have reviewed this annual report on Form 10-K of Accredited Home Lenders Holding Co.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter of 2005 that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of trustees (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 15, 2006

By: _____ /s/ JAMES A. KONRATH _____

James A. Konrath
Chief Executive Officer and
Chairman of the Board

EXHIBIT C
-3-

Exhibit 31.2

**Certification of Chief Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, John S. Buchanan, certify that:

1. I have reviewed this annual report on Form 10-K of Accredited Home Lenders Holding Co.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter of 2005 that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of trustees (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 15, 2006

By:  /s/  JOHN S. BUCHANAN
John S. Buchanan
Chief Financial Officer

Exhibit 31.1

**Certification of Chief Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, James A. Konrath, certify that:

1. I have reviewed this Form 10-Q of Accredited Home Lenders Holding Co.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13(a)-15(f) and 15(d)-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal controls over financial reporting, or caused such internal controls over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent function):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: May 9, 2006

By: /s/ JAMES A. KONRATH
James A. Konrath
Chief Executive Officer and
Chairman of the Board

Exhibit 31.2

**Certification of Chief Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, John S. Buchanan, certify that:

1. I have reviewed this Form 10-Q of Accredited Home Lenders Holding Co.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13(a)-15(f) and 15(d)-15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal controls over financial reporting, or caused such internal controls over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent function):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: May 9, 2006

By: /s/ JOHN S. BUCHANAN
     John S. Buchanan
     Chief Financial Officer

EXHIBIT F

Exhibit 31.1

## Certification of Chief Executive Officer Pursuant to Rule 13a-14a/15d-14(a)

I, James A. Konrath, certify that:

1. I have reviewed this Form 10-Q of Accredited Home Lenders Holding Co.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13(a)-15(f) and 15(d)-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal controls over financial reporting, or caused such internal controls over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent function):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: August 9, 2006

By: /s/ JAMES A. KONRATH
    James A. Konrath
    Chairman of the Board and
    Chief Executive Officer

Exhibit 31.2

### Certification of Principal Financial Officer Pursuant to Rule 13a-14a/15d-14(a)

I, Stuart D. Marvin, certify that:

1. I have reviewed this Form 10-Q of Accredited Home Lenders Holding Co.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13(a)-15(f) and 15(d)-15(f)) for the registrant and have:

   a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)  Designed such internal controls over financial reporting, or caused such internal controls over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent function):

   a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: August 9, 2006

By: /s/ STUART D. MARVIN
Stuart D. Marvin
Executive Vice President and Secretary

Exhibit 31.1

### Certification of Chief Executive Officer Pursuant to Rule 13a-14a/15d-14(a)

I, James A. Konrath, certify that:

1. I have reviewed this Form 10-Q of Accredited Home Lenders Holding Co.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13(a)-15(f) and 15(d)-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal controls over financial reporting, or caused such internal controls over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent function):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: November 9, 2006

By: /S/ JAMES A. KONRATH
    James A. Konrath
    Chairman of the Board and
    Chief Executive Officer

EXHIBIT I
-9-

**Exhibit 31.2**

### Certification of Principal Financial Officer Pursuant to Rule 13a-14a/15d-14(a)

I, Stuart D. Marvin, certify that:

1. I have reviewed this Form 10-Q of Accredited Home Lenders Holding Co.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13(a)-15(f) and 15(d)-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal controls over financial reporting, or caused such internal controls over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent function):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: November 9, 2006

By: /s/ STUART D. MARVIN
    Stuart D. Marvin
    Executive Vice President and Secretary
